# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| FRANK GARRISON, <br><br> Plaintiff, <br><br> v. <br><br> U.S. DEPARTMENT OF EDUCATION, <br><br> & <br><br> MIGUEL CARDONA, in his official capacity as U.S. SECRETARY OF EDUCATION <br><br> Defendants. | CIVIL ACTION NO.: 1:22-cv-1895 <br><br> **COMPLAINT** <br><br> *JURY TRIAL DEMANDED* |

## INTRODUCTION

Student debt cancellation has been the subject of great debate in America for at least a decade. Some argue that the government should provide relief to students to offset skyrocketing tuition costs and the consequent debt incurred by many to attend college. Others point to the regressive quality of student debt relief, arguing that it is unfair to cancel student debts that were freely assumed with taxes raised from those who predominately have not attended college, or attended but avoided debt, or paid it off. Congress has authorized a variety of student debt relief programs, including the Public Service Loan Forgiveness program, by which some debt is written off for students who choose to work in relatively lower-paying public service or non-profit organization positions after graduation and follow program rules for a period of years. Perhaps because of the costs of student loan cancellation, or its potential impact on the economy, or the inherently divisive nature of this debate, Congress has declined to enact more sweeping debt

1

cancellation. This is, of course, Congress's prerogative under our Constitution, as Congress is the branch of government that possesses the exclusive power to make law.

Purporting to step into the breach left by Congress, and making good on a campaign promise, the President in August announced that his administration would, by October, begin canceling between $10,000 and $20,000 of loan debts categorically—without respect to hardship or Congressionally authorized program rules—for more than 40 million borrowers. The authority for this $500 billion write-off, according to the administration, can be found in a 2003 law passed in response to the Iraq war as a means of aiding veterans and their families. This law—the Higher Education Relief Opportunities for Students or "HEROES" Act—authorizes the Secretary of Education to "waive or modify any statutory or regulatory provision applicable to" student aid programs when "necessary in connection with a war or other military operation or national emergency." 20 U.S.C. § 1098bb(a)(1). Importantly, to qualify for such a waiver or modification, individuals must reside or be employed in a "disaster area" as declared by a "Federal, State, or local official in connection with a national emergency." Concluding that the entire nation is a "disaster area" because of the COVID pandemic, the administration claims that the Secretary of Education has the power to "automatically" issue blanket loan forgiveness to 8 million borrowers in the first week of October.

Despite the staggering scope of this regulatory action, it was taken with breathtaking informality and opacity. The Department did not undertake the notice-and-comment process required for rulemaking, much less solicit any public input. It did not even issue a formal order or directive setting out its cancellation program. Instead, it issued a press release on August 12th along with two legal memoranda providing its justifications, and, later, a hastily created a FAQ section on its website.

2

In the rush, the administration has created new problems for borrowers in at least six states that tax loan cancellation as income. People like Plaintiff Frank Garrison will actually be worse off because of the cancellation. Indeed, Mr. Garrison will face immediate tax liability from the state of Indiana because of the automatic cancellation of a portion of his debt. These taxes would not be owed for debt forgiveness under the Congressionally authorized program rewarding public service. Mr. Garrison and millions of others similarly situated in the six relevant states will receive no additional benefit from the cancellation—just a one-time additional *penalty*.

Nothing about loan cancellation is lawful or appropriate. In an end-run around Congress, the administration threatens to enact a profound and transformational policy that will have untold economic impacts. The administration's lawless action should be stopped immediately.

## **PARTIES**

1. Plaintiff Frank Garrison is an individual who resides within the jurisdiction of the U.S. District Court for the Southern District of Indiana. He is employed by Pacific Legal Foundation, a 501(c)(3) non-profit organization in a position that qualifies him for the Congressionally authorized Public Service Loan Forgiveness program.

2. Defendant U.S. Department of Education (ED) is an agency of the United States.

3. Defendant ED will implement the challenged regulatory action in this case—cancellation of federal student loan debt for more than 40 million Americans (loan cancellation).

4. Defendant Miguel Cardona (Secretary Cardona) is the U.S. Secretary of Education and is sued in his official capacity.

5. Defendant Secretary Cardona is the agency head of Defendant ED, which is responsible for issuing and implementing the challenge regulatory action.

6. Throughout this Complaint, Defendants are referred to jointly as ED or the Department except where otherwise specified.

## JURISDICTION AND VENUE

7. This Court has federal question jurisdiction pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331.

8. This Court has the authority to grant an injunction and declaratory judgment and to "set aside" agency action in this matter pursuant to 28 U.S.C. §§ 2201, 2202 and 5 U.S.C. §§ 705, 706(2).

9. Venue for this action properly lies in this district pursuant to 5 U.S.C. § 703 and 28 U.S.C. § 1391(b)(2), (e)(1) because a defendant resides in this district, Plaintiff resides in this judicial district, and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## STATEMENT OF FACTS

### I. BACKGROUND

#### A. Statutory Background

10. The Higher Education Act (HEA) establishes the Direct Loan Program (DLP) and Federal Family Education Loan Program (FFELP). 20 U.S.C. §§ 1071 *et seq.*, 1087a *et seq.*

11. The HEA and its implementing federal regulations provide a comprehensive legal framework governing federal student loan assistance and borrowers' obligations to repay their loans, including how and when certain loan statuses qualify for income-driven repayment (IDR) and the Public Service Loan Forgiveness (PSLF) program.

12. The HEA sets forth the "[t]erms and conditions" of DLP loans, including the "[r]epayment plan for public service employees" and "income-based repayment plan." *Id*. § 1087e. Federal

regulation also specifies the conditions under which "[a] borrower may obtain loan forgiveness under [the FFELP] program," 34 C.F.R. § 685.219(c), and under which a borrower "qualif[ies] for loan forgiveness" under the IDR program, *id*. § 685.221(f).

**B. The Department's Actions**

13. While on the campaign trail in 2020, then-candidate Biden promised to provide sweeping relief to federal student loan borrowers.

14. For instance, Mr. Biden tweeted on March 22, 2020, "We should forgive a minimum of $10,000/person of federal student loans, as proposed by Senator Warren and colleagues."

15. In October 2021, ED announced "transformational changes" to the PSLF program. U.S. Department of Education, *U.S. Department of Education Announces Transformational Changes to the Public Service Loan Forgiveness Program, Will Put Over 550,000 Public Service Workers Closer to Loan Forgiveness* (Oct. 6, 2021).

16. ED later stated that this "[r]evamping" of the PSLF program has already resulted in loan relief for approximately 100,000 borrowers under that program. U.S. Department of Education, *Biden-Harris Administration Extends Student Loan Pause Through August 31* (Apr. 6, 2022).

17. In April 2022, ED announced additional actions to provide loan forgiveness to borrowers through the PSLF program and IDR plans, which it estimated would result in debt cancellation for more than 40,000 borrowers and credit toward IDR forgiveness for millions more. U.S. Department of Education, *Department of Education Announces Actions to Fix Longstanding Failures in the Student Loan Programs* (Apr. 19, 2022).

18. On August 24, 2022, President Biden finally revealed his new regulatory policy by press release.

19. On that date, ED announced that it plans to cancel $10,000 to $20,000 in student debt for all borrowers with ED-owned loans and annual income "during the pandemic" less than $125,000 (or $250,000 for households).

20. According to ED, "The U.S. Department of Education will provide up to $20,000 in debt cancellation to Pell Grant recipients with loans held by the Department of Education and up to $10,000 in debt cancellation to non-Pell Grant recipients. Borrowers are eligible for this relief if their individual income is less than $125,000 or $250,000 for households." U.S. Department of Education, *One-Time Student Loan Debt Relief*, https://studentaid.gov/debt-relief-announcement/one-time-cancellation (last accessed Sept. 26, 2022).

21. The Department estimates that approximately 40 million borrowers would receive this relief, including approximately 856,400 in the state of Indiana. *FACT SHEET: The Biden-Harris Administration's Plan for Student Debt Relief Could Benefit Tens of Millions of Borrowers in All Fifty States*, White House (Sept. 20, 2022).

22. Independent estimates calculate the one-time cost of debt cancellation to be up to $519 billion. *See* Chen, Smetters & Paulson, *The Biden Student Loan Forgiveness Plan: Budgetary Costs and Distributional Impact*, University of Pennsylvania, Wharton School (August 26, 2022).

23. Many borrowers will have cancellation automatically applied to them almost immediately.

24. According to the White House, "Nearly 8 million borrowers may be eligible to receive relief automatically because relevant income data is already available to the U.S. Department of Education." *FACT SHEET: President Biden Announces Student Loan Relief for Borrowers Who Need It Most*, White House (Aug. 24, 2022).

25. For the "8 million people for whom" the Department "ha[s] data," they "will get the relief automatically."

26. Indeed, ED has emphasized on its website that, "Although most borrowers will have to apply for debt relief, we have income data on hand for around 8 million borrowers. These borrowers will get the relief automatically." *One-Time Student Loan Debt Relief*, https://studentaid.gov/debt-relief-announcement/one-time-cancellation (last accessed Sept. 26, 2022).

27. ED will apply this automatic cancellation in early October.

28. For other borrowers, "If the U.S. Department of Education doesn't have your income data, the Administration will launch a simple application which will be available by early October." U.S. Department of Education, The Biden-Harris Administration's Student Debt Relief Plan Explained, https://studentaid.gov/debt-relief-announcement/ (last accessed Sept. 26, 2022).

29. "Once a borrower completes the application, they can expect relief within 4-6 weeks." *Id.*

30. The "automatic[]" cancellation for the approximate 8 million borrowers applies to borrowers who have provided income or other information to ED or their servicer because they have enrolled in programs like IDR or have certified payments made under PSLF. *Id.*

31. According to ED, for those receiving automatic cancellation, "Your loan servicer will notify you when the relief has been applied to your account, with details on how the relief was applied." U.S. Department of Education, *One-Time Student Loan Debt Relief*, https://studentaid.gov/debt-relief-announcement/one-time-cancellation (last accessed Sept. 26, 2022).

32. ED has not issued a formal rule and has not complied with notice-and-comment rulemaking procedures concerning the loan cancellation.

33. ED has also confirmed that it does not intend to undergo formal rulemaking or submit its actions to Congress under the Congressional Review Act.

### C. The Purported Source of Authority for ED's Action

34. ED stated that it had determined that the Higher Education Relief Opportunities for Students (HEROES) Act of 2003 provides the Secretary of Education with legal authority to cancel student debt.

35. The HEROES Act was passed in 2003, in response to the Iraq war as a means of providing assistance to veterans and their family.

36. It provides that ED may "waive or modify any statutory or regulatory provision applicable to the student financial assistance programs" when "necessary in connection with a war or other military operation or national emergency." 20 U.S.C. § 1098bb(a)(1).

37. The Act further specifies, as relevant here, that this waiver or modification must be "necessary to ensure that" one of certain statutory objectives are achieved, including to ensure that "recipients of student financial assistance . . . are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals." *Id*. § 1098bb(a)(2)(A).

38. In a legal memorandum issued with its announcement of loan cancellation, ED revoked a prior Department legal analysis of the issue and asserted that the HEROES Act "grants the Secretary authority that could be used to effectuate a program of targeted loan cancellation directed at addressing the financial harms of the COVID-19 pandemic." Lisa Brown, General Counsel, U.S. Department of Education, *The Secretary's Legal Authority for Debt Cancellation* at 1 (Aug. 23, 2022).

39. ED further claimed that it is "not required to show that any individual borrower is entitled to a specific amount of relief" and "instead may provide relief on a categorical basis." *Id.* at 3.

40. In a separate memo published that same day, the Office of Legal Counsel concluded that "the Secretary can exercise the waiver or modification authority granted by the HEROES Act of 2003 to reduce or cancel the principal balances of student loans[.]" Christopher H. Schroeder, Asst. Attorney General, U.S. Dept. of Justice, Office of Legal Counsel, *Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans*, Memorandum Op. for the General Counsel, Dept. of Education, 46 Op. O.L.C. ___, Slip Op. at 24 (Aug. 23, 2022) (OLC Memo).

41. As an initial matter, OLC concluded that because ED may waive or modify "any" covered statutory or regulatory provision, it may waive or modify any provisions "applicable to the repayment of the principal balances of loans." *Id*. at 2.

42. The memo then proceeded to analyze three relevant criteria governing the Secretary of Education's authority under the Act to effect mass cancellation. *Id.* at 19.

43. First, it considered whether cancellation is directed toward "affected individuals," *id.*, which here includes individuals who "reside[] or [are] employed in an area that is declared a disaster area by any Federal, State, or local official in connection with a national emergency." 20 U.S.C. § 1098ee(2).

44. OLC noted that all of the United States and its permanently populated territories had been declared a disaster area due to COVID-19 and therefore all persons residing or working in those areas were eligible (along with anyone who suffered direct economic hardship due to the pandemic). *Id.* at 21.

45. Second, OLC observed that, under the Act, a waiver or modification "would be permissible only as may be necessary to ensure the individuals are not placed in a 'worse position financially . . . *because of*'" their status as affected individuals. *Id.* (quoting 20 U.S.C. § 1098bb(a)(2)(A) (emphasis added)).

9

46. According to OLC, this required ED to "determine that the COVID-19 pandemic was a but-for cause of the financial harm" to be addressed by mass debt cancellation. *Id.*

47. Third, the OLC memo considered the Act's requirement that any waiver and modification "be necessary" to "ensure" that affected individuals "*are not placed in a worse position financially in relation to that financial assistance* because of their status as affected individuals." *Id.* at 22 (quoting 20 U.S.C. § 1098bb(a)(2) (emphasis added)).

48. OLC read this requirement to mean that any waiver or modification should "put loan recipients back into the financial position they would be in" in relation to their loans "were it not for the national emergency." *Id.* at 21.

49. Having defined the Act's criteria for waiver or modification, OLC then analyzed whether "within these parameters" the Secretary was authorized to implement mass debt cancellation.

50. At this point, the memo balked at reaching a firm conclusion, stating only that affording "broad, categorical" debt cancellation "*could be* an appropriate invocation of the Act." *Id.* OLC asserted that the Secretary has unlimited discretion to make this analysis as he "deems necessary." *Id.* at 22.

51. OLC also claimed to find "contextual clues" in the Act that "Congress used the word 'necessary' in a more flexible and capacious sense, as meaning 'appropriate' or 'conducive' rather than 'essential.'" *Id.* at 23.

52. In addition, the memo implicitly acknowledged the lack of a "closely tailored fit" between ED's mass debt cancellation plan and the Act's waiver requirements—in particular, the requirement that the waiver be necessary to restore affected individuals to the position they would have been in but for the pandemic-caused financial harm to their student loans. *Id.*

53. But no such "fit" is necessary, OLC concluded, because the Secretary need not proceed "case-by-case" under the Act and is allowed to "minimize 'administrative requirements.'" *Id.*

**II. THE EFFECT ON PLAINTIFF**

54. Mr. Garrison financed his college education using federal student loans, which have been consolidated and are currently serviced by the Missouri Higher Education Loan Authority (MOHELA).

55. Mr. Garrison was also a Pell Grant recipient.

56. Since entering the workforce Mr. Garrison has worked in the public interest and has pursued PSLF while making timely monthly payments on his outstanding loan debt.

57. Mr. Garrison has also enrolled in income-driven repayment, which has capped his monthly payment amount based on his income.

58. Mr. Garrison has regularly certified both his IDR eligibility and PSLF payments with his loan servicers.

59. As of October 2021, the Department of Education recognized that Mr. Garrison had made 57 payments toward PSLF while working in qualifying public service employment.

60. Since that time, he has accrued additional qualifying payments towards PSLF.

61. As of October 2021, Mr. Garrison also certified his IDR eligibility with the Department, through his servicer, and voluntarily disclosed his yearly tax information to the Department to support that certification.

62. Mr. Garrison intends to continue making monthly payments toward PSLF and expects to qualify for full forgiveness based on his public service in slightly more than four years.

63. Mr. Garrison is a current resident of the State of Indiana.

64. By statute, any loan forgiveness that Mr. Garrison receives pursuant to the pre-existing PSLF program, as it was enacted prior to January 1, 2020, will not be taxed in the State of Indiana as income. *See* Ind. Code § 6-3-1-3.5(a)(30).

65. Mr. Garrison qualifies for $20,000 in loan cancellation under ED's impending regulatory action, as his household income is less than $125,000 per year, he holds eligible student loan debt, and was a Pell Grant recipient.

66. As a borrower who has recently certified his employment status and income with ED through his servicer, Mr. Garrison will also be in the class of automatic cancellation during the first week of October 2022.

67. Under Indiana law, when Mr. Garrison receives $20,000 in automatic cancellation of his federal student loan debt, he will face a state income tax liability of more than $1,000 for 2022. *See* Ind. Code § 6-3-1-3.5(a)(30).

68. Mr. Garrison would not incur that state tax liability if not for the Department's automatic cancellation of a portion of his federal student loan debt.

69. Because Mr. Garrison otherwise intends to seek forgiveness under PSLF and has limited monthly payments under IDR, a $20,000 reduction in his total indebtedness will not change either his monthly payment obligation or the total amount of the loans he must repay.

70. ED's loan cancellation will cause Mr. Garrison to incur a financial obligation that he would not otherwise have faced.

### **COUNT I—VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)—RULE IN EXCESS OF STATUTORY AUTHORITY**

71. Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

72. "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S.

204, 208 (1988). Thus, "an agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). The Administrative Procedure Act (APA) directs a court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right" or "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2)(A), (B), (C).

73. "'[A]gency action' includes the whole or a part of an agency rule, order, license, sanction, relief[.]" 5 U.S.C. § 551(13).

74. ED's debt cancellation is reviewable agency action as it is a final decision by the agency that has sweeping legal consequences.

75. The cancellation, announced formally and supported by two memos, one from ED's own general counsel and one from OLC, marks the consummation of the Department's decision-making process concerning its decision to cancel student loans.

76. The action also determines rights and legal obligations, as it purports to erase more than $500 billion in federal student debt, for more than 40 million borrowers, and does so automatically for up to 8 million borrowers.

77. The Department has no lawful authority to issue the rule.

78. The debt cancellation is not justified by the HEROES Act because, among other reasons, the cancellation is neither "necessary," nor is it targeted at harms that are "a direct result of a . . . national emergency." *See* 20 U.S.C. § 1098ee(2).

79. The putative harms targeted by the cancellation are not a "direct result" of the "national emergency" surrounding the COVID-19 pandemic, as student loan borrowers are not directly

"affected individuals" who "suffered direct economic hardship as a direct result of a war or other military operation or national emergency." *See* 20 U.S.C. § 1098ee(2).

80. The mass cancellation is also hardly "necessary" to mitigate the economic harms of the pandemic. *See* 20 U.S.C. § 1098bb(a)(2)(A).

81. Cancellation also runs afoul of the requirement in Section 1098bb(a)(2) that borrowers "are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals." For borrowers like Mr. Garrison, as well as other borrowers in other states that tax cancellation as income, the overall debt burden increases as a result of the Department's debt cancellation program.

82. Cancellation also affords relief to those who are "not placed in a worse position financially in relation to [their] financial assistance because of their status as affected individuals," because it extends to individuals who are not worse off compared to early 2020, individuals who are not worse off relative to their federal student loans, and individuals who are not worse off because of their status as affected individuals.

83. Additionally, to the extent the statute can *arguably* justify the cancellation, the major questions doctrine requires a clear authorization by Congress of such an economically and politically significant action, which is lacking here. *See West Virginia v. EPA*, No. 20-1530, 2022 WL 2347278 (U.S. June 30, 2022).

84. Without a valid source of authority, the Secretary has "literally has no power to act." *See La. Pub. Serv. Comm'n*, 476 U.S. at 374.

85. The impending cancellation was issued in excess of statutory authority and is therefore invalid.

86. As a result of the foregoing, Plaintiff is entitled to a declaratory judgment and permanent injunction barring any cancellation action, attorneys' fees, expenses, costs and disbursements, and any other relief that may be appropriate.

## COUNT II—VIOLATION OF U.S. CONSTITUTION, NON-DELEGATION DOCTRINE AND SEPARATION OF POWERS

87. Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

88. The APA directs a court to "hold unlawful and set aside" an agency's rule that is "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

89. Article I, § 1, of the Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States."

90. No agency has any inherent power to make law, and "an agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n*, 476 U.S. at 374.

91. Article II, § 3, of the Constitution directs that the President "shall take Care that the Law be faithfully executed . . . ."

92. A "fundamental precept" of "another strand of [] separation-of-powers jurisprudence, the delegation doctrine," "is that the lawmaking function belongs to Congress, U.S. Const., Art. I, § 1, and may not be conveyed to another branch or entity." *Loving v. United States*, 517 U.S. 748, 758 (1996).

93. Congress may not "abdicate or [] transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935).

94. The HEROES Act empowers an Executive official to "waive or modify any statutory . . . provision" as that official "deems necessary." 20 U.S.C. § 1098bb(a)(1).

95. Such waiver or modification of a statute has a "legislative character," as "confirmed by the character of the Congressional action it supplants"—legislative amendment. *INS v. Chadha*, 462 U.S. 919 (1983).

96. The statute permits the Secretary to suspend the law, to "modify" it with his own "terms and conditions," 20 U.S.C. § 1098bb(a)(1), (b)(2), and to do so when and how "[he] deems necessary," *id.* § 1098bb(a)(1).

97. The statute thus bestows the Executive with lawmaking power in violation of Article I of the Constitution.

98. As a result of the foregoing, Plaintiff is entitled to a declaratory judgment and permanent injunction declaring the delegations in 20 U.S.C. § 1098bb(a)(1) invalid, barring any cancellation action, attorneys' fees, expenses, costs and disbursements, and any other relief that may be appropriate.

## **PRAYER FOR RELIEF**

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

(i) The issuance of an injunction, pursuant to 5 U.S.C. § 705 and 28 U.S.C. § 2201, prohibiting Defendants from enacting loan cancellation;

(ii) A declaratory judgment, pursuant to 5 U.S.C. § 706(2) and 28 U.S.C. § 2202, holding unlawful and setting aside any action by Defendants to enact loan cancellation;

(iii) A declaratory judgment and permanent injunction declaring the delegations in 20 U.S.C. § 1098bb(a)(1) invalid;

(iv) An award of attorneys' fees and costs to Plaintiff; and

(v) Any other relief as the Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

DATED: September 27, 2022.

Respectfully submitted,

*/s/ Caleb Kruckenberg*
**CALEB KRUCKENBERG\***
Pacific Legal Foundation
3100 Clarendon Blvd, Suite 610
Arlington VA 22201
Telephone: 202-888-6881
incominglit@pacificlegal.org


**MICHAEL POON\***
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
incominglit@pacificlegal.org

*\*Pro Hac Vice pending*
*Attorneys for Plaintiff*