**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| FRANK GARRISON,<br><br>     Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION,<br><br>&<br><br>MIGUEL CARDONA, U.S. SECRETARY OF EDUCATION<br><br>     Defendants. | CIVIL ACTION NO.: 1:22-cv-1895 |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION**
**FOR TEMPORARY RESTRAINING ORDER**

**Relief requested on or before September 29, 2022**

Student debt cancellation is among the most contentious, most hotly debated proposals in the nation today. And although Congress has erected established pathways for loan forgiveness, such as the Public Service Loan Forgiveness program, some press that the government must do more to cancel loan principals more broadly. Nevertheless, Congress has declined to do so. Dissatisfied with Congress's response, the President announced in August that the Department of Education will unilaterally cancel up to $20,000 in loan principal for each of 40 million borrowers at a cost of over $500 billion. Of those 40 million borrowers, 8 million will have their debts canceled automatically. This extraordinary act of Executive lawmaking is to be taken with equally extraordinary opacity and informality, with cancellations beginning in early October without so much as notice and comment. The Executive thus seized from Congress the prerogative to "make major policy decisions." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (simplified).

In their rush to enact debt cancellation, Defendants Secretary of Education Miguel Cardona and the Department of Education will inflict new harms on Plaintiff Frank Garrison and nearly 1.1 million others. In at least six states, including Indiana where Plaintiff resides, the automatically canceled loan principal will give rise to tax liability. Yet for Plaintiff and others participating in pre-existing, congressionally authorized debt forgiveness programs, Defendants' debt cancellation will not actually reduce the amount borrowers pay back. The result is that Plaintiff and more than one million others in his shoes, *New Analysis: More Than 9 Million Public Service Workers with Federal Student Loans Eligible to Pursue Debt Relief, Fewer Than 2 Percent Have Received Relief, and Only 15 Percent On Track*, Student Borrower Protection Center (June 9, 2022) (Summing up "[n]umber of public service workers with student loan debt" in Indiana, Missouri, Minnesota, Arkansas, North Carolina, and Wisconsin), will simply receive a tax penalty with no corresponding benefit—and that tax liability will arise as soon as Defendants implement the cancellation in early October.

To prevent this irreparable harm, Plaintiff respectfully moves for a temporary restraining order preventing Defendants from implementing the cancellation. The claimed basis for the cancellation is the HEROES Act, a statute enacted in 2003 during the Iraq war to provide relief to veterans and their families. But never before has the Act been used to unilaterally cancelling debts en masse at a cost of half a trillion dollars. And no wonder: Defendants' debt cancellation far exceeds the statute's reasonable constraints. Statutes must provide "clear congressional authorization" when the Executive claims "extravagant statutory power over the national economy." *West Virginia*, 142 S. Ct. at 2609 (simplified). The Act does not clearly authorize Defendants' debt cancellation; in fact, its terms clearly forbid the scope of the cancellation. Further, the use of the Act in this manner inflicts a grievous wound on our constitutional order. To

support Defendants' debt cancellation, they invoke the Secretary's authority under the Act to "waive or modify . . . statutory . . . provision[s]" that require loan repayment and replace them with the Secretary's own "terms and conditions." 20 U.S.C. § 1098bb(a)(1), (b)(2). But such direct interference with statute is lawmaking reserved for Congress by the Constitution.

The Court should enter a temporary restraining order. Not only is Plaintiff likely to succeed on the merits and to satisfy the other requirements of a TRO, but temporarily enjoining Defendants' loan cancellation will allow the Court to preserve the status quo and provide time to consider Plaintiff's Motion for Preliminary Injunction and the lawfulness of $500 billion in loan cancellation that, as a practical matter, cannot be reversed once it happens. No borrower will be disadvantaged by this short pause because loan repayments and interest accruals have been paused since March 2020. In short, even if the loan cancellation program is valid and lawful, there is no rush to get it done less than two months after it was announced.

Should the Court deny Plaintiff's motion, Plaintiff respectfully requests that the Court immediately rule on Plaintiff's contemporaneously filed Motion for Preliminary Injunction, so that Plaintiff may seek appellate relief before Defendants implement their cancellation of student loans and inflict irreparable harm on Plaintiff and others like him. *See Wheeler v. Talbot*, 770 F.3d 550, 552 (7th Cir. 2014) (holding that district courts may deny preliminary injunctions without notice to adverse parties, including before adverse parties are served, and that an order doing so "may be appealed immediately").

## I.    FACTUAL BACKGROUND

### A.    Federal student loans, repayment, and forgiveness

The Higher Education Act establishes the Direct Loan Program (DLP) and Federal Family Education Loan Program (FFEL). 20 U.S.C. §§ 1071 *et seq.*, 1087a *et seq.* The Direct Loan Program allows eligible students at participating schools to borrow money directly from the

Department of Education. 20 U.S.C. §§ 1077, 1091. Under the FFEL, the federal government guarantees student loans held by private lenders. 34 C.F.R. § 682.100.

Separate from these programs, the Higher Education Act establishes two programs to help borrowers repay their federal loans.

First, under income-driven repayment (IDR) programs, borrowers contribute a portion of their income each year toward their loans. 20 U.S.C. §§ 1087e(d), 1098e. Income-driven repayment lasts for a set repayment period, and at the end of that period, the remaining balance is forgiven. 34 C.F.R. § 685.209. For example, Plaintiff takes part in the REPAYE program, which forgives any remaining balance after he makes 240 payments. *Id.* § 685.209(c)(6). Participation in income-driven repayment requires borrowers to certify their incomes to the Department of Education each year. *See, e.g.*, *id.* § 685.209(c)(4).

Second, under the Public Service Loan Forgiveness (PSLF) program, borrowers who make 120 payments while working in qualifying public service or public interest positions are eligible to have their balances forgiven. *Id.* § 1087e(m). To obtain forgiveness, a borrower need not "register" for PSLF in advance; he may simply notify the Department when he becomes eligible to have his loan balance forgiven. However, a borrower may register employment in a qualifying position in a given year, if he chooses. Garrison Decl. ¶ 9. Doing so allows the Department to confirm with a borrower that his employment that year counts toward the 10-year requirement. *See id.* ¶ 11.

**B.    Relief provided to borrowers since 2020**

Since the beginning of the COVID-19 pandemic, Defendants have suspended "repayment of and interest accrual on all Federal loans held by the Department." 87 Fed. Reg. 41,878, 41,884 (July 13, 2022). As a result, "[n]o one with federally-held loans has had to pay a single dollar in loan payments," *FACT SHEET: President Biden Announces Student Loan Relief for Borrowers*

*Who Need It Most*, White House (Aug. 24, 2022),[1] nor have their balances accumulated interest. Ex. 3, at 1.

Furthermore, those participating in debt-forgiveness programs like PSLF and income-driven repayment programs are not disadvantaged by this suspension of repayments. Despite making no payments, each passing month counts toward their 120 or 240 payments required for forgiveness under PSLF and income-driven repayment programs, respectively. Ex. 2, at 1–2; Ex. 3, at 1.

### C.     Imminent and automatic loan cancellation

Despite the fact that borrowers of federally held student loans are in materially the same position with respect to their loans as before the pandemic, Defendants are poised to cancel student-loan principals. On August 24, 2022, Defendants announced a plan to cancel $10,000 of federally held student debt for every borrower who, in either 2020 or 2021, earned less than $125,000 (or $250,000 for those married filing jointly or heads of households). Ex. 1, at 2. The amount canceled would increase to $20,000 for eligible borrowers who had received Pell Grants. *Id.* The cancellation program will be implemented in "early October." Ex. 4, at 2; Ex. 1, at 2.

Defendants estimate that approximately 40 million borrowers will be eligible for cancellation under the income criteria, including approximately 856,400 in the state of Indiana. *FACT SHEET: The Biden-Harris Administration's Plan for Student Debt Relief Could Benefit Tens of Millions of Borrowers in All Fifty States*, White House (Sept. 20, 2022) (hereinafter "*FACT SHEET 2*") ("[A]nalysis from the Department of Education").[2] An independent study estimated

---

[1]    https://www.whitehouse.gov/briefing-room/statements-releases/2022/08/24/fact-sheet-president-biden-announces-student-loan-relief-for-borrowers-who-need-it-most/.

[2]    https://www.whitehouse.gov/briefing-room/statements-releases/2022/09/20/fact-sheet-

this one-time cancellation will cost up to $519 billion. Chen, Smetters & Paulson, *The Biden Student Loan Forgiveness Plan: Budgetary Costs and Distributional Impact*, University of Pennsylvania, Wharton School (Aug. 26, 2022).[3]

Defendants state on their website: "Although most borrowers will have to apply for debt relief, we have income data on hand for around 8 million borrowers. These borrowers will get the relief automatically." Ex. 4; Ex. 1 ("We encourage everyone who is eligible to file the application, but there are 8 million people for whom we have data and who will get the relief automatically."). Defendants also state that, to determine who will "automatically qualify for debt relief," "[w]e'll use *Free Application for Federal Student Aid* (FAFSAâ) and income-driven repayment application information to identify borrowers . . . who have submitted income data for tax years 2021 or 2020. We'll use this data to determine which borrowers meet the income requirements." Ex. 4. In other words, for borrowers who are eligible and who have submitted income data under income-driven repayment programs, loan forgiveness will be automatic. Defendants have confirmed this both in their communications with the public, *id.*, and in communications with Congress, Ex. 5. "Your loan servicer will notify you when the relief has been applied to your account, with details on how the relief was applied." Ex. 4, at 5.

### D. Harm to Plaintiff

Plaintiff has taken out federally held student loans and received a Pell Grant. Garrison Decl. ¶ 2. In both 2020 and 2021, Plaintiff was unmarried, and his annual income was below $125,000. *Id.* ¶ 3. He participates in an income-driven repayment program, *id.* ¶ 5, under which he certified

---

the-biden-harris-administrations-plan-for-student-debt-relief-could-benefit-tens-of-millions-of-borrowers-in-all-fifty-states/.

[3] https://budgetmodel.wharton.upenn.edu/issues/2022/8/26/biden-student-loan-forgiveness.

his income in 2021, *id.* ¶ 5–6. Plaintiff therefore will have $20,000 automatically canceled from his federal loans when Defendants' debt cancellation program is implemented in early October. *Id.* ¶ 4.

Plaintiff's employment qualifies him for the PSLF program, *id.* ¶ 7. and he intends to seek forgiveness of his remaining student loans after making 120 payments, as required, *id.* ¶ 10. As of October 2021, the Department of Education recognized that Plaintiff had made 57 payments while working in a PSLF-qualifying position, *id.* ¶ 11, and he estimates that he will qualify for forgiveness under PSLF in slightly more than 4 years, *id.* ¶ 13. At that time, Plaintiff expects his remaining balance to significantly exceed $20,000. *Id.* ¶ 17.

Plaintiff resides in Indiana. *Id.* ¶ 1. Under Indiana law, forgiven loan balances under PSLF are not taxed, because the PSLF program was enacted prior to January 1, 2020. Ind. Code § 6-3-1-3.5(a)(30); Garrison Decl. ¶ 19. Thus, in the absence of Defendants' cancellation plan, he will not be taxed on any of his forgiven amounts.

However, Indiana is among the states whose tax regimes will treat Defendants' debt cancellation as taxable income. Ind. Code § 6-3-1-3.5(a)(30); Garrison Decl. ¶ 20; *cf.* N.C. Stat. 105-153.5(c2)(22). As a result, Defendants' debt cancellation will cause Plaintiff's state-taxable income for 2022 to rise by $20,000, with a corresponding rise in tax liability for the year. Between the state tax rate of 3.23%, Ind. Code. § 6-3-2-1(b)(3), and the county tax rate for Marion County,[4] where Plaintiff resides, Garrison Decl. ¶ 18, Plaintiff will be liable for more than $1,000 in taxes as a result of Defendants' debt cancellation.

---

[4] *2021 Indiana County Income Tax Rates and County Codes*, Indiana.gov (Sept. 2021), https://www.in.gov/dor/files/2021-county-tax-rates-and-codes.pdf.pdf. Plaintiff has omitted his county to preserve his privacy but will provide it on the Court's request.

Furthermore, although "[l]oan balances remaining after relief will be re-amortized, . . . potentially reducing your monthly payment," re-amortization will not benefit Plaintiff. Ex. 4, at 6. Because Plaintiff takes part in income-driven repayment under the REPAYE program, his monthly payments are capped at 10% of the portion of his income that exceeds 150% of the poverty line, 34 C.F.R. § 685.209(c)(2)(i), so his monthly payments will not be reduced. Garrison Decl. ¶ 16. In addition, because his remaining loan balances will significantly exceed $20,000 by the time Plaintiff seeks forgiveness under PSLF, Garrison Decl. ¶ 17, Defendants' debt cancellation will not cause Plaintiff's loan to be terminated early.

The net effect of Defendants' debt cancellation for Plaintiff is that his state-tax liability will increase in 2022. He will not pay less on his loans, whether per month or over the lifetime of his loan.

## II.    STANDARD

"The standards for issuing temporary restraining orders are identical to the standards for preliminary injunctions." *Long v. Bd. of Educ., Dist. 128*, 167 F. Supp. 2d 988, 990 (N.D. Ill. 2001); *see also Democratic Nat'l Comm. v. Bostelmann*, 447 F. Supp. 3d 757, 765 (W.D. Wis. 2020) ("[T]he standard for determining whether either form of relief is appropriate is the same."). In either instance, a plaintiff is entitled to relief if he shows: (1) a likelihood of success on the merits; (2) a likelihood that he will suffer irreparable harm in the absence of preliminary relief, that is, that remedies at law are inadequate; (3) that the balance of equities tips in his favor; and (4) that the injunction is in the public interest. *Winter v. N.R.D.C., Inc.*, 555 U.S. 7, 21 (2008).

When the government is the defendant, the last two elements merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Furthermore, courts consider the likelihood of success on the merits and the degree of irreparable harm on a sliding scale, so that a greater likelihood of success requires less

irreparable harm, and vice versa. *Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013).

## III. ARGUMENT

### A. Plaintiff is likely to succeed on the merits.

Plaintiff is likely to succeed on the merits. "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Particularly when the Executive claims "sweeping and consequential authority," a "colorable textual basis" in statute is insufficient; rather, the Executive must point to "clear congressional authorization." *West Virginia*, 142 S. Ct. at 2608–09 (simplified). And the Administrative Procedure Act directs courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right," or "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2). Because Defendants lack any statutory authority to cancel loans en masse, and because the HEROES Act unconstitutionally delegates lawmaking authority to the Secretary of Education, Plaintiff is entitled to relief on the merits.[5]

---

[5] As a preliminary matter, Defendants' debt cancellation is a final agency action reviewable under the sovereign immunity waiver of 5 U.S.C. § 704 because it is the "'consummation' of the agency's decisionmaking process," and it determines "rights [and] obligations" and will result in "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (simplified). The cancellation marks the consummation of Defendants' decisionmaking process because it has formally announced the cancellation, including the specific criteria required for a borrower to qualify for cancellation, and justified its legal authority under public released memos from the Department of Education's General Counsel and the Office of Legal Counsel. *Notice of Debt Cancellation Legal Memorandum*, 87 Fed. Reg. 52,943 (Aug. 30, 2022) (General Counsel opinion); *Use of the Heroes Act of 2003 to Cancel the Principal Loan Amounts of Student Loans*, 46 Op. O.L.C. __, 2022 WL 3975075 (Aug. 23, 2022) (OLC opinion). And the cancellation creates rights and obligations with legal consequences because it will purportedly erase more than $500 billion in federal student debt for more than 40 million borrowers, doing so automatically for up to 8 million borrowers.

# 1.    Defendants' debt cancellation is not supported by statute

According to Defendants, *Notice of Debt Cancellation Legal Memorandum*, 87 Fed. Reg. 52,943 (Aug. 30, 2022), the cancellation program is authorized by the HEROES Act, Pub. L. No. 108-76, 117 Stat. 904 (2003). Under the HEROES Act, "[t]he Secretary of Education . . . may waive or modify any statutory or regulatory provision applicable to the student financial assistance programs under title IV of the Act as the Secretary deems necessary in connection with a war or other military operation or national emergency to provide . . . waivers or modifications" that are "necessary to ensure that . . . recipients of student financial assistance under title IV of the Act who are affected individuals are not placed in a worse place financially in relation to that financial assistance because of their status as affected individuals[.]" 20 U.S.C. § 1098bb(a)(1)–(2)(A).

An "affected individual" is defined to include "an individual who . . . resides or is employed in an area that is declared a disaster area by any Federal, State, or local official in connection with a national emergency" and an individual who "suffered direct economic hardship as a direct result of a war or other military operation or national emergency, as determined by the Secretary." *Id.* § 1098ee(2).

## a.    The Secretary lacks authority to categorically cancel debt based on income alone

Under the relevant statutory provision, the Secretary may provide waivers only to individuals who are (1) "in a worse position financially" (2) "in relation to their financial assistance" (3) "because of their status as affected individuals." *Id.* § 1098bb(a)(2)(A). That is, waivers are allowed only to those who are worse off relative to their student loans as a result of direct economic hardship caused by a national emergency or because they live in a disaster area. Defendants' debt cancellation far exceeds these limited parameters.

First, debt cancellation will be available to those who are in a better financial position, such

as those whose wealth or income have increased since 2020 when the COVID-19 pandemic started. Defendants' eligibility requirements only restrict cancellation to individuals who made less than $125,000 in either 2020 or 2021 (or $250,000 for households), so those whose income has increase from 2019 to 2020 to 2021 will still be eligible for cancellation.

Second, simply being in a worse position financially compared to 2020 is insufficient. Borrowers must be worse off "in relation to their financial assistance." 20 U.S.C. § 1098bb(a)(2)(A). And no borrower is worse off with respect to their financial assistance. That's because, "since March 2020," Defendants have suspended "repayment of and interest accrual on all Federal loans held by the Department." 87 Fed. Reg. 41,878, 41,884 (July 13, 2022). So since the beginning of the COVID-19 pandemic, "[n]o one with federally-held loans has had to pay a single dollar in loan payments," *FACT SHEET*, *supra*, nor have their balances accumulated interest, *see* Ex. 2, at 1. Defendants have been so thorough as to ensure that participants in PSLF and income-driven repayment programs continue to earn credit toward the 120 and 240 payments, respectively, necessary to obtain forgiveness under those programs, despite making no payments. Ex. 2, at 1–2; Ex. 3, at 1. So due to actions Defendants have already taken, no borrower is worse off with respect to their federal student loans.

Third, even assuming there are those who are worse off with respect to their federal student loans, no part of Defendants' plan limits cancelation to those who are worse off "because of their status as affected individuals." 20 U.S.C. § 1098bb(a)(2)(A). Recall that an "affected individual" include an individual who "resides or is employed in an area that is declared a disaster area by any Federal, State, or local official in connection with a national emergency" and an individual who "suffered direct economic hardship as a direct result of a war or other military operation or national emergency, as determined by the Secretary." *Id.* § 1098ee(2).

The entire nation has been declared a COVID-19 disaster area by FEMA.[6] But no one suggests that any borrower's student-loan obligations are worse off "because of their status" as a resident of the United States. *Id.* § 1098bb(a)(2)(A). And, if the Court were to ignore Defendants' pause of loan repayments and interest accrual (which it shouldn't), it's conceivable that the second class of affected individuals—borrowers who "suffered direct economic hardship as a direct result of" COVID-19—would be worse off with respect to their student loans. *Id.* § 1098ee(2). But Defendants' extremely broad income criteria clearly provides cancellation beyond that limited statutory class.

To be sure, "[t]he Secretary is not required to exercise the waiver or modification authority . . . on a case-by-case basis." *Id.* § 1098bb(b)(3). But the Secretary's power to exercise waiver authority for individuals on a categorical basis does not expand the *types* of individuals who may receive waivers. Thus, the Secretary may be able to waive certain requirements for residents of a city that was destroyed in a war, because such destruction would create obvious direct economic hardship for each resident. And under § 1098bb(b)(3), the Secretary would not be required to identify each affected individual by name before extending relief. But nothing in § 1098bb(b)(3) gives the Secretary the power to enormously expand the specific criteria required to be an "affected individual" under § 1098ee(2).

### b.  Debt cancellation is not "necessary"

Under § 1098bb(a)(2)(A), waivers are permitted only if "necessary" to ensure affected individuals are not placed in a worse position with respect to their federal loans because of their status as affected individuals. As discussed above, by suspending loan repayments and interest

_____

[6]  *COVID-19  Disaster  Declarations*,  FEMA  (Aug.  20,  2021), https://www.fema.gov/disaster/coronavirus/disaster-declarations.

accrual, Defendants have put borrowers in the *same* position now as before the pandemic with respect to their federal loans. As such, debt cancellation is clearly unnecessary to achieve the statutory goal under § 1098bb(a)(2)(A).

Defendants may not rely on the broader language in § 1098bb(a)(1), which empowers the Secretary to "waive or modify any statutory or regulatory provision . . . as the Secretary deems necessary." This language permits the Secretary to choose *which* statutory or regulatory provisions to waive, but it does not allow the Secretary to determine *for whom* waiver is permitted. The latter is controlled by paragraph 2, which allows waivers that are "necessary" to achieve five specific goals. *Id.* § 1098bb(a)(2). The omission of the "deeming" language in paragraph 2 demonstrates that Congress meant for the paragraph to place real limits on the Secretary's discretion. *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (simplified)).

The Sixth Circuit considered an analogous question in *Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022). There, the President attempted to force the employees of every federal contractor to obtain a COVID-19 vaccine. The court held that this unilateral coercive action was unsupported by statute. The government there relied on the Procurement Act, under which "[t]he President may prescribe policies and directives that the President considers necessary to carry out this subtitle." 40 U.S.C. § 121(a). And "[t]he purpose of th[e] subtitle is to provide the Federal Government with an economical and efficient system for" enumerated activities, such as obtaining property and services. *Id.* § 101. The government argued that the breadth of the "considers necessary" language supported a vaccine mandate, but the court disagreed. It reasoned that, while § 121 allowed the President leeway in deciding how to carry out § 101, the President's substantive power derived

from § 101; and § 101 "never actually confers" a vaccine-mandate power. *Kentucky*, 23 F.4th at 607. So § 121 gave the President "a modest valence of necessary and proper powers" in exercising "powers enumerated in § 101"—but the exercise of that "necessary and proper power" must still "clearly stem[] from a power enumerated." *Id.*

Here, the "deems necessary" language in paragraph 1 of 20 U.S.C. § 1098bb(a) does no more than give the Secretary discretion in deciding how to implement a waiver, that is, which statutory and regulatory provisions to waive. But like the President's discretion under the Procurement Act, the Secretary's discretion still must be exercised toward enumerated ends, i.e., his actions must be "necessary" to achieve one of the five goals in paragraph 2.

### c.   The debt cancellation program presents a major question not answered by statute

Courts will not assume that Congress has assigned to the Executive Branch questions of "vast economic and political significance" unless Congress has provided a "clear statement" to that effect. *West Virginia*, 142 S. Ct. at 2605 (simplified). Even when a statute contains a "colorable textual basis" for Executive action, courts "presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.* at 2609 (simplified). "When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, [the Court] typically greet[s] its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (simplified). A court should thus adopt a narrow reading of a statute when an agency tries "to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (simplified).

It is beyond dispute that outright debt cancellation—on a categorical basis for 40 million borrowers and costing more than $500 billion—is a "power of vast economic and political

significance." *Id.* As one measure of economic significance, Executive Order 12866 designates "economically significant" rules as those that have an annual impact of at least $100 million. The order subjects such rules to analyses designed to ensure agencies have considered the costs and benefits of the rule and its alternatives. The debt cancellation is more than 5,000 times that threshold amount.

And it is also clear that Defendants' plan relies on as-yet-undiscovered powers in the HEROES Act. First, the class of borrowers given relief under the Act has never been so broad and included so many individuals who do not actually meet statutory criteria. As the Congressional Research Service pointed out last year, until COVID-19, the Department of Education has "generally invoked the HEROES Act relatively narrowly to grant relief to limited subsets of borrowers, such as deployed military service members or victims of certain natural disasters." Kevin M. Lewis & Edward C. Liu, *The Biden Administration Extends the Pause on Federal Student Loan Payments: Legal Considerations for Congress*, Congressional Research Service, LSB10568 Version 3, at 2–3 (Jan. 27, 2021).[7]

Nor has the statute ever been used to broadly cancel loan principals before. As Defendant Department of Education's Office of General Counsel concluded in 2021, "the Department has never relied on the HEROES Act . . . for the blanket or mass cancellation . . . of student loan principal balances" or for the "material change of repayment amounts or terms." United States Department of Education, Office of the General Counsel, *Memorandum to Betsy DeVos, Secretary of Education* 6 (Jan. 12, 2021).[8] Recasting the HEROES Act from a statute permitting limited modifications to adjust certain requirements to one that can sweep away debt for 40 million people

---

[7] https://crsreports.congress.gov/product/pdf/LSB/LSB10568.

[8] https://static.politico.com/d6/ce/3edf6a3946afa98eb13c210afd7d/ogcmemohealoans.pdf

and effectively spend more than $500 billion is a change so significant as to "effect[] a fundamental revision of the statute, changing it from one sort of scheme . . . into an entirely different kind." *West Virginia*, 142 S. Ct. at 2596 (2022).

Congress itself has struggled over the question of whether to cancel student-loan principals, with bills being introduced, considered, and defeated in both the Senate and the House of Representatives, and during both this and the prior administrations. Student Loan Debt Relief Act of 2019, S. 2235, 116th Cong. (2019); Income-Driven Student Loan Forgiveness Act, H.R. 2034, 117th Cong. (2021). Given the inevitably controversial nature of such a program, it is "doubt[ful] that Congress intended to delegate decisions of such economic and political significance" as whether to cancel 40 million borrowers' loan principals—whether $10,000, $20,000, or in their entirety—to the Executive in the HEROES Act; and it is equally doubtful that that power lay dormant in that statute all along in the "oblique" words of § 1098bb(a)(2). *West Virginia*, 142 S. Ct. at 2596, 2609 (simplified).

### d.    The statute should be read to avoid constitutional questions

Even if the HEROES Act could bear the weight of Defendants' extraordinary, unilateral actions and authorize Defendants to spend more than $500 billion, Plaintiff is still likely to prevail on the merits. That's because "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs.*, 531 U.S. 159, 173 (2001) (simplified). Courts are "obligated to construe the statute to avoid constitutional problems if it is fairly possible to do so." *Boumediene v. Bush*, 553 U.S. 723, 787 (2008); *West Virginia*, 142 S. Ct. at 2620 (Gorsuch, J., concurring) (Careful application of the major questions doctrine "ensure[s] that the government does not inadvertently cross constitutional lines." (simplified)).

16

The HEROES Act contains important limits to Defendants' discretion, including the requirement under the relevant provision that the waiver or modification be necessary to ensure affected individuals are not placed in a worse place financially relative to their financial assistance as a result of their status as affected individuals. But those limitations would be rendered meaningless if the statute were to be construed as allowing Defendants to freely grant waivers or modifications to individuals who are not financially worse off, who are in the same position with respect to their student loans as before the pandemic, and whose status as affected individuals has no relation to their financial state. This Court must reject that construction under the canon of constitutional avoidance because it would violate the non-delegation doctrine to construe the statute as authorizing the Department of Education to decide for itself—without any governing standard—whether and under what conditions to allow waivers or modifications. *See Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 645–46 (1980) (plurality opinion) ("[I]t is unreasonable to assume that Congress intended to give the Secretary the unprecedented power over American industry that would result from the Government's view . . . . A construction of the statute that avoids this kind of open-ended grant should certainly be favored."); *see also Tiger Lily, LLC v. United States Dep't of Hous. & Urb. Dev.*, 5 F.4th 666, 672 (6th Cir. 2021) (construing a statute narrowly to avoid raising a potential non-delegation problem); *United States v. Mitchell*, 18 F.3d 1355, 1360 n.7 (7th Cir. 1994) (affirming that statutes should be interpreted to avoid non-delegation problems).

Already § 1098bb vests the Secretary with a degree of discretion in deciding which statutes to "waive or modify" and how to modify them in pursuit of statutory goals. But if these goals are construed so elastically as to permit debt cancellation for 40 million debtors solely based on their income, the statute will impermissibly vest the Secretary with wholly unguided discretion. *See*

*Panama Ref. Co. v. Ryan*, 293 U.S. 388, 415 (1935) (finding a non-delegation violation where nothing in the statutory text established a guiding policy or governing standard, and finding it problematic that the President was not required to make any findings before exercising conferred discretion to prohibit transport of a regulated commodity); *see also Whitman v. Am. Trucking Assn.*, 531 U.S. 457, 472 (2001) (affirming that Congress may not leave it to the Executive Branch to decide what standard shall govern Executive Branch discretion); *cf. West Virginia*, 142 S. Ct. at 2609 (directing courts to approach elastic interpretations that confer power to regulate on matters of major economic and political concern with "skepticism").

To avoid these serious questions of the HEROES Act's constitutionality, the Court must conclude the statute does not authorize Defendants' cancellation program.

### 2. The HEROES Act unconstitutionally delegates lawmaking authority to the Secretary

Not only is there no statutory authority for Defendants' debt cancellation, but the waiver-or-modification provision is itself unconstitutional because it unconstitutionally delegates legislative power to the Secretary. Unlike the non-delegation concern discussed previously, this non-delegation violation is inherent in the nature of a waiver or modification and cannot be avoided with a narrowing construction.

The HEROES Act empowers an Executive official to "waive or modify any statutory . . . provision" as that official "deems necessary." 20 U.S.C. § 1098bb(a)(1). Such waiver or modification of a statute has a "legislative character," as "confirmed by the character of the Congressional action it supplants"—legislative amendment. *INS v. Chadha*, 462 U.S. 919 (1983). Whether or not an intelligible principle guides the waiver or modification, *cf.* 20 U.S.C. § 1098bb(a)(2), such waiver or modification of legislation—and the provision of "the terms and conditions to be applied in lieu of such statutory . . . provisions," *id.* § 1098bb(b)(2)—is

unavoidably and quintessentially the legislative act.

In *Clinton v. City of New York*, the Court rejected the President's authority under the Line Item Veto Act to "cancel" certain types of "provisions that have been signed into law." 524 U.S. 417, 436 (1998). Because the effect of cancellation was to "prevent[] the item from having legal force or effect," the "legal and practical effect" of cancellation was to "amend[] . . . Acts of Congress," because it takes places "*after* the bill becomes law." *Id.* at 437–39 (simplified). It did not matter that the cancellations did not formally "effect a repeal" and cancelled items continued to have some effect on budgets; the relevant outcome was that "the President made [the canceled items] entirely inoperative as to appellees." *Id.* at 441. The Court made clear that such changes to statute must "accord with a single, finely wrong and exhaustively considered procedure"—that provided in Article I. *Id.* at 439 (simplified). There is no daylight between the cancellation disapproved in *Clinton* and the authority to "waive or modify any statutory . . . provision" in the HEROES Act. 20 U.S.C. § 1098bb(a)(1).

To be sure, *Clinton* acknowledged that *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892), held to be constitutional a foreign-policy statute requiring Presidential suspensions of certain statutory provisions under specified circumstances. But even assuming *Field* should still be followed, in that case, "Congress itself made the decision to suspend or repeal the particular provisions at issue upon the occurrence of particular events," and "when the President determine that the contingency had arisen, he had a duty to suspend." *Clinton*, 524 U.S. at 443, 445. There was thus no room for "the President himself to effect the repeal of laws[] for his own policy reasons." *Id.* at 445. Furthermore, any discretion was supported by the fact that the *Field* suspensions were "in the foreign affairs arena, [where] the President has a degree of discretion and freedom . . . which would not be admissible were domestic affairs alone involved." *Id.* (simplified).

Here, in contrast, not only is higher-education financing purely a domestic matter, but unlike the *Field* suspensions, the Secretary does not have a duty to issue waivers or modifications; he "*may* waive or modify any statutory . . . provision." 20 U.S.C. § 1098bb(a)(1) (emphasis added). Even though the Secretary may do so only in service of statutory goals, *see id.* § 1098bb(a)(2), his discretion in choosing *whether* and *when* to do so allows "his own policy reasons"—rather than Congress—to determine the existence or timing of a waiver or modification, *Clinton*, 524 U.S. at 445. Furthermore, the Secretary has the discretion to waive or modify statutory provisions "as [he] deems necessary," *id.*, so that he controls which statutory provisions he waives and what "terms and conditions" he replaces them with, *id.* § 1098bb(b)(2). That is, he controls the contents of the statutory amendment.

The effects of this discretion are evident here. The Secretary's choice of *how* to enact a waiver and modification was to produce debt cancellation—a long-term political priority of the current President and his political party. The Secretary's choice of *whether* to enact debt cancellation was indisputably, thoroughly infected with non-statutory considerations, including the rising cost of education "[s]ince 1980" and the aim of "[a]dvanc[ing] racial equity." *FACT SHEET*, *supra* ("This plan offers targeted debt relief as part of a comprehensive effort to address the burden of growing college costs and make the student loan system more manageable for working families."). And Defendants' loan cancellation achieves a priority of the President's political party that predates COVID-19. *See* Elizabeth Warren, *I'm calling for something truly transformational: Universal free public college and cancellation of student loan debt*, Medium (Apr. 22, 2019) (proposing "the cancellation of up to $50,000 in student loan debt for 42 million

Americans")[9]; Bernie Sanders, *America Is Drowning in Student Debt. Here's my Plan to End It*, Fortune (July 9, 2019) (proposing that the federal government "cancel all $1.6 trillion of student debt")[10]; Student Loan Debt Relief Act of 2019, S. 2235, 116th Cong. (2019) (Bill was not enacted.). Finally, the Secretary's choice of *when* to enact debt cancellation was aimed not at the heart of the pandemic, when borrower need would have been highest, but at a midterm congressional election that will take place long past the peak of the pandemic.

Whatever the merits of student-debt cancellation, it is clear that the President and his Secretary's "own policy reasons" for enacting debt cancellation directed every aspect of the Secretary's choice to invoke waiver and modification under § 1098bb. *Clinton*, 423 U.S. at 445. Even if that were not so, the capacious discretion allowed by the HEROES Act would certainly allow the Secretary's own policy considerations to control the timing and manner of a waiver or modification. Either way, the Act contradicts the requirement that "Congress itself ma[k]e the decision" of whether, when, and how to suspend the laws. *Id.*

The statute permits the Secretary to suspend the law, to "modify" it with his own "terms and conditions," 20 U.S.C. § 1098bb(a)(1), (b)(2), and to do so when and how "[he] deems necessary," *id.* § 1098bb(a)(1). The statute thus bestows the Executive with lawmaking power in violation of Article I of the Constitution.

## B. Injunctive relief is necessary to prevent irreparable harm, as there is no adequate remedy at law

Plaintiff must show he is "likely to suffer irreparable harm before a decision on the merits can be rendered." *Winter*, 555 U.S. at 22 (citation omitted). Irreparable harm is "harm that cannot

---

[9] https://medium.com/@teamwarren/im-calling-for-something-truly-transformational-universal-free-public-college-and-cancellation-of-a246cd0f910f.

[10] https://fortune.com/2019/07/09/bernie-sanders-cancel-student-debt/.

be repaired and for which money compensation is inadequate." *Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020) (citation omitted). "Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury." *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 770–71 (10th Cir. 2010); *see also California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) ("harm is irreparable here because the states will not be able to recover monetary damages" because of 5 U.S.C. § 702), *remanded on other grounds by* 141 S. Ct. 192 (2020); *Ind. Fine Wine & Spirits, LLC v. Cook*, 459 F. Supp. 3d 1157, 1170 (S.D. Ind. 2020) (harm was irreparable because the plaintiff "cannot recover the costs that it has incurred . . . [b]ecause this lawsuit is against state officials in their official capacities, and because of sovereign immunity of the Defendants against compensatory damages, [the plaintiff] has no adequate remedy at law]"); *GoodCat, LLC v. Cook*, 202 F. Supp. 3d 896, 918 (S.D. Ind. 2016) (irreparable harm because "[p]rinciples of sovereign immunity would preclude [the plaintiff] any recovery against Defendants" for financial harms suffered); *Cmty. Pharmacies of Ind., Inc. v. Ind. Fam. & Soc. Servs. Admin.*, 801 F. Supp. 2d 802, 806 (S.D. Ind. 2011).

Plaintiff, and indeed more than 800,000 borrowers like him in the State of Indiana, face irreparable harm from the automatic tax liability that Defendants' loan cancellation will impose on them during the first week of October, but if Defendants are not enjoined, there is no way to recover that loss. Plaintiff, in particular, will become liable for more than $1,000 in state income tax as soon as Defendants automatically cancel $20,000 of his outstanding loans. *See* Ind. Code. § 6-3-2-1(b)(3); Garrison Decl. ¶ 20. He's not alone. The Department of Education estimates that 856,400 borrowers in Indiana will be eligible for loan cancellation, with 555,500 eligible for Pell Grant cancellation of up to $20,000. *See FACT SHEET 2*, *supra*.

Each one of those people will face income tax liability for 2022 the moment that

Defendants cancel their loans, even those, like Plaintiff, who will get automatic cancellation without asking for it. At least five other states will tax cancellation as income. *See* Ark. Code § 26-51-404(b)(1); Minn. Stat. § 290.01(19)(f); Miss. Code § 27-7-15(4)(mm); N.C. Stat. § 105-153.5(c2)(22); Wis. Stat. § 70.01. And Defendants expect more than 3.5 million borrowers in those states will have their loans canceled. *See FACT SHEET 2*, *supra*. But there's no way for Plaintiff, or anyone else, to recover for the new tax bill, even though Defendants' actions are unlawful. Section 702 of the APA forbids monetary damages against the federal government. Thus, the financial harm suffered by Plaintiff, which will also affect hundreds of thousands of others, is irreparable and merits this Court's intervention. *See California*, 911 F.3d at 581; *Indiana Fine Wine & Spirits, LLC*, 459 F. Supp. 3d at 1170*; GoodCat, LLC*, 202 F. Supp. 3d at 918.

### C.      The balance of the equities favors granting the motion

A party seeking a temporary restraining order or preliminary injunction must demonstrate "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "These factors merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. A government "does not have an interest in enforcing a law that is likely" invalid. *Edmondson*, 594 F.3d at 771. Instead, "'the public interest will perforce be served by enjoining the enforcement of the invalid provisions of [] law.'" *Id.* (citation omitted). Indeed, the Supreme Court has held that when a rule exceeds an agency's authority, the court should not "weigh [] tradeoffs" between its intended effect and harms. *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 142 S. Ct. 661, 666 (2022). "In our system of government, that is the responsibility of those chosen by the people through democratic processes." *Id*. Simply—"[t]he public interest is served by compliance with the APA." *California*, 911 F.3d at 581; *Alabama Association of Realtors*, 141 S. Ct. at 2490 ("[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends," such as the public's "strong interest in

combating the spread of the COVID-19 Delta variant.").

Defendants, in playing fast and loose with the law, have not only exceed their authority under the HEROES Act but have also violated constitutional limits under Article I. They thus have no *legitimate* interest in avoiding an injunction. The cancellation will result in more than $500 billion in federal expenditures, affect more than 40 million individuals, and wholly bypass the congressional representatives those individuals elected to decide this contentious issue. As many as 8 million individuals will get automatic loan cancellation during the first week of October, and, as discussed, millions of people qualify for loan cancellation in the states that treat cancellation as taxable income. *See FACT SHEET 2*, *supra*. Huge numbers face the immediate possibility of unwanted, and unlawful, tax liability through automatic cancellation, while *every* American will foot the half-trillion bill for Defendants' improper actions. *See Abbott Lab'ys. v. Mead & Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992) (This factor considers "the consequences of granting or denying the injunction to non-parties.") "[T]he public interest will perforce be served by enjoining the enforcement of the invalid provisions of [] law," and the court should enter the injunction. *See Edmondson*, 594 F.3d at 771.

Even if none of this were so, the public interest would not be harmed by a temporary restraining order. As discussed above, loan repayments and interest accrual are still paused—and may yet be extended further—so no borrower will be disadvantaged by an injunction that allows the Court to consider Plaintiff's claims in an orderly fashion.

### D.     The scope of injunction

"The purpose of a TRO, similar to that of a preliminary injunction, is to minimize the hardship to the parties pending the ultimate resolution of the suit*." Crue v. Aiken*, 137 F. Supp. 2d 1076, 1082 (C.D. Ill. 2001) (citing *Faheem–El v. Klincar*, 841 F.2d 712, 717 (7th Cir.1988)). And that means preserving the status quo against the threat of irreparable harm, even if it means issuing

a TRO ex parte. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 438–39 (1974) (ex parte TROs "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer"). Moreover, the Seventh Circuit has recently reaffirmed that when imposing an injunction or other equitable relief, "both historical and current practice lends support to a determination that the courts possess the authority to impose injunctions that extend beyond the parties before the court." *City of Chicago v. Barr*, 961 F.3d 882, 916 (7th Cir. 2020). Further, the scope of any equitable relief will depend, in part, on the harm faced by the public at large. *See id.*

When crafting such a remedy, this Court should also consider the ultimate remedy available. The APA provides unequivocally that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be," arbitrary and capricious, not in accordance with law, in excess of statutory authority, or unconstitutional. 5 U.S.C. § 706(2) (emphasis added). Thus, "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989). Such has long been standard practice under the APA. *See, e.g.*, *Camp v. Pitts*, 411 U.S. 138, 143 (1973) ("If [the agency's action] is not sustainable on the administrative record made, then the [agency's] decision must be vacated."); *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) ("If an appellant . . . prevails on its APA claim, it is entitled to relief under that statute, which normally will be a vacatur of the agency's [action]."). "Justice Blackmun made a similar observation in *Lujan* [497 U.S. at 913], writing in dissent but apparently expressing the view of all nine Justices on this question: '. . . if the plaintiff prevails, the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual. Under these circumstances a single plaintiff, so long as he is injured by the rule, may obtain

'programmatic' relief that affects the rights of parties not before the court.'" *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *see also Pennsylvania v. President United States*, 930 F.3d 543, 575 (3d Cir. 2019), *rev'd on other grounds sub nom. by Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020) ("courts invalidate—without qualification—unlawful administrative rules as a matter of course").

Defendants promise to take an unheralded action within the next week, which not only will result in more than $500 billion in federal expenditures but will also impose irreparable economic harms on potentially millions of people. Those actions are almost certainly unlawful. Faced with this scenario, this Court should simply maintain the status quo and enjoin Defendants' entire program. Indeed, as Defendants' entire regulatory action is a one-time payment, the only way to preserve the possibility of the APA's presumptive remedy of *vacatur* is to preserve the status quo while this Court determines the merits.

## IV.  CONCLUSION

There is no denying that Defendants' debt cancellation addresses questions of "vast economic and political significance." *West Virginia*, 142 S. Ct. at 2605 (simplified). In our constitutional order, however, such questions are entrusted to Congress unless it explicitly directs otherwise. And, far from clearly authorizing Defendants' actions, the HEROES Act forbids Defendants from canceling debt based on income alone. In pressing ahead, Defendants not only displace Congress in resolving this major question, they also usurp Congress's power to amend and repeal statute, in violation of Article I of the Constitution.

The Court should enjoin the debt cancellation program to hold the status quo and give itself time to consider Plaintiff's Motion for Preliminary Injunction. But if the Court should deny this motion, Plaintiff respectfully requests that the Court also immediately deny the Motion for

Preliminary Injunction so that Plaintiff may seek appellate relief before cancellation is implemented as soon as October 1.

DATED: September 27, 2022.

Respectfully submitted,

*/s/ Michael Poon*
**MICHAEL POON***
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
incominglit@pacificlegal.org

**CALEB KRUCKENBERG***
Pacific Legal Foundation
3100 Clarendon Blvd, Suite 610
Arlington VA 22201
Telephone: 202-888-6881
incominglit@pacificlegal.org

*\*Pro Hac Vice pending*
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on this September 27, 2022, I served copies of the foregoing on counsel for all Defendants in this action both by same-day personal service of and by delivering copies to the U.S. Postal Service to be sent by certified mail to:

Zachary Myers
U.S. Attorney for The Southern District of Indiana
United States Attorney's Office
10 W Market St, Suite 2100
Indianapolis, IN 46204

and by delivering copies to the U.S. Postal Service to be sent by certified mail to:

Merrick Garland, Attorney General
U.S. Department of Justice
950 Pennsylvania Ave Nw
Washington, DC 20530-0009

Miguel Cardona
U.S. Secretary of Education
400 Maryland Ave Sw
Washington, DC 20202-0001

U.S. Department of Education
400 Maryland Ave Sw
Washington, DC 20202-0001

*/s/ Michael Poon*
**MICHAEL POON**