**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| FRANK GARRISON, on behalf of himself and all others similarly situated, | NO.: 1:22-CV-01895-RYL-TAB |
| & | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| NOEL JOHNSON, on behalf of himself and all others similarly situated, | *JURY TRIAL DEMANDED* |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF EDUCATION, | |
| & | |
| MIGUEL CARDONA, in his official capacity as U.S. SECRETARY OF EDUCATION | |
| Defendants. | |

## INTRODUCTION

Student debt cancellation has been the subject of great debate in America for at least a decade. Some argue that the government should provide relief to students to offset skyrocketing tuition costs and the consequent debt incurred by many to attend college. Others point to the regressive quality of student debt relief, arguing that it is unfair to cancel student debts that were freely assumed with taxes raised from those who predominately have not attended college, or attended but avoided debt, or paid it off. Congress has authorized a variety of student debt relief programs, including the Public Service Loan Forgiveness program, by which some debt is written off for students who choose to work in relatively lower-paying public service or non-profit organization positions after graduation and follow program rules for a period of years. Perhaps

1

because of the costs of student loan cancellation, or its potential impact on the economy, or the inherently divisive nature of this debate, Congress has declined to enact more sweeping debt cancellation. This is, of course, Congress's prerogative under our Constitution, as Congress is the branch of government that possesses the exclusive power to make law.

Purporting to step into the breach left by Congress, and making good on a campaign promise, the President in August announced that his administration would, by October, begin canceling between $10,000 and $20,000 of loan debts categorically—without respect to hardship or Congressionally authorized program rules—for more than 40 million borrowers. The authority for this $500 billion write-off, according to the administration, can be found in a 2003 law passed in response to the Iraq war as a means of aiding veterans and their families. This law—the Higher Education Relief Opportunities for Students or "HEROES" Act—authorizes the Secretary of Education to "waive or modify any statutory or regulatory provision applicable to" student aid programs when "necessary in connection with a war or other military operation or national emergency." 20 U.S.C. § 1098bb(a)(1). Importantly, to qualify for such a waiver or modification, individuals must reside or be employed in a "disaster area" as declared by a "Federal, State, or local official in connection with a national emergency." Concluding that the entire nation is a "disaster area" because of the COVID pandemic, the administration claims that the Secretary of Education has the power to "automatically" issue blanket loan forgiveness to 8 million borrowers almost immediately.

Despite the staggering scope of this regulatory action, it was taken with breathtaking informality and opacity. The Department did not undertake the notice-and-comment process required for rulemaking, much less solicit any public input. It did not even issue a formal order or directive setting out its cancellation program. Instead, it issued a press release on August 12th

along with two legal memoranda providing its justifications, and, later, a hastily created a FAQ section on its website.

In the rush, the administration has created new problems for borrowers in at least six states that tax loan cancellation as income. People like Plaintiffs Frank Garrison and Noel Johnson will actually be worse off because of the cancellation. Indeed, both Mr. Garrison and Mr. Johnson will face immediate tax liability from the state of Indiana because of the automatic cancellation of a portion of their debt. These taxes would not be owed for debt forgiveness under the Congressionally authorized program rewarding public service. Mr. Garrison, Mr. Johnson, and millions of others similarly situated in the six relevant states will receive no additional benefit from the cancellation—just a one-time additional *penalty*.

Even after the filing of this suit, the Department's slapdash policy has changed from hour to hour and remained utterly elusive. In response to this and other suits, ED simply updated its FAQs to try to negate individual claims and promised to delay the program until October 17th. Meanwhile, however, it has pressed forward with its stated intent to cancel hundreds of billions of dollars in student loan debt before any court meaningfully reviews the action. Up to 8 million borrowers still face "automatic" cancellation, many of them in states taxing the cancellation as income.

Nothing about loan cancellation is lawful or appropriate. In an end-run around Congress, the administration threatens to enact a profound and transformational policy that will have untold economic impacts. The administration's lawless action should be stopped immediately.

## **PARTIES**

1.    Plaintiff Frank Garrison is an individual who resides within the jurisdiction of the U.S. District Court for the Southern District of Indiana. He is employed by Pacific Legal Foundation, a

501(c)(3) non-profit organization in a position that qualifies him for the Congressionally authorized Public Service Loan Forgiveness program.

2.   Mr. Garrison brings this case on his own behalf and on behalf of those similarly situated.

3.   Plaintiff Noel Johnson is an individual who resides within the jurisdiction of the U.S. District Court for the Southern District of Indiana.

4.   Mr. Johnson is also employed in a position that qualifies him for the Congressionally authorized Public Service Loan Forgiveness program.

5.   Mr. Johnson brings this case on his own behalf and on behalf of those similarly situated.

6.   Defendant U.S. Department of Education (ED) is an agency of the United States.

7.   Defendant ED will implement the challenged regulatory action in this case—cancellation of federal student loan debt for more than 40 million Americans (loan cancellation).

8.   Defendant Miguel Cardona (Secretary Cardona) is the U.S. Secretary of Education and is sued in his official capacity.

9.   Defendant Secretary Cardona is the agency head of Defendant ED, which is responsible for issuing and implementing the challenge regulatory action.

10.   Throughout this Complaint, Defendants are referred to jointly as ED or the Department except where otherwise specified.

## JURISDICTION AND VENUE

11.   This Court has federal question jurisdiction pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331.

12.   This Court has the authority to grant an injunction and declaratory judgment and to "set aside" agency action in this matter pursuant to 28 U.S.C. §§ 2201, 2202 and 5 U.S.C. §§ 705, 706(2).

13.     Venue for this action properly lies in this district pursuant to 5 U.S.C. § 703 and 28 U.S.C.

§ 1391(b)(2), (e)(1) because a defendant resides in this district, Plaintiffs resides in this judicial

district, and a substantial part of the events or omissions giving rise to the claim occurred in this

judicial district.

## STATEMENT OF FACTS

## I. BACKGROUND

### A. Statutory Background

14.     The Higher Education Act (HEA) establishes the Direct Loan Program (DLP) and Federal

Family Education Loan Program (FFELP). 20 U.S.C. §§ 1071 *et seq.*, 1087a *et seq.*

15.     The HEA and its implementing federal regulations provide a comprehensive legal

framework governing federal student loan assistance and borrowers' obligations to repay their

loans, including how and when certain loan statuses qualify for income-driven repayment (IDR)

and the Public Service Loan Forgiveness (PSLF) program.

16.     The HEA sets forth the "[t]erms and conditions" of DLP loans, including the "[r]epayment

plan for public service employees" and "income-based repayment plan." *Id*. § 1087e. Federal

regulation also specifies the conditions under which "[a] borrower may obtain loan forgiveness

under [the FFELP] program," 34 C.F.R. § 685.219(c), and under which a borrower "qualif[ies] for

loan forgiveness" under the IDR program, *id*. § 685.221(f).

### B. The Department's Actions

17.     While on the campaign trail in 2020, then-candidate Biden promised to provide sweeping

relief to federal student loan borrowers.

18.     For instance, Mr. Biden tweeted on March 22, 2020, "We should forgive a minimum of

$10,000/person of federal student loans, as proposed by Senator Warren and colleagues."

19.     In October 2021, ED announced "transformational changes" to the PSLF program. U.S. Department of Education, *U.S. Department of Education Announces Transformational Changes to the Public Service Loan Forgiveness Program, Will Put Over 550,000 Public Service Workers Closer to Loan Forgiveness* (Oct. 6, 2021).

20.     ED later stated that this "[r]evamping" of the PSLF program has already resulted in loan relief for approximately 100,000 borrowers under that program. U.S. Department of Education, *Biden-Harris Administration Extends Student Loan Pause Through August 31* (Apr. 6, 2022).

21.     In April 2022, ED announced additional actions to provide loan forgiveness to borrowers through the PSLF program and IDR plans, which it estimated would result in debt cancellation for more than 40,000 borrowers and credit toward IDR forgiveness for millions more. U.S. Department of Education, *Department of Education Announces Actions to Fix Longstanding Failures in the Student Loan Programs* (Apr. 19, 2022).

22.     On August 24, 2022, President Biden finally revealed his new regulatory policy by press release.

23.     On that date, ED announced that it plans to cancel $10,000 to $20,000 in student debt for all borrowers with ED-owned loans and annual income "during the pandemic" less than $125,000 (or $250,000 for households).

24.     According to ED as of September 27, 2022, "The U.S. Department of Education will provide up to $20,000 in debt cancellation to Pell Grant recipients with loans held by the Department of Education and up to $10,000 in debt cancellation to non-Pell Grant recipients. Borrowers are eligible for this relief if their individual income is less than $125,000 or $250,000 for households." U.S. Department of Education, *One-Time Student Loan Debt Relief*, https://studentaid.gov/debt-relief-announcement/one-time-cancellation (Sept. 27, 2022).

25.　　The Department estimates that approximately 40 million borrowers would receive this relief, including approximately 856,400 in the state of Indiana. *FACT SHEET: The Biden-Harris Administration's Plan for Student Debt Relief Could Benefit Tens of Millions of Borrowers in All Fifty States*, White House (Sept. 20, 2022).

26.　　Independent estimates calculate the one-time cost of debt cancellation to be up to $519 billion. *See* Chen, Smetters & Paulson, *The Biden Student Loan Forgiveness Plan: Budgetary Costs and Distributional Impact*, University of Pennsylvania, Wharton School (August 26, 2022).

27.　　Prior to the filing of this lawsuit, ED announced that many borrowers will have cancellation automatically applied to them almost immediately.

28.　　According to the White House, "Nearly 8 million borrowers may be eligible to receive relief automatically because relevant income data is already available to the U.S. Department of Education." *FACT SHEET: President Biden Announces Student Loan Relief for Borrowers Who Need It Most*, White House (Aug. 24, 2022).

29.　　Indeed, as of September 27, 2022, ED emphasized on its website that, "Although most borrowers will have to apply for debt relief, we have income data on hand for around 8 million borrowers. These borrowers will get the relief automatically." *One-Time Student Loan Debt Relief*, https://studentaid.gov/debt-relief-announcement/one-time-cancellation (Sept. 27, 2022).

### C. The Original Cancellation Date Was the First Week in October

30.　　ED planned to apply this automatic cancellation in early October.

31.　　Representatives from the Department required loan servicers to begin preparing for loan cancellation and advised servicers to prepare for large call volumes during the Columbus Day weekend—October 8-10th.

32.     ED informed certain servicers that it would send a test cancellation file on Saturday, October 8, 2022, with a potential automatic cancellation date of Tuesday, October 11, 2022.

33.     For other borrowers, as of September 27, 2022, ED outlined its process on its website.

34.     "If the U.S. Department of Education doesn't have your income data, the Administration will launch a simple application which will be available by early October." U.S. Department of Education, *The Biden-Harris Administration's Student Debt Relief Plan Explained*, https://studentaid.gov/debt-relief-announcement/ (Sept. 27, 2022).

35.     "Once a borrower completes the application, they can expect relief within 4-6 weeks." *Id.*

36.     The "automatic[]" cancellation for the approximate 8 million borrowers applies to borrowers who have provided income or other information to ED or their servicer because they have enrolled in programs like IDR or have certified payments made under PSLF. *Id.*

37.     According to ED, again as of September 27, 2022, for those receiving automatic cancellation, "Your loan servicer will notify you when the relief has been applied to your account, with details on how the relief was applied." U.S. Department of Education, *One-Time Student Loan Debt Relief*, https://studentaid.gov/debt-relief-announcement/one-time-cancellation (Sept. 27, 2022).

38.     ED has not issued a formal rule and has not complied with notice-and-comment rulemaking procedures concerning the loan cancellation.

39.     ED has also confirmed that it does not intend to undergo formal rulemaking or submit its actions to Congress under the Congressional Review Act.

40.     In an email to Members of Congress on August 26, 2022, Claire Viall, Deputy Assistant Secretary for Higher Education, said, "[A]s a general matter, the Department submits rules to

Congress under the CRA, but not ongoing Departmental actions. Neither this nor the prior

administration has submitted COVID-related HEROES actions to Congress under the CRA."

### D. The Purported Source of Authority for ED's Action

41.     ED stated that it had determined that the Higher Education Relief Opportunities for

Students (HEROES) Act of 2003 provides the Secretary of Education with legal authority to cancel

student debt.

42.     The HEROES Act was passed in 2003, in response to the Iraq war as a means of providing

assistance to veterans and their family.

43.     It provides that ED may "waive or modify any statutory or regulatory provision applicable

to the student financial assistance programs" when "necessary in connection with a war or other

military operation or national emergency." 20 U.S.C. § 1098bb(a)(1).

44.     The Act further specifies, as relevant here, that this waiver or modification must be

"necessary to ensure that" one of certain statutory objectives are achieved, including to ensure that

"recipients of student financial assistance . . . are not placed in a worse position financially in

relation to that financial assistance because of their status as affected individuals." *Id*.

§ 1098bb(a)(2)(A).

45.     In a legal memorandum issued with its announcement of loan cancellation, ED revoked a

prior Department legal analysis of the issue and asserted that the HEROES Act "grants the

Secretary authority that could be used to effectuate a program of targeted loan cancellation directed

at addressing the financial harms of the COVID-19 pandemic." Lisa Brown, General Counsel, U.S.

Department of Education, *The Secretary's Legal Authority for Debt Cancellation* at 1 (Aug. 23,

2022).

46.     ED further claimed that it is "not required to show that any individual borrower is entitled to a specific amount of relief" and "instead may provide relief on a categorical basis." *Id.* at 3.

47.     In a separate memo published that same day, the Office of Legal Counsel concluded that "the Secretary can exercise the waiver or modification authority granted by the HEROES Act of 2003 to reduce or cancel the principal balances of student loans[.]" Christopher H. Schroeder, Asst. Attorney General, U.S. Dept. of Justice, Office of Legal Counsel, *Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans*, Memorandum Op. for the General Counsel, Dept. of Education, 46 Op. O.L.C. ___, Slip Op. at 24 (Aug. 23, 2022) (OLC Memo).

48.     As an initial matter, OLC concluded that because ED may waive or modify "any" covered statutory or regulatory provision, it may waive or modify any provisions "applicable to the repayment of the principal balances of loans." *Id.* at 2.

49.     The memo then proceeded to analyze three relevant criteria governing the Secretary of Education's authority under the Act to effect mass cancellation. *Id.* at 19.

50.     First, it considered whether cancellation is directed toward "affected individuals," *id.*, which here includes individuals who "reside[] or [are] employed in an area that is declared a disaster area by any Federal, State, or local official in connection with a national emergency." 20 U.S.C. § 1098ee(2).

51.     OLC noted that all of the United States and its permanently populated territories had been declared a disaster area due to COVID-19 and therefore all persons residing or working in those areas were eligible (along with anyone who suffered direct economic hardship due to the pandemic). *Id.* at 21.

52.     Second, OLC observed that, under the Act, a waiver or modification "would be permissible only as may be necessary to ensure the individuals are not placed in a 'worse position financially

. . . *because of*'" their status as affected individuals. *Id.* (quoting 20 U.S.C. § 1098bb(a)(2)(A) (emphasis added)).

53.     According to OLC, this required ED to "determine that the COVID-19 pandemic was a but-for cause of the financial harm" to be addressed by mass debt cancellation. *Id.*

54.     Third, the OLC memo considered the Act's requirement that any waiver and modification "be necessary" to "ensure" that affected individuals "*are not placed in a worse position financially in relation to that financial assistance* because of their status as affected individuals." *Id.* at 22 (quoting 20 U.S.C. § 1098bb(a)(2) (emphasis added)).

55.     OLC read this requirement to mean that any waiver or modification should "put loan recipients back into the financial position they would be in" in relation to their loans "were it not for the national emergency." *Id.* at 21.

56.     Having defined the Act's criteria for waiver or modification, OLC then analyzed whether "within these parameters" the Secretary was authorized to implement mass debt cancellation.

57.     At this point, the memo balked at reaching a firm conclusion, stating only that affording "broad, categorical" debt cancellation "*could be* an appropriate invocation of the Act." *Id.* OLC asserted that the Secretary has unlimited discretion to make this analysis as he "deems necessary." *Id.* at 22.

58.     OLC also claimed to find "contextual clues" in the Act that "Congress used the word 'necessary' in a more flexible and capacious sense, as meaning 'appropriate' or 'conducive' rather than 'essential.'" *Id.* at 23.

59.     In addition, the memo implicitly acknowledged the lack of a "closely tailored fit" between ED's mass debt cancellation plan and the Act's waiver requirements—in particular, the

requirement that the waiver be necessary to restore affected individuals to the position they would have been in but for the pandemic-caused financial harm to their student loans. *Id.*

60.     But no such "fit" is necessary, OLC concluded, because the Secretary need not proceed "case-by-case" under the Act and is allowed to "minimize 'administrative requirements." *Id.*

## II. THE EFFECT ON BORROWERS

### A. The Effect on Mr. Garrison

61.     Mr. Garrison financed his college education using federal student loans, which have been consolidated and are currently serviced by the Missouri Higher Education Loan Authority (MOHELA).

62.     Mr. Garrison was also a Pell Grant recipient.

63.     Since entering the workforce Mr. Garrison has worked in the public interest and has pursued PSLF while making timely monthly payments on his outstanding loan debt.

64.     Mr. Garrison has also enrolled in income-driven repayment, which has capped his monthly payment amount based on his income.

65.     Mr. Garrison has regularly certified both his IDR eligibility and PSLF payments with his loan servicers.

66.     As of October 2021, the Department of Education recognized that Mr. Garrison had made 57 payments toward PSLF while working in qualifying public service employment.

67.     Since that time, he has accrued additional qualifying payments towards PSLF.

68.     As of October 2021, Mr. Garrison also certified his IDR eligibility with the Department, through his servicer, and voluntarily disclosed his yearly tax information to the Department to support that certification.

69.     Mr. Garrison intends to continue making monthly payments toward PSLF and expects to qualify for full forgiveness based on his public service in slightly more than four years.

70.     Mr. Garrison is a current resident of the State of Indiana.

71.     By statute, any loan forgiveness that Mr. Garrison receives pursuant to the pre-existing PSLF program, as it was enacted prior to January 1, 2020, will not be taxed in the State of Indiana as income. *See* Ind. Code § 6-3-1-3.5(a)(30).

72.     Mr. Garrison qualifies for $20,000 in loan cancellation under ED's impending regulatory action, as his household income is less than $125,000 per year, he holds eligible student loan debt, and was a Pell Grant recipient.

73.     As a borrower who has recently certified his employment status and income with ED through his servicer, Mr. Garrison is in the class of automatic cancellation that ED had announced would occur in early October.

74.     Under Indiana law, if Mr. Garrison received $20,000 in automatic cancellation of his federal student loan debt, he would face a state income tax liability of more than $1,000 for 2022. *See* Ind. Code § 6-3-1-3.5(a)(30).

75.     Mr. Garrison would not incur that state tax liability if not for the Department's automatic cancellation of a portion of his federal student loan debt.

76.     Because Mr. Garrison otherwise intends to seek forgiveness under PSLF and has limited monthly payments under IDR, a $20,000 reduction in his total indebtedness will not change either his monthly payment obligation or the total amount of the loans he must repay.

77.     ED's loan cancellation would cause Mr. Garrison to incur a financial obligation that he would not otherwise have faced.

       **B. The Effect on Mr. Johnson**

78.     Mr. Johnson financed his college education using federal student loans, which are currently serviced by MOHELA.

79.     Since entering the workforce Mr. Johnson has worked in the public interest and has pursued PSLF while making timely monthly payments on his outstanding loan debt.

80.     Mr. Johnson has also enrolled in income-driven repayment, which has capped his monthly payment amount based on his income.

81.     Mr. Johnson has regularly certified both his IDR eligibility and PSLF payments with his loan servicers.

82.     Mr. Johnson previously certified his income with his servicer for IDR eligibility by providing his income tax information to his servicer.

83.     Mr. Johnson is currently enrolled in IDR, and his servicer lists his certification as current, with a re-certification date of July 7, 2023.

84.     Mr. Johnson was also enrolled in IDR through his same servicer in 2020 and 2021.

85.     Mr. Johnson intends to continue making monthly payments toward PSLF and expects to qualify for full forgiveness based on his public service in the next few years.

86.     Mr. Johnson is a current resident of the State of Indiana.

87.     By statute, any loan forgiveness that Mr. Johnson receives pursuant to the pre-existing PSLF program, as it was enacted prior to January 1, 2020, will not be taxed in the State of Indiana as income. *See* Ind. Code § 6-3-1-3.5(a)(30).

88.     Mr. Johnson qualifies for $10,000 in loan cancellation under ED's impending regulatory action, as his household income is less than $125,000 per year and he holds eligible student loan debt.

89.     As a borrower who has certified his income with ED through his servicer, and is currently enrolled in IDR, Mr. Johnson is in the class of automatic cancellation that ED had announced would occur in early October.

90.     Under Indiana law, if Mr. Johnson received $10,000 in automatic cancellation of his federal student loan debt, he would face a state income tax liability of more than $500 for 2022. *See* Ind. Code § 6-3-1-3.5(a)(30).

91.     Mr. Johnson would not incur that state tax liability if not for the Department's automatic cancellation of a portion of his federal student loan debt.

92.     Because Mr. Johnson otherwise intends to seek forgiveness under PSLF and has limited monthly payments under IDR, a $10,000 reduction in his total indebtedness will not change either his monthly payment obligation or the total amount of the loans he must repay.

93.     ED's loan cancellation would cause Mr. Johnson to incur a financial obligation that he would not otherwise have faced.

### C. Harms to the Proposed Class

94.     Plaintiffs seek to maintain this action both on behalf of themselves and on behalf of others similarly situated under Federal Rule of Civil Procedure 23.

95.     Plaintiffs propose the following class definition: "All persons who qualify for ED's impending automatic loan cancellation and reside in states imposing income tax obligations for any amount of debt cancelled under ED's policy."

96.     The class meets all the Rule 23(a) prerequisites for maintaining a class action.

97.     **Numerosity under Rule 23(a)(1):** The putative class is so numerous that joinder of all members is impracticable:

a.  At least six states, Arkansas, Indiana, Minnesota, Mississippi, North Carolina and Wisconsin, will tax student loan cancellation as income;

b.  ED estimates that 365,600 borrowers in Arkansas will be eligible for loan cancellation, with 269,000 eligible for Pell Grant cancellation of up to $20,000;

c.  ED estimates that 856,400 borrowers in Indiana will be eligible for loan cancellation, with 555,500 eligible for Pell Grant cancellation of up to $20,000;

d.  ED estimates that 729,700 borrowers in Minnesota will be eligible for loan cancellation, with 416,300 eligible for Pell Grant cancellation of up to $20,000;

e.  ED estimates that 417,200 borrowers in Mississippi will be eligible for loan cancellation, with 316,400 eligible for Pell Grant cancellation of up to $20,000;

f.  ED estimates that 1,190,500 borrowers in North Carolina will be eligible for loan cancellation, with 785,500 eligible for Pell Grant cancellation of up to $20,000;

g.  ED estimates that 685,100 borrowers in Wisconsin will be eligible for loan cancellation, with 412,700 eligible for Pell Grant cancellation of up to $20,000; and

h.  ED estimates that up to 8 million borrowers will receive automatic loan cancellation, many of whom reside in the relevant states that tax the cancellation as income.

98.  **Commonality under Rule 23(a)(2):** Questions of law or fact are common to Plaintiffs' claims against ED's regulatory action and the putative class's claims as the two counts alleged in this Complaint assert that the regulatory action is invalid under the Administrative Procedure Act and the U.S. Constitution.

99.  **Typicality under Rule 23(a)(3):** Plaintiffs' claims and the putative class's claims arise out of the same regulatory action taken by ED, which cases the same harms to both Plaintiffs and the

16

putative class and the declaratory and injunctive relief sought by Plaintiffs would afford complete relief to the putative class.

100.   Adequacy of Representation under Rule 23(a)(4):

    a.   Plaintiffs' interests are aligned with those of the putative class because they will suffer the same injuries, from the same action taken by the same defendants as each member of the putative class; and

    b.   The putative class would be adequately represented by Pacific Legal Foundation. Founded in 1973, PLF is a nonprofit, tax-exempt, California corporation established for the purpose of litigating matters affecting the public interest. PLF provides a voice in the courts for Americans who believe in limited constitutional government, private property rights, and individual freedom.

    c.   PLF is the most experienced public-interest legal organization defending the constitutional principle of separation of powers in the arena of administrative law. PLF's attorneys have participated as lead counsel or counsel for *amici* in several cases involving the role of the Judicial Branch as an independent check on the Executive and Legislative branches under the Constitution's Separation of Powers. *See, e.g.*, *Lucia v. SEC*, 138 S. Ct. 2044 (2018) (SEC administrative-law judge is "officer of the United States" under the Appointments Clause); *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590 (2016) (judicial review of agency interpretation of Clean Water Act); *Sackett v. EPA*, 566 U.S. 120 (2012) (same); *Rapanos v. United States*, 547 U.S. 715 (2006) (agency regulations defining "waters of the United States").

d. Lead counsel for Plaintiffs, Caleb Kruckenberg, has represented clients as lead counsel in numerous regulatory challenges under the Administrative Procedure Act, including complex challenges with nationwide effect. *See, e.g., Michigan Assoc. of Public School Academies*, *et al., v. U.S. Dept. of Education, et al.*, 1:22-cv-00712 (W.D. Mich.) (challenge to ED rule for charter school grant funding); *John Doe, et al., v. U.S. Dept. of Justice, et al.*, 5:22-cv-00855 (C.D. Cal.) (challenge to final rule implementing sex offender registration requirements); *Duke Bradford, et al., v. U.S. Dept. of Labor, et al.*, 1:21-cv-3283 (D. Co.) (challenge to minimum wage rule), *rule enjoined by* No. 22-1023 (10th Cir.).

101.    The putative class also meets the requirements of Rule 23(b)(2) and (c)(4) of the Federal Rules of Civil Procedure. These requirements are pleaded collectively and in the alternative.

a. As to Rule 23(b)(2), ED has acted on grounds generally applicable to the putative class. Declaratory and injunctive relief is appropriate with respect to all members of the class.

b. As to Rule 23(c)(4), the question of the validity of ED's regulatory action is eligible for resolution on an issue-certified basis because whether the loan cancellation violates the APA is a "particular issue[]" that is appropriately decided on a class-wide basis.

## III. THE DEPARTMENT'S EFFORTS TO AVOID LEGAL REVIEW

102.    Mr. Garrison filed suit on September 27, 2022. *See* ECF No. 1.

103.    Central to Mr. Garrison's complaint was that both he and up to 8 million others would receive what the Department promised to be "automatic cancellation" of a portion of their student debt, which would result in income tax liability. *See id.*

18

104.     Mr. Garrison also sought a temporary restraining order and a preliminary injunction to prevent ED from granting immediate automatic cancellation as it had promised. *See* ECF Nos. 4, 5.

105.     In response to the suit, ED took several actions, only some of which it acknowledged to this Court.

106.     Just hours after this suit was filed, White House press secretary Karine Jean-Lierre commented on it at a daily briefing, saying, "Opponents of the Biden-Harris administration's student loan plans are trying to stop it because it will provide much needed relief for working families. Anyone who doesn't want to get that debt relief can opt out." NBC News, *Lawsuit seeks to block Biden's student debt forgiveness program*, Sept. 17, 2022, https://www.nbcnews.com/politics/politics-news/lawsuit-seeks-block-bidens-student-debt-forgiveness-program-rcna49638.

107.     At the time, however, ED's own website said nothing about opting out, and still proudly proclaimed that "we have income data on hand for around 8 million borrowers. These borrowers will get the relief automatically." *One-Time Student Loan Debt Relief*, https://studentaid.gov/debt-relief-announcement/one-time-cancellation (Sept. 27, 2022).

108.     The next day, ED quietly amended its website to conform its policy to the Press Secretary's.

109.     As ED said in a notice to this Court, it had amended its website, which apparently contains the full and final regulatory action concerning cancellation, to now include the language, "If you would like to opt out of debt relief for any reason, including because you are concerned about a state tax liability, you will be given an opportunity to opt out." *See* ECF No. 13.

110.     ED also noted that it had taken steps to attempt to moot the present case, "Upon receiving this lawsuit and reviewing Plaintiff's filings, the Department has already taken steps to effectuate

Plaintiff's clearly stated desire to opt out of the program and not receive $20,000 in automatic cancellation of his federal student loan debt, and so notified Plaintiff's counsel today." *Id.*

111.    The following day, September 29, 2022, a group of six states filed suit challenging the debt cancellation plan, this time objecting, in part, to ED's action of consolidating Federal Family Education Loan Program (FFELP) loans into the new cancellation program. *See Nebraska, et al., v. Biden, et al.*, No. 4:22-cv-1040 (E.D. Mo.), ECF No. 1 at ¶¶ 62-63, 119-20.

112.    Up until the filing of that suit ED had proclaimed on its loan cancellation FAQs that FFELP borrowers could benefit from the cancellation program. *See id.* at ¶¶ 62-63.

113.    Within hours, ED *yet again* updated its website, this time in an effort to moot the States' challenge.

114.    According to one report, "In a remarkable reversal that will affect the fortunes of many student loan borrowers, the U.S. Department of Education has quietly changed its guidance around who qualifies for President Biden's sweeping student debt relief plan." Cory Turner, *In a reversal, the Education Dept. is excluding many from student loan relief*, NPR (Sept. 30, 2022), https://www.npr.org/2022/09/29/1125923528/biden-student-loans-debt-cancellation-ffel-perkins?utm_campaign=npr&utm_medium=social&utm_term=nprnews&utm_source=twitter.com.

115.    Other reports recognized ED's calculated attempt to avoid the lawsuits.

116.    The New York Times reported that the "automatic cancellation" at issue in this case "would leave the plan open to legal challenges" since "[o]pponents of automatic debt relief say that borrowers in some states would be forced to pay taxes on the forgiven debts." Katie Rogers, *Biden's Student Debt Plan Touches Off Lawsuits, Scams and Confusion*, NY Times (Sept. 30, 2022) https://www.nytimes.com/2022/09/30/us/politics/biden-student-loans.html.

117.    But in response to this suit, "This week, the administration updated its guidance to let borrowers know they could opt out of automatic relief." *Id.*

118.    The FFELP borrowers, in turn "have been excluded without much notice: On the same day officials in six Republican-led states filed a lawsuit accusing Mr. Biden of abusing his power and acting unlawfully, the administration updated eligibility guidance to say that borrowers whose federal loans are privately held were no longer part of the program. The effort was no coincidence — eliminating eligibility for those students could make it harder for a Republican attorney general to successfully attack the entire program in court." *Id.*

119.    This Court held a status report on September 29, 2022, and ED's attorney represented that the Department would not cancel Mr. Garrison's loans, and thus, the case had been successfully mooted.

120.    ED's attorney did not say when the remaining cancellation would occur, nor did it commit to doing so only after a formal rulemaking or other written action by the President or the Department.

121.    In reliance on the representations made by ED, this Court denied the motions for preliminary relief without prejudice and allows Mr. Garrison to amend his complaint on or before October 10, 2022. ECF No. 16.

122.    This Court also requested that Mr. Garrison address the following issues:

  a.  Whether he (and any additional plaintiffs) have standing. Particularly, whether their injury is caused by and fairly traceable to the debt relief program or to the Indiana Tax Code. *See Segovia v. United States*, 880 F.3d 384, 388–89 (7th Cir. 2018).

  b.  Whether the Department of Education has taken sufficient action for the case to be ripe for adjudication. Plaintiff's allegations speculate about the terms of the

program. But as evidenced by the Government's recent addition of an optout provision, the plan is still evolving.

123.    In a stipulation that ED filed that same day in the litigation initiated by the States, ED was slightly more forthcoming concerning its intent in the coming weeks.

124.    It represented that ED "will not discharge any student loan debt pursuant to the policy challenged in this case before October 17, 2022[.]" *See Nebraska, et al., v. Biden, et al.*, No. 4:22-cv-1040 (E.D. Mo.), ECF No. 14 at 1.

125.    That stipulation is signed by the same counsel appearing in this matter on ED's behalf. *See id.* at 3.

## IV. LOAN CANCELLATION REMAINS IMMINENT

126.    ED does not intend to follow the normal, formal pathways to implementing its cancellation policy.

127.    It has confirmed that it views loan cancellation as an "ongoing Departmental action[]," not a rule that will be submitted to Congress under the Congressional Review Act.

128.    ED will implement loan cancellation without issuing a final rule or undertaking notice and comment. *See Use of the Heroes Act of 2003 to Cancel the Principal Loan Amounts of Student Loans*, 46 Op. O.L.C. __, 2022 WL 3975075, at *3 (Aug. 23, 2022) (OLC opinion advising ED that it "is authorized to disregard notice-and-comment requirements when implementing the [HEROES] Act," "is exempt from otherwise-applicable procedural requirements that would delay the implementation" of loan cancellation, and need "only publish a notice" to effect loan cancellation).

129.    ED's FAQs appear to be the only public description of the actual policy, even though ED intends to implement the policy "in October 2022." *One-Time Student Loan Debt Relief*, https://studentaid.gov/debt-relief-announcement/one-time-cancellation (Oct. 5, 2022).

130.    ED also intends to apply cancellation to millions of borrowers who do not apply. *Id.*

131.    According to ED, "Although most borrowers will have to apply for debt relief, we have income data on hand for around 8 million borrowers. These borrowers will get the relief without applying, unless they choose to opt out (see below, "What if I don't want to receive debt relief?")." *Id.*

132.    ED has already implemented part of its cancellation policy, by improperly allowing consolidation of FFELP loans. *See Nebraska, et al., v. Biden, et al.*, No. 4:22-cv-1040 (E.D. Mo.), ECF No. 1 at ¶¶ 62-63, 119-20.

133.    ED only stopped improperly consolidating loans in direct response to litigation.

134.    ED has only committed to delaying its cancellation policy until October 17, 2022, at which point the Department will proceed with its stated policy. *See Nebraska, et al., v. Biden, et al.*, No. 4:22-cv-1040 (E.D. Mo.), ECF No. 14 at 1.

135.    Meanwhile, ED has taken steps to implement its application for cancellation, which "is expected to go live" any day. *See* Katie Lobosco, *Biden's student loan forgiveness application is coming soon. Here's what you need to know*, CNN (Oct. 4, 2022) https://www.cnn.com/2022/10/04/politics/student-loan-forgiveness-application-rules.

136.    ED has also publicly stated that it does not intend to delay its cancellation even in light of the stipulated delay.

137.    According to one report, "On a call with reporters Wednesday [Oct. 5, 2022], a senior administration official said the date provided to the court has no bearing on when the application

will go live but declined to give a firm release date. 'We're charging full speed ahead in getting relief to borrowers who need it most,' the official said, speaking on the condition of anonymity under ground rules set by the administration. 'We've already started communicating with borrowers on what to expect in the coming weeks. And we'll have more updates in the coming days.'" Danielle Douglas-Gabriel, *White House shares more on student loan forgiveness application, efforts to curb scams*, Washington Post (Oct. 5, 2022) https://www.washingtonpost.com/education/2022/10/05/student-loan-forgiveness-application-scams/.

138.    ED confirmed during the same call that "Roughly 8 million borrowers whose income is already on file at the department will have their loans automatically forgiven without having to apply." *Id.*

139.    If ED is not enjoined, it will apply automatic cancellation to up to 8 million borrowers, including members of the putative class, who do not opt-out, during the month of October 2022. *One-Time Student Loan Debt Relief*, https://studentaid.gov/debt-relief-announcement/one-time-cancellation (Oct. 5, 2022).

140.    Mr. Johnson is just one of those borrowers facing imminent and unwanted cancellation.

**V. PLAINTIFFS HAVE STANDING TO SUE**

**A. Mr. Garrison and Other Borrowers Have Standing**

141.    The date Mr. Garrison's original complaint was filed, he suffered an imminent injury fairly traceable to ED's loan cancellation policy because he was in the class of borrowers who would be subjected to automatic cancellation and ensuing state tax liability.

142.    Traceability "requires no more than *de facto* causality." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019). A plaintiff's injury by a third party is traceable to a defendant's action when

"third parties will likely react in predictable ways" to the defendant's actions, and that predictable action causes the injury. *Id.*

143.   It was (and remains) predictable that Indiana will react to ED's loan cancellation by levying higher taxes against Mr. Garrison for the 2022 tax year, because the state has specified in statute that it will tax cancelled loan amounts as income. Ind. Code § 6-3-1-3.5(a)(30). Mr. Garrison's impending state tax liability was therefore traceable to ED's cancellation policy as a but-for cause of the tax liability.

144.   An injunction and declaratory judgment against the cancellation would redress Mr. Garrison's impending injury.

145.   Mr. Johnson also faces an imminent injury fairly traceable to ED's loan cancellation policy because he remains subject to automatic loan cancellation and ensuing state tax liability.

146.   As with Mr. Garrison, Mr. Johnson faces the predictable and unwanted tax liability arising from Indiana law once ED takes action, but an injunction would redress this injury.

147.   Members of the putative class also have standing because, like Mr. Garrison and Mr. Johnson, they too would face state tax liability from ED's cancellation.

148.   Members of the putative class also face imminent cancellation if they fail to opt-out of ED's policy, even if they lack notice of the cancellation policy. An injunction and declaratory judgment would redress the impending injuries faced by the putative class.

### B. The Challenge Is Not Moot

149.   ED's attempt to avoid judicial review of its cancellation policy by relieving Mr. Garrison of the cancellation in direct response to this lawsuit does not moot this challenge.

150.    ED's actions are designed solely to avoid litigation, and judicial review is available under the voluntary cessation exception to mootness. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000).

151.    ED's actions constitute an involuntary settlement, which does not prevent a putative class representative from continuing to litigate a class action even when he "no longer has a personal stake." *Wrightsell v. Cook Cnty.*, 599 F.3d 781, 783 (7th Cir. 2010).

152.    ED's "inherently transitory" cancellation policy can also be reviewed for a class-wide injunction, even if Mr. Garrison's individual injury has been stopped, because the nature of the cancellation policy is too transitory for immediate judicial review. *See Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 76 (2013).

153.    Furthermore, Mr. Johnson still faces imminent automatic cancellation, and has a live controversy that he shares with members of the putative class.

### COUNT I—VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)—RULE IN EXCESS OF STATUTORY AUTHORITY

154.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

155.    "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Thus, "an agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). The Administrative Procedure Act (APA) directs a court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right" or "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2)(A), (B), (C).

26

156.   "'[A]gency action' includes the whole or a part of an agency rule, order, license, sanction, relief[.]" 5 U.S.C. § 551(13).

157.   ED's debt cancellation is reviewable agency action as it is a final decision by the agency that has sweeping legal consequences.

158.   The cancellation, announced formally and supported by two memos, one from ED's own general counsel and one from OLC, marks the consummation of the Department's decision-making process concerning its decision to cancel student loans.

159.   The action also determines rights and legal obligations, as it purports to erase more than $500 billion in federal student debt, for more than 40 million borrowers, and does so automatically for up to 8 million borrowers.

160.   The Department has no lawful authority to issue the rule.

161.   The debt cancellation is not justified by the HEROES Act because, among other reasons, the cancellation is neither "necessary," nor is it targeted at harms that are "a direct result of a . . . national emergency." *See* 20 U.S.C. § 1098ee(2).

162.   The putative harms targeted by the cancellation are not a "direct result" of the "national emergency" surrounding the COVID-19 pandemic, as student loan borrowers are not directly "affected individuals" who "suffered direct economic hardship as a direct result of a war or other military operation or national emergency." *See* 20 U.S.C. § 1098ee(2).

163.   The mass cancellation is also hardly "necessary" to mitigate the economic harms of the pandemic. *See* 20 U.S.C. § 1098bb(a)(2)(A).

164.   Cancellation also runs afoul of the requirement in Section 1098bb(a)(2) that borrowers "are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals." For borrowers like Mr. Garrison and Mr. Johnson as well as putative

class members who are borrowers in other states that tax cancellation as income, the overall debt burden increases as a result of the Department's debt cancellation program.

165.    Cancellation also affords relief to those who are "not placed in a worse position financially in relation to [their] financial assistance because of their status as affected individuals," because it extends to individuals who are not worse off compared to early 2020, individuals who are not worse off relative to their federal student loans, and individuals who are not worse off because of their status as affected individuals.

166.    Additionally, to the extent the statute can *arguably* justify the cancellation, the major questions doctrine requires a clear authorization by Congress of such an economically and politically significant action, which is lacking here. *See West Virginia v. EPA*, No. 20-1530, 2022 WL 2347278 (U.S. June 30, 2022).

167.    Without a valid source of authority, the Secretary has "literally has no power to act." *See La. Pub. Serv. Comm'n*, 476 U.S. at 374.

168.    The impending cancellation was issued in excess of statutory authority and is therefore invalid.

169.    As a result of the foregoing, Plaintiffs are entitled to a declaratory judgment and permanent injunction barring any cancellation action, attorneys' fees, expenses, costs and disbursements, and any other relief that may be appropriate.

### COUNT II—VIOLATION OF U.S. CONSTITUTION, NON-DELEGATION DOCTRINE AND SEPARATION OF POWERS

170.    Plaintiffs repeat and reallege each and every allegation hereinabove as if fully set forth herein.

171.    The APA directs a court to "hold unlawful and set aside" an agency's rule that is "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

172.     Article I, § 1, of the Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States."

173.     No agency has any inherent power to make law, and "an agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n*, 476 U.S. at 374.

174.     Article II, § 3, of the Constitution directs that the President "shall take Care that the Law be faithfully executed . . . ."

175.     A "fundamental precept" of "another strand of [] separation-of-powers jurisprudence, the delegation doctrine," "is that the lawmaking function belongs to Congress, U.S. Const., Art. I, § 1, and may not be conveyed to another branch or entity." *Loving v. United States*, 517 U.S. 748, 758 (1996).

176.     Congress may not "abdicate or [] transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935).

177.     The HEROES Act empowers an Executive official to "waive or modify any statutory . . . provision" as that official "deems necessary." 20 U.S.C. § 1098bb(a)(1).

178.     Such waiver or modification of a statute has a "legislative character," as "confirmed by the character of the Congressional action it supplants"—legislative amendment. *INS v. Chadha*, 462 U.S. 919 (1983).

179.     The statute permits the Secretary to suspend the law, to "modify" it with his own "terms and conditions," 20 U.S.C. § 1098bb(a)(1), (b)(2), and to do so when and how "[he] deems necessary," *id.* § 1098bb(a)(1).

180.     The statute thus bestows the Executive with lawmaking power in violation of Article I of the Constitution.

181.    As a result of the foregoing, Plaintiffs are entitled to a declaratory judgment and permanent injunction declaring the delegations in 20 U.S.C. § 1098bb(a)(1) invalid, barring any cancellation action, attorneys' fees, expenses, costs and disbursements, and any other relief that may be appropriate.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiffs demand judgment against Defendants as follows:

(i) The issuance of an injunction, pursuant to 5 U.S.C. § 705 and 28 U.S.C. § 2201, prohibiting Defendants from enacting loan cancellation;

(ii) A declaratory judgment, pursuant to 5 U.S.C. § 706(2) and 28 U.S.C. § 2202, holding unlawful and setting aside any action by Defendants to enact loan cancellation;

(iii) A declaratory judgment and permanent injunction declaring the delegations in 20 U.S.C. § 1098bb(a)(1) invalid;

(iv) An award of attorneys' fees and costs to Plaintiffs; and

(v) Any other relief as the Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

DATED:  October 10, 2022.

Respectfully submitted,

*/s/ Caleb Kruckenberg*
**CALEB KRUCKENBERG\***
Pacific Legal Foundation
3100 Clarendon Blvd, Suite 610
Arlington VA 22201
Telephone: 202-888-6881
incominglit@pacificlegal.org


**MICHAEL POON\***
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
incominglit@pacificlegal.org

*\*Pro Hac Vice*
*Attorneys for Plaintiff*

31

**CERTIFICATE OF SERVICE**

I certify that on this day, October 10, 2022, I served copies of the foregoing on counsel of

record for all Defendants using the Court's CM/ECF system.


*/s/ Caleb Kruckenberg*
**CALEB KRUCKENBERG**