UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| FRANK GARRISON, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:22-cv-01895-RLY-TAB |
| | ) | |
| U.S. DEPARTMENT OF EDUCATION, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND IN SUPPORT OF MOTION TO DISMISS**

## **STATEMENT OF ISSUES**

1. Whether the Court should dismiss this case for lack of standing where Plaintiffs can opt out of the challenged federal government policy and where the injury that Plaintiffs assert is imposed by the Indiana state tax code, not any action of the Defendants.

2. Whether the Court should deny Plaintiffs' motions for preliminary injunction and temporary restraining order where they have not shown the existence of any irreparable injury and have not shown a likelihood of success on the merits of their claims because the challenged federal government policy is authorized by a statute that provides intelligible principles for the lawful exercise of agency discretion.

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

BACKGROUND .........................................................................................................................2

I.      Statutory and Regulatory Background ............................................................................2

II.     The HEROES Act ...........................................................................................................2

III.    The COVID-19 Pandemic ...............................................................................................4

IV.     The Targeted One-Time Pandemic Loan Discharge Plan ...............................................5

V.      Procedural History ..........................................................................................................7

LEGAL STANDARDS ...............................................................................................................8

ARGUMENT ..............................................................................................................................9

I.      The Court Should Dismiss This Case For Lack Of Subject-Matter Jurisdiction .........9

        A.      Plaintiffs Lack Standing Because They Can Opt Out of Loan Cancellation. ...........10

        B.      Plaintiffs' Theory of Standing Is Impermissibly Speculative ...........................14

II.     Plaintiffs Have Failed To Establish A Likelihood Of Success On The Merits. .............16

        A.      The HEROES Act Authorizes the Targeted Student-Loan Debt Relief. ..................16

                1.      The Secretary Is Authorized to Modify Loan Discharge Provisions
                        for the Benefit of At-Risk Borrowers Affected by the COVID-19
                        Pandemic. ......................................................................................................16

                2.      Plaintiffs Misinterpret the Scope of Relief Available Under the
                        HEROES Act. ..............................................................................................21

                3.      Plaintiffs Do Not Undermine the Secretary's Conclusion that a
                        Limited Measure of Student-Loan Discharges Is Necessary. ..................24

        B.      The Major Questions Doctrine Does Not Negate the Clear Statutory
                Authorization Provided by the HEROES Act. ............................................................25

        C.      Plaintiffs' Nondelegation Claim Fails. .....................................................................31

III.    Plaintiffs Have Failed To Establish Any Irreparable Harm ...........................................36

IV.     The Balance Of The Equities And Public Interest Weigh Against Injunctive Relief. ...........37

V.      Any Relief Should Be Appropriately Limited. ..............................................................39

CONCLUSION.........................................................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Access Living Metro. Chicago v. Uber Techs., Inc.,*
958 F.3d 604 (7th Cir. 2022) ........................................................................................10

*Ala. Ass'n of Realtors v. HHS,*
141 S. Ct. 2485 (2021) ..................................................................................26, 27, 29

*Arizona v. Biden,*
40 F.4th 375 (6th Cir. 2022) .........................................................................................39

*Bazile v. Finance Sys. of Green Bay, Inc.,*
983 F.3d 274 (7th Cir. 2020) ...........................................................................................9

*Biden v. Missouri,*
142 S. Ct. 647 (2022) ...................................................................................................27

*Bryant v. Compass Group USA, Inc.,*
958 F.3d 617 (7th Cir. 2020) .........................................................................................14

*Cassell v. Snyders,*
990 F.3d 539 (7th Cir. 2021) ...........................................................................................9

*Castillo v. Unilever U.S., Inc.,*
No. 20 C 6786, 2022 WL 704809 (N.D. Ill. Mar. 9, 2022) ...........................................11

*Cellco P'ship v. FCC,*
357 F.3d 88 (D.C. Cir. 2004) .........................................................................................22

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983) .........................................................................................................10

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) .......................................................................................................10

*Clinton v. City of New York,*
524 U.S. 417 (1998) ................................................................................................33, 34

*Cnty. of El Paso v. Chertoff,*
No. EP-08-CA-196-FM, 2008 WL 4372693 (W.D. Tex. Aug. 29, 2008) .........................35

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,*
447 U.S. 102 (1980) .......................................................................................................30

*Cornish v. Dudas,*
540 F. Supp. 2d 61 (D.D.C. 2008) ................................................................................38

*Craft v. Health Care Serv. Corp.*,
  No. 14 C 5853, 2016 WL 1270433 (N.D. Ill. Mar. 31, 2016) ...........................................15

*Ctr. for Biological Diversity v. McAleenan*,
  404 F. Supp. 3d 218 (D.D.C. 2019) .................................................................................35

*Curtis v. 7-Eleven, Inc.*,
  No. 21-cv-6079, 2022 WL 4182384 (N.D. Ill. Sept. 13, 2022) .......................................11

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) .................................................................................................. 27, 29

*Florida Power & Light Co v. Lorion*,
  470 U.S. 729 (1985) .........................................................................................................8

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) .......................................................................................................12

*GEFT Outdoors, LLC v. City of Westfield*,
  922 F.3d 357 (7th Cir. 2019) ...................................................................................... 9, 36

*Georgia v. President of the United States*,
  46 F.4th 1283 (11th Cir. 2022) .......................................................................................39

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018) ....................................................................................................39

*Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*,
  512 F.3d 1112 (9th Cir. 2008) .........................................................................................38

*Gundy v. United States*,
  139 S. Ct. 2116 (2019) ............................................................................................. 32, 33

*In re Border Infrastructure Env't Litig.*,
  284 F. Supp. 3d 1092 (S.D. Cal. 2018) ...........................................................................35

*Indiana Coal. for Public Educ. v. McCormick*,
  338 F. Supp. 3d 926 (S.D. Ind. 2018) .............................................................................16

*Industrial Union Department, AFL-CIO v. American Petroleum Institute*,
  448 U.S. 607 (1980) .......................................................................................................33

*INS v. Chadha*,
  462 U.S. 919 (1983) ................................................................................................. 33, 34

*Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*,
  846 F.2d 1079 (7th Cir. 1988) .........................................................................................39

*Isby-Isreal v. Lemmon*,
  No. 2:12-cv-116-JMS-MJD, 2012 WL 13202744 (S.D. Ind. June 13, 2012) ......................................8

*Kohen v. Pac. Inv. Mgmt. Co.*,
  571 F.3d 672 (7th Cir. 2009) ..........................................................................................................11

*Lewis v. Casey*,
  518 U.S. 343 (1996) .........................................................................................................................10

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
  140 S. Ct. 2367 (2020)......................................................................................................................31

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ..................................................................................................................... 9, 15

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994)..........................................................................................................................39

*Mahwiziki v. CDC*,
  573 F. Supp. 3d 1245 (N.D. Ill. Nov. 22, 2021) ...............................................................................8

*MainStreet Org. of Realtors v. Calumet City*,
  505 F.3d 742 (7th Cir. 2007) .............................................................................................................9

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) .................................................................................................................... 8, 37

*McKenzie v. City of Chicago*,
  118 F.3d 552 (7th Cir. 1997) .......................................................................................................36-37

*Mike Avila Trustee v. Bronger Masonry, Inc.*,
  123 F. Supp. 3d 1088 (S.D. Ind. 2015)............................................................................................36

*Mistretta v. United States*,
  488 U.S. 361 (1989) .........................................................................................................................32

*Morgan v. Veterans Canteen Serv.*,
  No. 1:17-cv-03671-TWP-DLP, 2018 WL 3208195 (S.D. Ind. June 29, 2018)..................................9

*Nat'l Ass'n of Mfrs. v. Dep't of*,
  *Def.*, 138 S. Ct. 617 (2018) ............................................................................................................31

*Nebraska v. Biden*,
  No. 22-cv-1040 (E.D. Mo. Oct. 7, 2022) ...........................................................................................8

*Nken v. Holder*,
  556 U.S. 418 (2009) ...............................................................................................................9, 37-38

*North Carolina v. Covington*,
    137 S. Ct. 1624 (2017) ...................................................................................................... 40

*Ozinga v. Price*,
    855 F.3d 730 (7th Cir. 2017) ............................................................................................ 13

*Second City Music, Inc. v. City of Chicago*,
    333 F.3d 846 (7th Cir. 2003) ............................................................................................ 13

*Segovia v. United States*,
    880 F.3d 384 (7th Cir. 2018) ............................................................................................ 15

*Sherman v. Koch*,
    623 F.3d 501 (7th Cir. 2010) ............................................................................................ 11

*Simic v. City of Chicago*,
    851 F.3d 734 (7th Cir. 2017) ............................................................................................ 12

*Smith v. Golden Rule Ins. Co.*,
    526 F. Supp. 3d 374 (S.D. Ind. 2021) .............................................................................. 10

*Speech First, Inc. v. Killeen*,
    968 F.3d 628 (7th Cir. 2020) ............................................................................................ 13

*Sullivan v. Liberty Mut. Ins. Co.*,
    No. 21 C 6084, 2022 WL 2105904 (N.D. Ill. June 10, 2022) .......................................... 11

*Tiger Lilly, LLC v. U.S. Dep't of Hous. and Urb. Dev.*,
    5 F.4th 666 (6th Cir. 2021) .............................................................................................. 33

*Touby v. United States*,
    500 U.S. 160 (1991) .......................................................................................................... 32

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) ................................................................................................ 9, 14

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ...................................................................................................... 39

*Trustees of Teamsters Union No. 142 Pension Fund v. AJ & S Trucking, Inc.*,
    992 F. Supp. 2d 870 (N.D. Ind. 2014) ............................................................................ 37

*United States v. Gonzales*,
    520 U.S. 1 (1997) .............................................................................................................. 16

*United States v. Melgar-Diaz*,
    2 F.4th 1263 (9th Cir. 2021) ............................................................................................ 32

vii

*United States v. Mitchell*,
  18 F.3d 1355 (7th Cir. 1994) ................................................................................33

*Univ. of Notre Dame v. Sebelius*,
  743 F.3d 547 (7th Cir. 2014) ................................................................................36

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014) ................................................................................................26

*Walters v. Edgar*,
  163 F.3d 430 (7th Cir. 1998) ................................................................................13

*Weinberger v. Salfi*,
  422 U.S. 749 (1975) ................................................................................................22

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022) ...................................................................................*passim*

*Winter v. NRDC, Inc.*,
  555 U.S. 7 (2008) ..............................................................................................8, 36

**Statutes**

7 U.S.C. § 2015(o) ........................................................................................................35

20 U.S.C. § 1071 .............................................................................................................2

20 U.S.C. § 1078(a)(1) ...................................................................................................2

20 U.S.C. § 1082 ......................................................................................................2, 29

20 U.S.C. § 1087-4 .........................................................................................................2

20 U.S.C. § 1087aa ........................................................................................................2

20 U.S.C. § 1087dd(g)(1) ............................................................................................29

20 U.S.C. § 1087ii ..........................................................................................................2

20 U.S.C. § 1087*ll* ........................................................................................................2

20 U.S.C. § 1098bb ...............................................................................................*passim*

20 U.S.C. § 1098ee(2) ...............................................................................................3, 17

20 U.S.C. § 1412(a)(18)(c) ..........................................................................................35

20 U.S.C. § 3441 .............................................................................................................2

20 U.S.C. § 3471 .............................................................................................................2

21 U.S.C. § 360bbb-3 ...............................................................................................................35

42 U.S.C. § 1315(a) ..................................................................................................................35

47 U.S.C. § 160(a) ....................................................................................................................35

50 U.S.C. § 1621 .........................................................................................................................3

American Rescue Plan Act of 2021 ("ARPA"),
  Pub. L. 117-2, 135. Stat. 4 (2021) ...........................................................................15, 31, 35

Coronavirus Aid, Relief, and Economic Security Act,
  Pub. L. 116-136, 134. Stat. 281 (2020) ................................................................................4

Higher Education Act of 1965 ("HEA"),
  20 U.S.C. § 1070 .....................................................................................................................2

Higher Education Relief Opportunities for Students Act of 2003 ("HEROES Act"),
  Pub L No. 108-76, 117 Stat. 904 (2003) (codified at 20 U.S.C. §§ 1098aa-1098ee) ..........2

Immigration and Nationality Act of 1952 ("INA"),
  Pub L No. 82-414, 66 Stat. 163 (1952).................................................................................34

**Legislative Materials**

H.R. 7058, 117th Cong. (introduced Mar. 11, 2022) ................................................................30

H.R. 7656, 117th Cong. § 4(d)(1) (introduced May 3, 2022) ...................................................30

S. 4094, 117th Cong. § 4(d)(1) (introduced Apr. 27, 2022).....................................................30

**Administrative and Executive Materials**

34 C.F.R. § 30.70 ......................................................................................................................29

34 C.F.R. Part 682, App. D .......................................................................................................29

*Continuation of the National Emergency Concerning the Coronavirus Disease 2019 (COVID-19) Pandemic*,
  87 Fed. Reg. 10,289 (Feb. 18, 2022) ...................................................................................17

*Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*,
  85 Fed. Reg. 15,337 (Mar. 18, 2020) ....................................................................................4

U.S. Dep't of Educ., *Federal Student Aid Programs (Federal Perkins Loan Program, Federal Family Education Loan Program, and William F. Ford Federal Direct Loan Program)* ("2022 Notice"),
  87 Fed. Reg. 51,512 (Oct. 12, 2022) ...........................................................................5, 17, 18

U.S. Dep't of Educ., *Federal Student Aid Programs (Student Assistance General Provisions, Federal Perkins Loan Program, William D. Ford Federal Direct Loan Program, and Federal Work Study Programs* ("2020

Notice"),
85 Fed. Reg. 79,856 (Dec. 11, 2020) ............................................................4, 17, 18

U.S. Dep't of Educ., Office of the General Counsel, *The Secretary's Legal Authority for Debt Cancellation* (2022),
87 Fed. Reg. 52,943 (Aug. 30, 2022) ..........................................................................3

**<u>Other Authorities</u>**

Centers for Disease Control and Prevention, COVID Data Tracker (Oct. 18, 2022),
https://perma.cc/TH7W-LM8T .....................................................................................4

*Ensure*, MerriamWebster,
https://www.merriam-webster.com/dictionary/ensure ...............................................23

Federal Emergency Management Agency, COVID-19 Disaster Declarations,
https://perma.cc/B7KA-W4KD. ....................................................................................4

Federal Student Aid ("FSA"), Fiscal Year 2020 Annual Report 38 (Nov. 16, 2020),
https://perma.cc/9ZM7-HWZP......................................................................................4

Federal Student Aid ("FSA"), *Student Loan Delinquency and Default*,
https://perma.cc/9T5Y-7Q9L.................................................................................38-39

U.S. Dep't of Educ., *Biden-Harris Administration Announces Final Student Loan Pause Extension Through December 31 and Targeted Debt Cancellation to Smooth Transition to Repayment*,
https://perma.cc/AP3Q-3V6C ........................................................................................5

U.S. Dep't of Educ *Education Department Approves $5.8 Billion Group Discharge to Cancel all Remaining Loans for 560,000 Borrowers Who Attended Corinthian* (June 1, 2022),
https://perma.cc/MTW6-XABV....................................................................................29

U.S. Dep't of Educ., FSA, *One-Time Student Debt Relief* ("FSA Website"),
https://studentaid.gov/manage-loans/forgiveness-cancellation/debt-relief-info (last visited Oct. 18, 2022) ...........................................................................................................6, 12, 13

U.S. Dep't of Justice, *Secretary DeVos Cancels Student Loans, Resets Pell Eligibility, and Extends Closed School Discharge Period for Students Impacted by Dream Center School Closures* (Nov. 8, 2019),
https://perma.cc/FRT6-WAWS ................................................................................29-30

U.S. Dep't of Justice, Office of Legal Counsel, *Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans*,
2022 WL 3975075 (Aug. 23, 2022) ...............................................................................3

*Webster's Third New International Dictionary* 97 (1976) ..................................................16

# INTRODUCTION

This Court denied Plaintiff Frank Garrison's emergency motions for extraordinary preliminary relief because he "cannot be irreparably harmed as is required for preliminary relief."  ECF No. 16. The Court granted leave to file an amended complaint with a warning to consider, among other things, whether Mr. Garrison (and any additional plaintiffs) have standing. *Id.*  Eleven days later, an amended complaint was filed that retains Mr. Garrison as a named plaintiff and adds another similarly situated individual who likewise faces no prospect of harm from the student loan debt discharge policy challenged in this action.  As was the case when the Court denied the first round of emergency motions, anyone eligible for automatic relief—including Plaintiffs—can opt out and choose not to receive any student loan debt relief.  Accordingly, Plaintiffs still face no threat of harm, irreparable or otherwise, and the Court should again deny their motions for emergency relief—and indeed, dismiss this case altogether—for that reason alone.

Plaintiffs also fail to satisfy any of the other requirements for the extraordinary relief they seek. On the merits, the Department of Education's targeted student loan cancellation program is authorized by the Higher Education Relief Opportunities for Students Act of 2003 ("HEROES Act"), which authorizes the Secretary of Education to waive or modify the terms of federal student loans to ameliorate the economic effects of war or national emergencies like COVID-19.  The Department has responded to the COVID-19 crisis by suspending payments on Department-held loans for more than two years, pursuant to the same HEROES Act provision relied upon here.  Now, as the payment pause draws to a close, the Secretary has determined, consistent with that authority, to provide a measure of student loan forgiveness to Americans at risk of student loan delinquency and default to ensure that the pandemic will not make them financially worse off with respect to their student loans as they resume making payments on those loans.  The Secretary's determination satisfies each element of the statutory text.  There is no basis to depart from that text, as the Secretary's authority to manage

the federal student loan programs is well established and long-standing. And Plaintiffs' nondelegation arguments are meritless given the intelligible principles clearly set forth in the HEROES Act.

Nor does the public interest support an injunction that would delay or deny necessary relief to millions of federal student loan borrowers merely because two individuals who would prefer not to receive that relief would rather pursue a federal lawsuit than simply opt out. The Court should deny Plaintiffs' motions.

## BACKGROUND

### I.     Statutory and Regulatory Background

The Secretary of Education ("Secretary") is charged with carrying out certain student loan programs under Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. § 1070 *et seq.* Foremost among these is the William D. Ford Federal Direct Loan Program, which allows students to apply for and receive Direct Loans from the federal government to pay for their educational expenses, including tuition and living expenses. 20 U.S.C. § 1087*ll*. Title IV also includes other programs, such as the Federal Family Education Loan ("FFEL") Program, *id.* §§ 1071-1087-4, and the Perkins Loan Program, *id.* §§ 1087aa-1087ii, although no new loans are authorized under either program. *See id.* § 1078(a)(1) (no new FFEL loans after July 1, 2010); *id.* § 1087aa(b)(2) (no new Perkins loans after September 30, 2017). The HEA delegates significant authority to the Secretary to administer the Department's portfolio of more than 43 million federal student loans, *see* 20 U.S.C. §§ 1082, 3441, 3471, including the authority to "compromise, waive, or release any right, title, claim, lien, or demand" acquired in the Secretary's performance of his vested "functions, powers, and duties" to administer federal student loan programs, *id.* § 1082(a)(6).

### II.    The HEROES Act

The HEROES Act, Pub. L. No. 108-76, 117 Stat. 904 (2003) (codified at 20 U.S.C. §§ 1098aa-1098ee), authorizes the Secretary to take broad and decisive action with respect to the federal student

financial aid programs in times of national emergency. Specifically, it provides that, "notwithstanding any other provision of law," the Secretary may "waive or modify any statutory or regulatory provision applicable to" the federal student financial aid programs "as the Secretary deems necessary in connection with a . . . national emergency to" accomplish certain statutory goals. 20 U.S.C. § 1098bb(a)(1). As relevant here, the Secretary may provide such waivers "as necessary to ensure" that (1) covered Title IV financial aid recipients "are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals," and (2) administrative requirements placed on such covered individuals are "minimized . . . to ease the burden on such students and avoid inadvertent, technical violations or defaults." *Id.* § 1098bb(a)(2). The Act defines the covered population of "affected individual[s]" broadly to encompass any individual who, as relevant here, either "resides or is employed in an area that is declared a disaster area by any Federal, State, or local official in connection with a national emergency," or "suffered direct economic hardship as a direct result of a . . . national emergency . . . as determined by the Secretary." *Id.* § 1098ee(2). And a "national emergency" is a "a national emergency declared by the President of the United States." *Id.* § 1098ee(4); *see* 50 U.S.C. § 1621 (authorizing President to declare national emergencies).

The Act exempts any exercise of the Secretary's authority from certain otherwise applicable procedural requirements, including notice-and-comment rulemaking under the Administrative Procedure Act ("APA"). *See id.* § 1098bb(b)(1), (d). And the statute explicitly states that the Secretary "is not required to exercise the waiver or modification authority under this section on a case-by-case basis." *Id.* § 1098bb(b)(3). Historically, the Department has exercised this authority to provide categorical relief to borrowers in connection with national emergencies. *See* U.S. Dep't of Justice, Office of Legal Counsel, *Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans*, 2022 WL 3975075, at *4–5 (Aug. 23, 2022); U.S. Dep't of Educ., Office of the General Counsel, *The Secretary's Legal Authority for Debt Cancellation* (2022), *available at* 87 Fed. Reg. 52,943 (Aug. 30, 2022).

## III.    The COVID-19 Pandemic

In March 2020, then-President Trump declared a national emergency to contain and combat COVID-19.  *See* 85 Fed. Reg. 15,337 (Mar. 13, 2020).  The federal government has since declared every state, the District of Columbia, and the territories to be disaster areas due to COVID-19.  Federal Emergency Management Agency, COVID-19 Disaster Declarations, https://perma.cc/Y7JE-8XQL. Over the past two and a half years, COVID-19 has killed more than 1 million Americans, *see* Centers for Disease Control and Prevention, COVID Data Tracker (Oct. 18, 2022), https://perma.cc/TH7W-LM8T, and has caused significant disruptions to all aspects of American life.  Even now, COVID-19 is killing more than 300 Americans every day.  *Id.*

In response to the pandemic and the myriad economic difficulties it has imposed, the federal government has taken several significant actions to provide relief to federal student loan borrowers with Department-held loans.  On March 20, 2020, the Secretary invoked the HEROES Act to pause repayment obligations and suspend interest accrual on Department-held student loans.  *See* 85 Fed. Reg. 79,856, 79,857 (Dec. 11, 2020) ("2020 Notice").  Shortly thereafter, Congress enacted legislation directing the Secretary to suspend all payments on any Title IV loans held by the Department and apply a zero percent interest rate to all such loans through September 2020.  Pub. L. No. 116-136, § 3513, 134 Stat. 281 (2020).  These protections were extended by both the Trump and Biden Administrations and remain in effect today pursuant to invocations of the Secretary's HEROES Act authority.  *See, e.g.*, 2020 Notice at 79,857; Federal Student Aid ("FSA"), Fiscal Year 2020 Annual Report at 38 (Nov. 16, 2020), https://perma.cc/9ZM7-HWZP; Memo from Secretary Cardona to Chief Operating Officer ("COO") Cordray ("Decision Memo"), Ex. B to Decl. of James Kvaal ("Kvaal Decl.").[1]  As a result, federal student loan borrowers with Department-held loans have not

---

[1] The Kvaal Declaration is attached as Exhibit 1.

4

been required to make payments on those loans for more than two and a half years.  On August 24, 2022, the Secretary announced that he would use his HEROES Act authority to extend the payment pause and zero percent interest protections one final time, through December 31, 2022.  *See* U.S. Dep't of Educ., *Biden-Harris Administration Announces Final Student Loan Pause Extension Through December 31 and Targeted Debt Cancellation to Smooth Transition to Repayment*, https://perma.cc/AP3Q-3V6C.

## IV.   The Targeted One-Time Pandemic Loan Discharge Plan

To address the financial harms caused by the pandemic and ensure a smooth transition back to repayment status after the long, pandemic-induced payment pause, the Secretary further announced he would use his HEROES Act authority to provide targeted and limited one-time debt relief to certain federal student loan borrowers.[2]  *Id.*  Designed to "address the financial harms of the pandemic" by providing relief to "borrowers at highest risk of delinquencies or default once payments resume," the Department's plan will make up to $10,000 in student loan debt relief available to eligible borrowers with incomes of less than $125,000 per year (or married couples with incomes of less than $250,000 per year).  *Id.*  Such borrowers who received a Pell Grant to attend college are eligible to receive up to $20,000 in loan relief.  *Id.*

This loan forgiveness program is based on the Secretary's determination that such measures are necessary to ensure that "borrowers subject to the payment pause are not placed in a worse position financially by the COVID-19 national emergency as they restart payments."  Decision Memo.  The Secretary recognized that while the payment pause had "delivered substantial relief to millions of loan borrowers," additional steps are needed to address the "heightened risk of loan delinquency and default" that many borrowers face upon reentering repayment and to ensure that such borrowers are not "in a worse position financially due to the pandemic with regard to their ability to repay their

---

[2] The Secretary published the relevant HEROES Act waivers and modifications in a notice in the Federal Register on October 12, 2022.  *See* 87 Fed. Reg. 61,512 (Oct. 12, 2022) ("2022 Notice").

5

loans." *Id.* That determination was based on, among other things, an economic analysis finding that discharging $10,000 in federal student loan debt (and $20,000 for Pell Grant recipients) for borrowers making less than $125,000 (or households making less than $250,000) would reduce the likelihood of delinquency and default for borrowers transitioning back to repayment and ensure that such borrowers are not made worse off by the COVID-19 pandemic. *See generally* Rationale for Pandemic-Connected Loan Discharge Program ("Supporting Analysis"), included with Ex. A to Kvaal Decl.

As part of its ongoing implementation of the announced loan cancellation plan, the Department has published additional information on its website. *See* FSA, *One-Time Federal Student Loan Debt Relief*, https://studentaid.gov/manage-loans/forgiveness-cancellation/debt-relief-info ("FSA Website") (last visited Oct. 18, 2022). That page states that while "most borrowers" will have to apply for debt relief, the Department may be able to provide such relief without any application to certain borrowers for whom it already has sufficient income data available. *Id.* Since September 27, 2022, that website "has informed borrowers that they will have the opportunity to opt out of receiving debt relief," and since October 12, it has provided instructions a borrower can use to contact her loan servicer to opt out of such relief. Kvaal Decl. ¶ 5; *see also* FSA Website (emphasizing that if a borrower "would like to opt out of debt relief for any reason—including because you are concerned about a potential state tax liability"—that borrower should contact her loan servicer). Starting today, the Department also began sending borrowers who it has determined are "eligible for debt relief without applying" an email "notifying them of their eligibility and the option to opt out." Kvaal Decl. ¶ 5. That notice states that if the borrower does not want debt relief, she "ha[s] until November 14 to opt out," and instructs the borrower how to do so. *See* Ex. D. to Kvaal Decl ("Opt-Out Notice"). As Defendants have reported, the Department will not discharge any student loan debt pursuant to the policy challenged in this action prior to October 23, 2022. *See* ECF No. 27.

## V.      Procedural History

Plaintiff Frank Garrison initiated this lawsuit on September 27, 2022.  ECF No. 1.  That same day, he moved for a temporary restraining order and a preliminary injunction, arguing that if he were to receive loan relief, it would give rise to tax liability under state law.  *See* ECF No. 4.   After Defendants informed the Court that Mr. Garrison had the ability to opt out of loan relief, and that the Department had already taken steps to ensure he would not automatically receive any relief, the Court denied the emergency motions without prejudice.  ECF No. 16.  The Court granted leave to file an amended complaint with an admonition to consider whether any potential plaintiff had standing to assert claims that were ripe for adjudication.  *Id.*

Plaintiffs filed the operative amended complaint on October 10, 2022, asserting claims under the APA.  *See* First Am. Compl., ECF No. 23 ("Am. Compl.").  The amended complaint retains Mr. Garrison as a named Plaintiff and adds a new one: Noel Johnson.  Both Plaintiffs allege that they qualify for loan cancellation under the Department's recent policy because their "household income is less than $125,000 per year" and they each "hold[] eligible student loan debt" *Id.* ¶¶ 72, 88.  Mr. Johnson allegedly qualifies for $10,000 in loan relief, *id.* ¶ 88, and Mr. Garrison allegedly qualifies for $20,000 because he "was a Pell Grant recipient," *id.* ¶ 72.  Plaintiffs contend that they will be harmed by such loan cancellation because they are both current residents of Indiana, *id.* ¶¶ 70, 86, and under current Indiana law the student loan debt relief specified in the Department's policy will allegedly be taxed as income.  *See id.* ¶¶ 74, 90 (alleging that once each Plaintiff receives the amount of loan cancellation to which they are entitled, he will face a state income tax liability for 2022); Mem. in Supp. of Pls.' Mot. for Prelim. Inj. at 31, ECF No. 25-1("PI Br.").

Plaintiffs further allege that they otherwise intend to seek loan cancellation in the future based on the Department's separate Public Service Loan Forgiveness ("PSLF") program and that amounts cancelled pursuant to the PSLF program would not be subject to state income taxes under current

Indiana law. *Id.* ¶¶ 69-71, 85-87. As a result, and because Plaintiffs are each currently making "limited monthly payments under [an income-driven repayment plan]," they allege that a $10,000 or $20,000 reduction to their "total indebtedness will not change either [their] monthly payment obligation or the total amount of the loans [they] must repay." *Id.* ¶¶ 76, 92. Plaintiffs seek to represent a class of all "persons who qualify for ED's impending automatic loan cancellation and reside in states imposing income tax obligations for any amount of debt cancelled under ED's policy." *Id.* ¶ 95; *but see* Pls.' Mot. for Class Cert. at 2, ECF No. 24 (defining the class as any such individual who also "will seek statutory loan forgiveness through programs such as income-driven repayment or [PSLF]").

Based solely on this alleged threat of "financial harm" to the subset of borrowers who may be eligible for automatic relief but would prefer not to receive it, *see* PI Br. at 31, Plaintiffs filed renewed motions for emergency relief on October 10, 2022, *see* ECF Nos. 25 & 26.[3] They request that the Court "enjoin Defendants' entire program" on a nationwide basis. PI Br. at 34.

## LEGAL STANDARDS

"A preliminary injunction—and, by extension, a temporary restraining order—is 'an extraordinary remedy never awarded as of right.'" *Mahwiziki v. CDC*, 573 F. Supp. 3d 1245, 1250 (N.D. Ill. Nov. 22, 2021) (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008)); *see also Isby-Israel v. Lemmon*, 2012 WL 13202744, at *1 (S.D. Ind. June 13, 2012) (requests for temporary restraining orders are "governed by the same general standards that govern the issuance of a preliminary injunction"). Such relief can only be granted where a movant, "by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). This requires a plaintiff to establish,

---

[3] Plaintiffs filed these motions the same day they filed their amended complaint, before Defendants could compile and certify an administrative record. *See, e.g., Florida Power & Light Co v. Lorion*, 470 U.S. 729, 733-34 (1985). As described below, the decisional documents attached to the Kvaal Declaration establish that the Secretary properly invoked his HEROES Act authority here. Defendants note that these same documents were attached to an opposition brief they filed in the *Nebraska* case—which Plaintiffs cite repeatedly, *e.g.*, PI Br. at 2, 5, 9—three days prior to Plaintiffs filing the amended complaint and renewed emergency motions. *See Nebraska v. Biden*, No. 22-cv-1040 (E.D. Mo. Oct. 7, 2022), ECF No. 27.

at the threshold, "that it has some likelihood of success on the merits; that it has no adequate remedy at law; that without relief it will suffer irreparable harm." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019). Where a plaintiff "fails to meet any of these threshold requirements" for preliminary relief, "the court 'must deny the injunction.'" *Id.* (citation omitted)). If the threshold requirements are met, courts then proceed to balance the harm to the moving party if relief is denied against "the irreparable harm the non-moving party will suffer if preliminary relief is granted" and "the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021) (citation omitted).

"A Rule 12(b)(1) motion challenges federal jurisdiction, and the party invoking federal jurisdiction bears the burden of establishing the elements necessary for jurisdiction." *Morgan v. Veterans Canteen Serv.*, 2018 WL 3208195, at *1 (S.D. Ind. June 29, 2018). "In ruling on a motion under Rule 12(b)(1), district courts may look beyond the complaint's jurisdictional allegations and consider whatever evidence has been submitted on the issue of jurisdiction." *Id.*

## ARGUMENT

### I.    The Court Should Dismiss This Case For Lack Of Subject-Matter Jurisdiction.

Standing "is an essential ingredient of subject-matter jurisdiction." *Bazile v. Finance Sys. of Green Bay, Inc.*, 983 F.3d 274, 278 (7th Cir. 2020). Plaintiffs bear the burden of proving the elements of standing . . . beyond mere allegations." *MainStreet Org. of Realtors v. Calumet City*, 505 F.3d 742, 753 (7th Cir. 2007). The "irreducible constitutional minimum of standing," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), requires that Plaintiffs demonstrate three elements: (i) "an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendants; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). Where injunctive relief is sought, "[a]llegations suggesting a possible future injury are not sufficient, and a plaintiff must identify a real and immediate threat, meaning at least a

substantial risk that such harm will occur." *Smith v. Golden Rule Ins. Co.*, 526 F. Supp. 3d 374, 392 (S.D. Ind. 2021) (quoting *Access Living Metro. Chicago v. Uber Techs., Inc.*, 958 F.3d 604, 613 (7th Cir. 2022)).

Here, Plaintiffs' sole alleged injury arises out of the prospect of receiving a measure of automatic loan cancellation from the Department's policy. Because any individual eligible to receive such relief may opt out, this injury cannot confer standing on either the named Plaintiffs or the putative class they seek to represent.

### A. Plaintiffs Lack Standing Because They Can Opt Out of Loan Cancellation.

The named Plaintiffs—Frank Garrison and Noel Johnson—are not at risk of suffering harm as a result of Defendants' pandemic-related student loan discharge policy because they will not receive any loan cancellation pursuant to that policy. As previously reported, the Department has already taken steps to effectuate Mr. Garrison's stated desire to opt out of the program and not receive any automatic loan cancellation. *See* ECF No. 13. The Department can now represent that it has done the same with respect to Mr. Johnson. *See* Kvaal Decl. ¶ 4. These Plaintiffs can always change their minds and seek the student loan debt relief to which they would otherwise be entitled at a later date. But unless and until they do, they face no prospect of state income tax liability as a result of Defendants' actions and no threat of any injury from those actions. Absent such a threat, the named Plaintiffs lack standing to pursue the prospective, injunctive relief they seek in this lawsuit. *See City of Los Angeles v. Lyons*, 461 U.S. 95 (1983); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ("threatened injury must be *certainly impending* to constitute injury in fact").

The lack of any injury to the named Plaintiffs settles the standing inquiry, notwithstanding the fact that Plaintiffs now attempt to plead their case as a putative class action. *See Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("[N]amed plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent"(citation omitted)). "Jurisdiction over

10

a putative class action depends on the named plaintiffs' standing," *Castillo v. Unilever U.S., Inc.*, 2022 WL 704809, at *2 (N.D. Ill. Mar. 9, 2022), because the named plaintiffs "can't represent the class if [they] suffered no injury," *Curtis v. 7-Eleven, Inc.*, 2022 WL 4182384, at *6 (N.D. Ill. Sept. 13, 2022); *see also, e.g.*, *Sherman v. Koch*, 623 F.3d 501, 506 (7th Cir. 2010) ("[I]f a class representative lacks standing at the time the complaint is filed, the entire class action should be dismissed."). While Plaintiffs have moved for class certification, that motion has not been decided (and indeed should not be decided prior to the Court's resolution of this motion to dismiss), and there is no certified class. *See, e.g.*, *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 676 (7th Cir. 2009) (emphasizing that "[b]efore a class is certified, . . . the named plaintiff must have standing"). Accordingly, the named Plaintiffs' lack of standing is fatal to this Court's jurisdiction. Plaintiffs' attempts to resist this straightforward conclusion are unavailing.

**1.** Plaintiffs suggest that Defendants should not be able to "moot" their putative class action by "picking off a representative plaintiff's claims one by one." PI Br. at 13; *see also id.* at 12 (discussing Defendants' purported efforts to "moot a representative plaintiff's claim by curing the problem at the initiation of litigation"). But this fundamentally misunderstands the operation of the Department's opt-out policy. This case does not present a situation in which named Plaintiffs assert cognizable claims that Defendants can moot by providing relief specific to the named Plaintiffs. Rather, as described above, Plaintiffs are unable to demonstrate the existence of any injury in the first place. *See Sullivan v. Liberty Mut. Ins. Co.*, 2022 WL 2105904, at *5 (N.D. Ill. June 10, 2022) (where conditions "prior to filing suit extinguished any possibility of future injury redressable by enjoining defendant's prospective conduct," the named plaintiffs lacked any "interest in their claim for an injunction"). As Plaintiffs admit, "[s]tanding is measured at the time a complaint is filed." PI Br. at 12. At the time Plaintiffs filed their amended complaint, they lacked an injury because the existence of an opt-out provision—whether or not Plaintiffs have exercised it or the Department has exercised it on behalf

11

of Plaintiffs—means Plaintiffs, and anyone else similarly situated,  are at no risk of receiving unwanted loan relief or incurring any resulting tax consequences.

Plaintiffs' reliance on the exceptions to the mootness doctrine, therefore, is a red herring.  *See* PI Br. at 13-17.  *Cf. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000) ("[I]f a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum.").  The rest of the putative class—like the named Plaintiffs—do not present justiciable claims that Defendants could "pick[] off."  PI Br. at 13.  It is not the case that any cancellation is "imminent for Mr. Johnson and the millions of borrowers who reside in the relevant states," *id.* at 8, because such cancellation will not happen for any borrower unless and until (1) the Department notifies the borrower of his eligibility for automatic cancellation, and (2) the borrower does not opt out by November 14 (nearly 30 days from now).  It is the availability of this opt out procedure that removes any "imminent" risk of harm and deprives the named Plaintiffs and anyone else who objects to receiving automatic loan cancellation of standing based on the injuries asserted here.  *See, e.g.*, *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017) (a plaintiff "must face a real and immediate threat of future injury as opposed to a threat that is merely conjectural or hypothetical" (citation omitted)).  The Department has treated Mr. Garrison's and Mr. Johnson's representations in this lawsuit as their opt outs, so they will not have to take any further action.  *See* Kvaal Decl. ¶ 4.  But any other individual can obtain the same result by, as the Department has publicly directed, simply "contact[ing] [his] loan servicer by phone or email and tell[ing] them that [he doesn't] want to receive one-time student loan debt relief."  FSA Website; *see also* Opt-Out Notice.  This case presents no issues of mootness and no need to explore the exceptions to that doctrine.[4]  *See Walters v. Edgar*, 163 F.3d 430, 432-33 (7th Cir. 1998) (where "the

---

[4] In any event, the Seventh Circuit has "repeatedly held that the complete repeal of a challenged [policy] renders a case moot," *Speech First, Inc. v. Killeen*, 968 F.3d 628, 645 (7th Cir. 2020), and that courts should recognize an exception to that

named plaintiffs lacked standing when they filed the suit," court was presented with "the opposite of a case in which jurisdiction is challenged by developments after the suit was filed").

**2.**   Plaintiffs also contend that the "mere existence of an opt-out procedure does not defeat standing," PI Br. at 12, but they provide no authority in support of that contention. This argument is premised on the claim that Mr. Johnson "has yet to receive any information about the potential for opting out" and "there is no indication that Defendants will ensure that all members of the proposed class fully understand their options prior to the automatic cancellation." *Id.* at 11. But the fact that Plaintiffs rushed to file their renewed emergency motions before the Department had fully implemented the opt out policy cannot establish their standing. As described above, the Department has posted on its website additional details about the steps individuals can take to opt out and publicly confirmed that it "will email borrowers who qualify for debt relief without applying, notifying them that they won't need to apply to receive debt relief and of the option to opt out."[5]  FSA Website. Those email notices are being sent out now, and include instructions about how borrowers can contact their servicers to effectuate their opt-out requests at any point over the next four weeks. *See* Opt-Out Notice. The availability of the opt-out procedure thus does "defeat standing," PI Br. at 12, because it removes any threat of concrete injury requiring judicial intervention. *Cf. Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003) (any injury caused by a party's failure to take some "readily available" action is "self-inflicted" and thus "not irreparable injury").

Plaintiffs' reliance on cases, PI Br. at 11-12, that discuss the existence of injury based on a defendant's failure to provide *statutorily required* information has no bearing here. *See, e.g., Bryant v.*

---

rule "[o]nly when there is a substantial likelihood that the offending policy will be reinstated if the suit is terminated," *Ozinga v. Price*, 855 F.3d 730, 734 (7th Cir. 2017). There is no "substantial likelihood" that the Department will do away with the opt-out procedure and provide automatic loan cancellation to borrowers who do not want it. The Department has publicly announced the procedure and is communicating it to eligible borrowers, and the procedure can be easily implemented by the Department.

[5] Indeed, even before the provision of such individualized notice, 102 borrowers have already opted out. Kvaal Decl. ¶ 4.

*Compass Group USA, Inc.*, 958 F.3d 617, 625 (7th Cir. 2020) (noting that an "informational injury" sufficient to confer standing may arise "when information that is required by statute to be disclosed to the public is withheld" and "the withholding impaired [the plaintiff's] ability to use the information in a way the statute envisioned").  There is no statute requiring the Department to inform Plaintiffs of their ability to opt out of loan relief, and any borrower eligible for automatic cancellation *will* receive that information (to the extent they have not already).  And the mere possibility that some putative class member somewhere may not "realize the need to opt out" despite receiving such notice, PI Br. at 17, is far too speculative and remote to confer standing (on a hypothetical class, no less).

### B.    Plaintiffs' Theory of Standing Is Impermissibly Speculative.

Plaintiffs' theory of standing is also speculative, contingent on hypothetical future events, and not traceable to the challenged loan cancellation policy.  The mere fact that the loan forgiveness provided by the Department may be subject to state taxation does not establish a harm.  The amount of loan forgiveness outweighs the amount of tax, so as a general matter the policy results in a net benefit to its recipients.  *See* PI Br. at 8 (contending that Mr. Garrison "would face a state income tax liability of more than $1,000" if he "received $20,000 in automatic cancellation").  Receipt of such a benefit, even if marginally reduced by a tax, does not constitute a concrete injury for purposes of standing.  *See, e.g.*, *Ramirez*, 141 S. Ct. at 2214 ("No concrete harm, no standing.").

In addition to all its other flaws, Plaintiffs' theory of harm thus necessarily turns on the prediction that they will, at some later date, receive loan forgiveness "pursuant to the pre-existing PSLF program," PI Br. at 8, that such forgiveness "will not be taxed in the State of Indiana as income," *id.*, and therefore that the Department's pandemic-related cancellation policy will provide "no additional benefit," Am. Compl. at 3.  But that kind of injury is not imminent.  State tax liability itself does not harm Plaintiffs—it could potentially constitute harm only to the extent Plaintiffs actually qualify for PSLF years down the road (which will require them to continue working in qualifying

14

public service employment and to make qualifying monthly payments on their eligible loans), and if the states in which they happen to then live do not impose any tax obligations on the amount of the PSLF discharge.   Forecasting whether or not these events will actually occur is an inherently conjectural enterprise.   Mr. Garrison and Mr. Johnson say they intend "to seek forgiveness under PSLF" at some unspecified point in the future, Am. Compl. ¶ 76, 92, but such "some day intentions" about merely possible future outcomes are insufficient to confer standing. *Lujan*, 504 U.S. at 564; *see also, e.g.*, *Craft v. Health Care Serv. Corp.*, 2016 WL 1270433, at *3 (N.D. Ill. Mar. 31, 2016) (allegation that defendant's action "might result in denial of future benefits was too speculative to involve injury" (citation omitted)).

Moreover, as the Court has previously recognized, to the extent state tax liability can constitute cognizable harm in this case, that harm is caused by the state tax code that imposes the liability—not the Department's policy.   That policy does not require that states tax the one-time loan cancellation; indeed, all student loan discharges are tax free under federal law through 2025.   *See* American Rescue Plan Act of 2021 ("ARPA"), § 9675, Pub. L. No. 117-2, 135 Stat. 4 (Mar. 11, 2021).   The states may choose to tax these federal student loan discharges (or not); as Plaintiffs' pleadings reflect, some states impose such taxes and others do not.   But the reason Plaintiffs would be subject to state tax liability is the independent decision of the state of Indiana, unconstrained by federal law, to tax discharged student loan amounts.   The case should therefore be governed by *Segovia v. United States*, 880 F.3d 384, 389 (7th Cir. 2018), where the Seventh Circuit concluded that, in light of a state's "unfettered discretion with respect to the plaintiffs, the federal government cannot be the cause of their injuries." Plaintiffs' attempt to distinguish *Segovia*, *see* PI Br. at 9-10, is unpersuasive, as a state's decision about what to tax is just as discretionary and optional as the state's decision, at issue in *Segovia*, about who should receive ballots.   The Department's policy here only "result[s] in state tax liability" to the extent that certain states tax the resulting federal student loan discharge amounts, and Plaintiffs' alleged harm

15

thus arises "solely because of a state law decision permitted by federal statute." PI Br. at 10. Simply put, absent the state tax code, Plaintiffs would suffer no harm, and that is sufficient to break any causal link between that claimed harm and the Department's policy. *See Indiana Coal. for Public Educ. v. McCormick*, 338 F. Supp. 3d 926, 938 (S.D. Ind. 2018) (emphasizing that an "independent action" breaks the "Article III chain of causation" so long as it is not "traceable to the determinative or coercive impact of the challenged action" (citation omitted)).

## II.   Plaintiffs Have Failed To Establish A Likelihood Of Success On The Merits.

### A.   The HEROES Act Authorizes the Targeted Student-Loan Debt Relief.

Because the Secretary validly relied on authority provided to him through the HEROES Act in granting the one-time discharge of student loan debts challenged here, Plaintiffs are unlikely to succeed on the merits of their claim that the Department's policy exceeds the Secretary's statutory authority in violation of the APA. *See* Am. Compl. ¶¶ 154–169; PI Br. at 18–25.

1.   The Secretary Is Authorized to Modify Loan Discharge Provisions for the Benefit of At-Risk Borrowers Affected by the COVID-19 Pandemic.

In the HEROES Act, Congress gave the Secretary broad authority to waive or modify student loan obligations in response to a national emergency. The Act provides that, "[n]otwithstanding any other provision of law, unless enacted with specific reference to" Section 1098bb, the Secretary may "waive or modify *any* statutory or regulatory provision applicable to" the federal student loan programs. 20 U.S.C. § 1098bb(a)(1) (emphasis added); *see also United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" (quoting *Webster's Third New International Dictionary* 97 (1976))). Pursuant to that authority, the Secretary here has modified certain provisions that govern the discharge of student loan debts and the procedures for obtaining such discharges, *see* 2022 Notice at 61,514, an action that parallels earlier waivers and modifications made by the Secretary and his predecessor to implement the payment pause beginning in March 2020 and continuing today, *see* 2020 Notice at 79,857. Because

none of the waived or modified provisions contains a cross-reference to 20 U.S.C. § 1098bb, the Secretary may waive or modify them under the circumstances specified by the Act.

Nothing in the HEROES Act suggests that student loan borrowers affected by the COVID-19 pandemic are disqualified from such relief merely because the pandemic has been nationwide, sweeping, and profound in effect. To the contrary, the HEROES Act specifically anticipates that relief may be necessary in the event of a "national emergency." 20 U.S.C. 1098bb(a)(1). In the event of such a national emergency—as in the event of, for example, a "war," *id.*—it is hardly surprising that borrowers across the nation could be affected.

Thus, notwithstanding Plaintiffs' objections, *see* PI Br. 20–21, the Secretary reasonably concluded that, given the profound depth and sweep of the COVID-19 pandemic, and "because the Federal Government has declared every State, the District of Columbia, and all five permanently populated United States territories to be disaster areas due to COVID-19," 2022 Notice at 61,513, any borrower who "resides or is employed in" one of those areas falls within the HEROES Act's definition of an "affected individual," 20 U.S.C. § 1098ee(2)(C). The Secretary also concluded reasonably that borrowers qualify as "affected individuals" on the independent ground that they have "suffered direct economic hardship as a direct result of" the pandemic. *Id.* § 1098ee(2)(D) (providing that a finding of direct economic hardship from a national emergency is to be "determined by the Secretary"); *see also* 2022 Notice at 61,513 (making this determination). Indeed, as confirmed by the President's latest continuation of the national emergency concerning COVID-19, *see* 87 Fed. Reg. 10,289 (Feb. 18, 2022), the pandemic is an ongoing national emergency that, after more than two years, has left no aspect of daily life untouched.

In light of the fact that all parts of the United States have been declared to be disaster areas due to the COVID-19 pandemic, the President's proclamation that the pandemic constitutes a national emergency, and the well-established, widespread economic hardship that all have suffered

from that emergency, the Secretary reasonably determined that all borrowers of federal student loans qualify as "affected individuals." *See* 2022 Notice at 61,513 ("[T]he 'affected individuals' for purposes of the waivers and modifications described in this document include any person with a Federal student loan under title IV of the HEA"). That determination remains as appropriate now as it has been every time that the Secretary and his predecessor have invoked HEROES Act authority during the pandemic (including in providing the payment pauses that Plaintiffs do not challenge here). *See, e.g.*, 2020 Notice at 79,857 ("An 'affected borrower' is one whose Federal student loans provided under title IV are in repayment.").

Likewise, the Secretary reasonably determined that a limited measure of student-loan discharges was "necessary" here, and so the HEROES Act fully authorizes the Secretary's actions. *See* Decision Memo; *see also* 20 U.S.C. § 1098bb(2)(A). Importantly, even though all borrowers during the COVID-19 pandemic qualify as "affected individuals" under the HEROES Act, the Secretary has not determined to grant loan discharges to all of them (nor was he required to). Instead, he has limited discharges to loans held by a subclass of affected individuals—those found to be at highest risk of delinquency and default on student loan obligations after the current payment pause ends. And he has done so only after finding such modifications "necessary to ensure that" members of that subclass do not emerge from the pandemic "in a worse position financially with respect to their student loans because of" it. *See* 2022 Notice at 61,513; *see also* Decision Memo at 1; 20 U.S.C. § 1098bb(a)(2). That judgment was informed by a careful study of the Department's past experience in roughly analogous circumstances, of administrative data collected by the Department, and of other research published by federal agencies and independent experts in the areas of consumer debt and student financial aid. *See generally* Supporting Analysis. And it falls squarely within the letter and spirit of the HEROES Act.

The Secretary considered evidence that borrowers face a heightened risk of delinquency and default as their loans are placed back into repayment following long periods of forbearance, and that

this risk is particularly acute with respect to lower-income borrowers and Pell Grant recipients.  *Id.* at 2.  The Department has found that, historically, when borrowers affected by natural disasters have received payment pauses similar to the one currently in effect due to the COVID-19 pandemic, those borrowers' transitions back into repayment have been correlated with "documented spikes in student loan defaults."  *Id.*  In particular, recent administrative data compiled following Hurricanes Maria, Harvey, and Irma and the northern California wildfires in late 2017 showed that borrowers involved in those disasters who had received a payment pause like the one provided during the COVID-19 pandemic were over 21 times more likely to default on their repayment obligations in the calendar year following the end of that forbearance than they had been in the calendar year before the regional disaster was declared.  *Id.*  The data also revealed that Pell Grant recipients were especially vulnerable following the end of forbearance.  *Id.*

The Secretary also considered evidence concerning the current economic conditions facing borrowers as they prepare to enter repayment at the end of the year.  *Id.*  That evidence included survey data showing that borrowers earning incomes below $125,000 expect to have greater difficulty making full payments after the pandemic than they had before it.  *Id.*  And though self-reported, those expectations were supported by the research findings of other government agencies.  For example, researchers at the Consumer Financial Protection Bureau found that, even as most student loans have remained in forbearance throughout the pandemic and many borrowers have benefited from other pandemic-related economic support, delinquency on non-student loan debt among student loan borrowers has already returned to pre-pandemic levels.  *Id.* at 3.  Similarly, after comparing credit report data for student loan borrowers subject to the payment pause and those whose loans remained in repayment, researchers at the Federal Reserve Bank of New York concluded that, absent additional relief at the end of the payment pause, borrowers will likely experience delinquencies on federal student loan debt at higher levels than before the pandemic.  *Id.*  Finally, the Secretary evaluated

evidence that recent pandemic-induced inflationary pressures have diminished the financial well-being of many households, particularly those with lower incomes. *Id.* Based on all the evidence presented to him, the Secretary found that, absent action to reduce the threat of delinquency and default, student loan borrowers at lower income levels face serious risks that, as they exit the pandemic and their loans go back into repayment, they will promptly be placed in a worse financial position with respect to their student loans—*i.e.*, face an immediate risk of delinquency or default that did not exist prior to the pandemic—than they would have been in the absence of the COVID-19 pandemic. *Id.*

In light of this, the Secretary reasonably concluded that discharging a limited measure of student loan debt for affected borrowers would mitigate the heightened risk of delinquency and default. The evidence reviewed by the Secretary revealed that targeted discharges would reduce borrowers' total liabilities and monthly payment burdens, thus contributing to increased rates of repayment success and to greater overall financial well-being. *Id.* at 4. And an analysis of the Department's administrative data showed that the specific proposal presented to the Secretary— providing a maximum benefit of $10,000 to borrowers below the individual and household income caps of $125,000 and $250,000, respectively, and a maximum of $20,000 to borrowers below those caps who previously received a Pell Grant—would be sufficient to reduce the median borrowers' monthly payments by 38%, permitting many of the most vulnerable borrowers to enter repayment with significantly reduced monthly payments. *Id.* at 6. The evidence before the Secretary supported his determination that setting certain discharge amounts would address the risk of heightened delinquency and default rates facing affected borrowers as a result of the pandemic. *Id.*

The Secretary's chosen income eligibility levels are supported by other considerations. As the Secretary recognized, "not all borrowers are equally at risk of" delinquency and default. *Id.* In particular, in the year before the pandemic, incomes above the $125,000 individual income cutoff that the Secretary adopted were correlated with a substantial reduction in the rate of inconsistent payments

reported by borrowers as compared to incomes below the cutoff. *Id.* Reinforcing the reasonability of the Secretary's chosen cutoff, data considered by the Secretary shows that borrowers in the $100,000–$125,000 income bracket also experienced greater difficulty before the pandemic in repaying loans than did borrowers with incomes above $125,000. *Id.* at 9. Borrowers with incomes below $125,000 were substantially more likely to report financial insecurity, to have experienced a period of unemployment, to have suffered educational harms during the pandemic, and to otherwise have been disproportionately impacted over the course of the pandemic. *Id.* And as to Pell Grant recipients—who are disproportionately low-income, generally come from families without significant wealth or resources, and already face substantially higher risks of default and delinquency than other student loan borrowers—the Secretary's selection of the $125,000 cutoff was even more clearly supported: at that income level, 99% of Pell Grant recipients would qualify for relief. *Id.* at 11.

In view of this substantial evidence that additional relief is needed to ensure that this vulnerable subset of borrowers currently receiving the benefit of the payment pause are not at substantial risk of becoming delinquent or defaulting on their loan obligations when payments resume, the Secretary reasonably concluded that it was necessary and appropriate to order a limited, one-time discharge of student loan debt for those borrowers.

2.  Plaintiffs Misinterpret the Scope of Relief Available Under the HEROES Act.

Plaintiffs primarily object to the size and scope of the group of borrowers that will receive discharges. *See, e.g.*, *id.* at 18 (claiming that "Defendants lack any statutory authority to cancel loans en masse"); *id.* at 21 (faulting Defendants for "provid[ing] cancellation beyond [a] limited statutory class").[6] But Plaintiffs' overbreadth objections have no grounding in the Act's text or purposes.

---

[6] Notably, Plaintiffs do not contest that the HEROES Act authorizes the Secretary to discharge at least some student loan obligations in at least some circumstances. *See* PI Br. at 21 (suggesting that an appropriate class of beneficiaries might be "residents of a city that was destroyed in a war"). And they appear to accept that the payment pause was and remains properly instituted as to all federal student loan borrowers. *See id.* at 20 (claiming that, "due to actions Defendants have already taken, no borrower is worse off with respect to their federal student loans").

21

Plaintiffs argue that the subset of affected individuals that will receive loan discharges is improperly overbroad because it could include individuals "whose wealth or income have increased since 2020 when the COVID-19 pandemic started." *Id.* at 19.   But nothing in the statute excludes such individuals from the definition of "affected individuals" otherwise eligible for relief.  Indeed, as Plaintiffs later acknowledge, *see* PI Br. at 21, the Secretary is not required to exercise the waiver or modification authority on a case-by-case basis, *see* 20 U.S.C. § 1098bb(b)(3).  Thus, in determining which affected borrowers should receive relief, the Secretary was not required to review the overall financial situation of individual student loan borrowers impacted by COVID-19, compare each borrower's "wealth or income" to pre-pandemic levels, and decide whether, for each such individual, relief is strictly "necessary" to combat heightened risks of delinquency or default when payments resume.  *See Cellco P'ship v. FCC*, 357 F.3d 88, 97 (D.C. Cir. 2004) (authority to act as "necessary" should not be "give[n] an unwarranted rigidity" when the broader context indicates that Congress intended to confer broad authority); *cf. Weinberger v. Salfi*, 422 U.S. 749, 777 (1975) (noting that Congress may rationally conclude that "the expense and other difficulties of individual determinations justif[y] the inherent imprecision of a prophylactic rule").  Rather, he needed to determine only that a set of affected individuals faced such risks, and that his chosen modifications generally would prevent that group from being worse off with respect to their financial assistance as a result of the COVID-19 pandemic.  As discussed above, the Secretary did so here, and his determination is not undermined by allegations that some hypothetical borrowers may receive greater-than-necessary relief.[7]

Plaintiffs raise a second overbreadth challenge to the set of borrowers eligible for discharges, arguing that no one can qualify for relief under the HEROES Act currently because, "due to actions Defendants have already taken" under the Act, "no borrower is worse off with respect to their federal

---

[7] It is also unclear how Plaintiffs—who do not allege that their financial situation improved during the pandemic—have standing to raise this overbreadth challenge, or suffer any harm from an action that expands the category of individuals eligible to receive a benefit that Plaintiffs are already eligible to receive.

student loans." PI Br. at 20. Plaintiffs' reading is perverse: it would permit relief only for individuals who are *already* delinquent on their loan payments, in default, or otherwise in a worse position with respect to their student loans than before the relevant emergency. But the statute is not so limited to such dire circumstances; rather, the Act empowers the Secretary "to *ensure* that . . . affected individuals *are not* placed in a worse position financially in relation to [their] financial assistance because of their status as affected individuals." 20 U.S.C. § 1098bb(a)(2)(A) (emphasis added). That statutory language is proactive and prospective, authorizing the Secretary to act, in cases of emergency, to guarantee that affected individuals will not suffer financially with respect to their student loans. *See Ensure*, MerriamWebster, *available at* https://www.merriam-webster.com/dictionary/ensure (defining "ensure" as meaning "to make . . . certain" or "guarantee"). It is thus inconsistent with Plaintiffs' apparent preference for belated relief.

Finally, Plaintiffs challenge the subclass of beneficiaries on the ground that it is not limited to individuals who are "worse off 'because of their status as affected individuals.'" PI Br. at 20 (quoting 20 U.S.C. § 1098bb(a)(2)(A)). But in providing relief only to those below certain income caps, the Secretary relied upon data that shows affected individuals often become worse off in relation to their student loans after a period of forbearance imposed during an emergency and that those with lower incomes are more likely to be in that situation. *See* Supporting Analysis at 2. Indeed, an analysis of the Department's data following recent disasters showed that the rate of borrower defaults following forbearance increased over 21-fold. *See id.* Given those findings, and in light of his authority to act on a class-wide basis, *see* 20 U.S.C. § 1098bb(b)(3), the Secretary acted reasonably to ensure that affected individuals with the lowest incomes would not become similarly worse off in relation to their student loan obligations once those loans enter repayment. Contrary to Plaintiffs' contentions, that measured action—granting limited relief to a lesser included population of borrowers who otherwise qualify as affected individuals under § 1098ee(2)—cannot be reframed as "enormously expand[ing]"

23

the definition of affected individuals.  PI Br. at 21.

3. <u>Plaintiffs Do Not Undermine the Secretary's Conclusion that a Limited Measure of Student-Loan Discharges Is Necessary.</u>

Similarly, none of Plaintiffs' challenges to the Secretary's finding of necessity are persuasive. In criticizing the Secretary's determination that a limited measure of discharge is necessary here, Plaintiffs again rely on the benefits of the payment pause, arguing that borrowers are already "in the same position now as before the pandemic with respect to their federal loans," and so "debt cancellation is clearly unnecessary."  PI Br. at 21.  But as discussed *supra* pp. 18-21, data reviewed by the Secretary showed that many borrowers, particularly those earning individual incomes below $125,000, continue to be in more precarious financial straits than they had been in before the pandemic.  *See* Supporting Analysis at 6–12.  And the data also showed that, without further action, substantial numbers of those borrowers would likely fall into delinquency or default when payments restart at the conclusion of the pandemic, wiping out the significant benefits of the payment pause for numerous borrowers.  *See id.* at 2.  Because that would leave many borrowers in a worse position with respect to their financial assistance following the pandemic, the Secretary reasonably determined that it was necessary to adopt additional measures, including limited loan discharges, that would smooth the transition into repayment for many lower income individuals and families.

Contrary to another of Plaintiffs' contentions, the Secretary has not improperly expanded the class "for whom waiver is permitted" in determining the necessity of relief.  PI Br. at 22.  As explained above, the congressionally crafted definition of "affected individuals" in Section 1098ee(2) is expansive and, in the context of the unprecedented COVID-19 pandemic, readily encompasses all federal student loan borrowers with outstanding loan obligations—just as the Secretary and his predecessor in the prior Administration have found repeatedly since March 2020.  Congress has provided that waivers and modifications may apply as to the entire class of "affected individuals"—a point Plaintiffs appear to endorse when it comes to the extension of the payment pause.  *See* PI Br. at

33.  Nevertheless, the Secretary did not determine that all such borrowers should be granted relief; rather, he concluded, consistent with the HEROES Act, that for a subset of those borrowers, certain measures were "necessary" to achieve the goals of the Act, 20 U.S.C. § 1098bb(a)(2), namely, to adequately mitigate the increased risk of delinquency and default as borrowers are required to resume payment on their student loan debts.  That the Secretary has not determined that those measures are "necessary" as to all affected borrowers does not suggest that his exercise of discretion was not guided "toward [the] enumerated ends" in Section 1098bb(a)(2).  PI Br. at 23.  To the contrary, by limiting the availability of loan discharges to particular amounts and to a defined subclass of at-risk borrowers for which further relief is necessary, the Secretary has exercised his congressionally granted discretion in a manner tailored to vindicate Congress's purposes.

\*   \*   \*

In short, with authorization by clear statutory text, the Secretary reasonably determined that many lower-income borrowers will be at heightened risk of delinquency and default following the conclusion of the pandemic-induced multi-year pause on federal student loan payments, and that additional relief measures were necessary to mitigate that risk.  The Secretary further determined that a one-time, limited measure of loan discharge would suffice to ensure that those borrowers will not be in a worse place financially with respect to their student loans as a result of the COVID-19 pandemic as they reenter repayment.  While Plaintiffs may disagree with the Secretary's decision as a policy matter, Congress vested the Secretary—not these Plaintiffs—with authority to determine when and how special relief measures should be provided to federal student loan borrowers affected by extraordinary circumstances such as the COVID-19 pandemic.  This Court should not disturb that congressional grant of authority.

### B.  The Major Questions Doctrine Does Not Negate the Clear Statutory Authorization Provided by the HEROES Act.

1.  In an attempt to avoid the plain text of the HEROES Act, Plaintiffs invoke the major

25

questions doctrine.  *See* PI Br. at 23–25.  In a few extraordinary cases, the Supreme Court has required "clear congressional authorization" for sweeping agency action where, "under more 'ordinary' circumstances," a "merely plausible textual basis" for that action might suffice under standard principles of statutory interpretation.  *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022); *see also Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) ("We expect Congress to speak clearly when authorizing an agency to exercise powers of 'vast economic and political significance.'" (citation omitted)).  This is not such an extraordinary case.

That is not to deny that this is a case of economic and political significance, *cf.* PI Br. at 23; many cases challenging national policies are.  But not every agency action of economic and political significance triggers the doctrine.  Rather, the hallmark of a "major questions case" is a marked incongruence between the agency action at issue and the history, purpose, or context of the statute that purportedly authorizes it.  Thus, the Supreme Court has invalidated agency action that advanced "novel reading[s]" of longstanding statutes, *West Virginia*, 142 S. Ct. at 2605, in order to claim "extravagant statutory power over the national economy," *id.* at 2609 (citation omitted), and made "decisions of vast economic and political significance," *id.* at 2605 (citation omitted), without firm indication that Congress intended it to exercise that authority.  *See also Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (requiring clear congressional authorization "[w]hen an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,'" and the challenged action would "bring about an enormous and transformative expansion in . . . regulatory authority" (citation omitted)).

This case bears none of these features.  For one thing, the Secretary's action is consistent with and proportional to the clearly apparent purposes of the HEROES Act.  The Act's central provision, Section 1098bb, is all about getting student-loan-related relief to affected borrowers in "response to military contingencies and national emergencies."  20 U.S.C. § 1098bb.  It is unsurprising, then, that

the Secretary relied on that provision to grant relief to federal student loan borrowers facing harm from the COVID-19 pandemic. *See* Decision Memo at 1. For another, this case involves the disbursement of a federal benefit to individuals, not the kind of expansive regulation of private parties that has previously triggered the doctrine. *Cf. Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 (regulating landlords across at least 80% of the country). And it should come as no shock that the relief that the Secretary has ordered under the Act is substantial. The scope of the Secretary's action matches the scope of the COVID-19 emergency, and if it is broader in scope than pre-pandemic grants of relief under the HEROES Act, that difference simply reflects the vastly greater scope of the current national emergency and the economic devastation it has wrought, not any understanding of the limits of the HEROES Act during its first 17 years of existence. *See Biden v. Missouri*, 142 S. Ct. 647, 653 (2022) (upholding agency action that went "further than what the Secretary has done in the past" to achieve statutory objective, in part because the agency "never had to address an infection problem of [the] scale and scope [of COVID-19] before").[8]

Moreover, there is nothing "cryptic," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000), or "ancillary," *West Virginia*, 142 S. Ct. at 2602, about the Act's provisions, which operate together, through unambiguous language, to give the Secretary maximum flexibility to prevent affected borrowers from suffering financially with respect to their financial assistance as a result of an emergency. *See, e.g.*, 20 U.S.C. § 1098bb(a)(1) (providing waiver and modification authority "[n]otwithstanding any other provision of law, unless enacted with specific reference to this section"); *id.* §§ 1098bb(b)(1), (d) (waiving certain procedural requirements); *id.* § 1098bb(b)(3) (Secretary need not exercise waiver or modification authority "on a case-by-case basis"). And earlier relief measures

---

[8] As for economic and political significance, to the extent that Plaintiffs emphasize the "cost[]" of the loan discharges at issue here, PI Br. at 23, it is worth noting that that "cost" is not dissimilar in magnitude to the impact of the current payment pause that Plaintiffs appear to endorse. The Department estimates that policy saves borrowers (at the expense of the government) approximately $5 billion per month. *See* https://www.ed.gov/news/press-releases/biden-harris-administration-extends-student-loan-pause-through-may-1-2022.

provided under the Act, particularly the payment pause, were among the first interventions made following the March 2020 outbreak of COVID-19 and their legality has never been questioned.

All of that distinguishes this case from *West Virginia*, which Plaintiffs cite repeatedly. The Court found there that the agency action at issue involved the use of what the Court described as a "little-used backwater" provision of the Clean Air Act to impose a 10% energy rate hike, permanently shut down many power plants, inflict a $1 trillion loss to GDP, and require a complete reorganization of American energy infrastructure. 142 S. Ct. at 2613. In that context, the Court concluded that some "skepticism" of the agency's position might have been warranted. *Id.* at 2614. But nothing of the sort is justified here, where the Secretary has granted a limited measure of debt relief to certain borrowers affected by the COVID-19 pandemic pursuant to the central provision of a statute whose entire purpose is the provision of substantial loan-related relief to borrowers during a national emergency.

Sometimes, the Supreme Court also looks to whether the challenged action is within the agency's traditional field of expertise in determining whether the major questions doctrine applies. *See West Virginia*, 142 S. Ct. at 2612–13 ("When an agency has no comparative expertise in making certain policy judgments, we have said, Congress presumably would not task it with doing so." (citation omitted)). Here again, this factor shows that the doctrine does not apply. The Secretary of Education is in the business of administering the federal student financial aid programs and, in myriad circumstances, providing appropriate relief from federal student loan repayment obligations. And the Secretary's action is limited to providing relief within the confines of the programs he administers— he has not purported to use HEROES Act authority in a manner that would expand the jurisdiction of his Department. This too distinguishes this case from major questions cases in which agencies exercised authority in unaccustomed areas. *See, e.g.*, *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 ("The moratorium intrudes into an area that is the particular domain of state law: the landlord-tenant relationship."); *Brown & Williamson*, 529 U.S. at 159-60 ("Congress . . . has . . . squarely rejected

28

proposals to give the FDA jurisdiction over tobacco[.]").

Finally, the Secretary's use of HEROES Act authority to discharge some measure of student loan debt in appropriate cases cannot fairly be characterized as an "as-yet-undiscovered power[]," PI Br. at 23, or "a fundamental revision of the statute," *id.* at 24 (citation omitted).  Congress has vested the Secretary with extensive authority to reduce or eliminate borrowers' debt obligations under the federal student loan programs.  The statute granted the Secretary the fundamental legal power to "compromise, waive, or release any right, title, claim, lien, or demand" acquired in the Secretary's performance of his vested "functions, powers, and duties" to administer federal student loans.  20 U.S.C. § 1082(a)(6); *see also, e.g.*, 20 U.S.C. § 1087dd(g)(1).  This authority, which dates back nearly six decades to the enactment of the HEA in 1965, is foundational to the Secretary's power to administer the federal student loan programs.  Pursuant to this broad authority, the Secretary regularly "releases" student loan debts owed to the Department by federal student loan borrowers on terms that he determines, and he may do so at substantial amounts.  *See, e.g.*, 34 C.F.R. § 30.70 (a)(2); *id.* Part 682, App. D (waiving right to refuse to pay claims to guaranty agencies and lenders where they violated certain regulations and would not qualify for payment); U.S. Dep't of Educ., *Education Department Approves $5.8 Billion Group Discharge to Cancel all Remaining Loans for 560,000 Borrowers Who Attended Corinthian* (June 1, 2022), https://perma.cc/MTW6-XABV; U.S. Dep't of Educ., *Secretary DeVos Cancels Student Loans, Resets Pell Eligibility, and Extends Closed School Discharge Period for Students Impacted by Dream Center School Closures* (Nov. 8, 2019), https://perma.cc/FRT6-WAWS.  That Congress long ago granted the Secretary authority to discharge debts owed to the Department, together with the unambiguous language of the HEROES Act, undermines Plaintiffs' contention that Congress withheld authority to modify loan discharge provisions under the HEROES Act.  *See* PI Br. at 24–25.[9]

---

[9] In suggesting that Congress cannot have intended to delegate authority to discharge loans on a broad basis under the HEROES Act, Plaintiffs point to the failure of various legislative proposals involving loan forgiveness. *See* PI Br. at 24.

**2.**   In any event, the text of the HEROES Act shows that Congress anticipated that the Secretary might have to use his authority broadly.  In granting the Secretary wide discretion to waive or modify provisions of the legal regime governing federal student loan programs, Congress did not "use oblique or elliptical language," nor provide a potentially broad delegation "through 'modest words,' 'vague terms,' or 'subtle devices.'"  *West Virginia*, 142 S. Ct. at 2609 (citation omitted).  Indeed, it would have been hard for Congress to more clearly express its intent to provide the Secretary, during a national emergency, with maximum flexibility to provide appropriate relief to student loan borrowers facing extraordinary and unforeseen circumstances.  If there could have been any question whether Congress, in fact, meant to empower the Secretary to waive or modify *any* statutory or regulatory provision applicable to federal student loan programs, Congress eliminated all doubt by granting that authority "[n]otwithstanding any other provision of law, unless enacted with specific reference to" the HEROES Act.  20 U.S.C. § 1098bb(a)(1).  And Congress certainly could have foreseen that the Secretary might discharge student loans under the HEROES Act: in apparent anticipation of that outcome, it created a "Special Rule for Discharges in 2021 Through 2025," making student loan discharges tax-free in pandemic-related relief legislation.  *See* ARPA § 9675.

The analysis of an agency's statutory authority "begins with the statutory text"—and, when the text is clear, it "ends there as well."  *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 631 (2018) (citation omitted).  Courts may not "impos[e] limits on an agency's discretion that are not supported

---

But the failure of those bills, which would have offered substantially greater amounts of loan forgiveness to different groups of borrowers, says nothing about whether the Secretary's action here was authorized under the HEROES Act. *See, e.g.*, *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117 (1980) (recognizing that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one"(citation omitted)).  If anything, recent legislation introduced to amend the HEROES Act to prevent loan discharges would seem to show that at least some understand the Act to permit such relief currently. *See, e.g.*, S. 4094, 117th Cong. § 4(d)(1) (introduced Apr. 27, 2022) (proposing to amend the HEROES Act to specify that "[n]otwithstanding any other provisions of law, the President or the Secretary of Education may not cancel the outstanding balances, or a portion of the balances, on covered loans due to the COVID-19 national emergency or any other national emergency"); H.R. 7656, 117th Cong. § 4(d)(1) (introduced May 3, 2022) (same); *see also* H.R. 7058, 117th Cong. (introduced Mar. 11, 2022) (proposing to prohibit further waivers or modifications in connection with the COVID-19 pandemic).

by the text." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2381 (2020). Because the Secretary here can point to "'clear congressional authorization' for the power [he] claims," his exercise of that authority survives whatever degree of "skepticism" may be counseled by the major questions doctrine. *West Virginia*, 142 S. Ct. at 2609 (citation omitted).

### C.      Plaintiffs' Nondelegation Claim Fails.

Plaintiffs' nondelegation challenges are likewise meritless—indeed they concede that the HEROES Act contains the kind of "intelligible principle" that is required to defeat such a challenge. *See* PI Br. at 25 (noting that the HEROES Act "contains important limits to Defendants' discretion").

Plaintiffs first argue that the Court should construe the HEROES Act so narrowly as to not authorize the challenged policy because, in their view, if the statute "permit[s] debt cancellation for 40 million debtors solely based on their income," it "will impermissibly vest the Secretary with wholly unguided discretion" in violation of the nondelegation doctrine. PI Br. at 25-26. As an initial matter, Plaintiffs' argument rests on an inaccurate description of the challenged program; the Secretary has not, as Plaintiffs charge, freely granted waivers or modifications to individuals who are not financially affected by the pandemic. On the contrary, the Secretary will cancel relevant student loan debt in the specific amounts necessary to reduce the risk of default for certain borrowers when payments resume in January 2023 after a long pandemic-induced pause—a choice that, as explained above, closely tracks the limitations in the HEROES Act. *See supra* Sec. II.A.

In any event, it is well-established that Congress may delegate legislative power to the Executive as long as it provides an "intelligible principle" to guide the agency's exercise of discretion. *Mistretta v. United States*, 488 U.S. 361, 372 (1989). That test "is an exceedingly modest limitation" that is "not demanding." *United States v. Melgar-Diaz*, 2 F.4th 1263, 1266-67 (9th Cir. 2021) (quoting *Gundy v. United States*, 139 S. Ct. 2116, 2129 (plurality opinion)). A delegation is "constitutionally sufficient if Congress clearly delineates [1] the general policy, [2] the public agency which is to apply it, and [3]

31

the boundaries of this delegated authority." *Mistretta*, 488 U.S. at 372–73 (citation omitted). Congressional delegations of power have been struck down as unconstitutional only twice in history—both in 1935, and both implicating the same statute—and only because "Congress had failed to articulate *any* policy or standard" to confine discretion. *Gundy*, 139 S. Ct. at 2129 (emphasis added).

Plaintiffs concede there is no such failure here—instead, as they acknowledge, "[t]he HEROES Act contains important limits to Defendants' discretion, including the requirement under the relevant provision that the waiver or modification be necessary to ensure affected individuals are not placed in a worse place financially relative to their financial assistance as a result of their status as affected individuals." PI Br. at 25. Although that should end the inquiry (as Plaintiffs do not argue that the statute lacks an intelligible principle), Plaintiffs contend that—as a matter of constitutional avoidance—the Court should construe the statute narrowly to not authorize this particular exercise of HEROES Act discretion. This argument is specious; there is no constitutional problem to avoid, given the explicit limits on the Secretary's "discretion in deciding which statutes to 'waive or modify' and how to modify them in pursuit of statutory goals," as Plaintiffs recognize. *Id.* at 26. Plaintiffs' nondelegation argument collapses into a contention that the Secretary's *exercise* of this discretion exceeds statutory authorization—an argument that fails for the reasons explained *supra* Sec. II.A, and that does not implicate the nondelegation doctrine in any case. *See Touby v. United States*, 500 U.S. 160, 165 (1991) ("Congress does not violate the Constitution merely because it legislates in broad terms, leaving a certain degree of discretion to executive or judicial actors."); *Gundy*, 139 S. Ct. at 2123, 2129 ("The constitutional question is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion" and the Court "ha[s] over and over upheld even very broad delegations").[10]

---

[10] Plaintiffs' reliance on inapposite authorities does not support a different result. In *Industrial Union Department, AFL-CIO v. American Petroleum Institute*, 448 U.S. 607, 645-46 (1980) (plurality opinion), the agency had failed to make the requisite findings before invoking the applicable authority—a situation not present here, as explained *supra* Sec. II.A. The Seventh Circuit expressed skepticism in *United States v. Mitchell* as to whether Congress could constitutionally delegate to the U.S.

Plaintiffs next contend that the statutory scheme *itself* effectuates an unconstitutional delegation, "[w]hether or not an intelligible principle guides the waiver or modification," because the "waiver or modification of legislation … is unavoidably and quintessentially [a] legislative act," PI Br. at 27, under the principles articulated in *Clinton v. City of New York*, 524 U.S. 417 (1998), and *INS v. Chadha*, 462 U.S. 919 (1983). Plaintiffs confuse the nondelegation doctrine—which, as demonstrated above, turns on the question whether "Congress has supplied an intelligible principle," *Gundy*, 139 S. Ct. at 2123—with the bicameralism and presentment requirements of Article I, which were at issue in *Clinton* and *Chadha*. Plaintiffs' arguments fail regardless of the moniker applied, however, because delegations such as that relied on by the Secretary here are not only constitutional but commonplace.

*Clinton* held unconstitutional a scheme granting the President line-item veto power over individual provisions within duly enacted laws. 524 U.S. at 436-41. As the Court explained, although the President may veto bills presented by Congress to *prevent* them from becoming law, "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes" after enactment, which is what the Line-Item Veto Act authorized the President to accomplish "[i]n both legal and practical effect." *Id.* at 438. Similarly, *Chadha* held unconstitutional a provision of the Immigration and Nationality Act of 1952 ("INA") authorizing one House of Congress to overrule, via resolution, a decision to cancel a noncitizen's deportation. 462 U.S. at 923, 944-59. The INA delegated authority to the Attorney General "in his discretion" to "suspend deportation and adjust the status to that of an alien lawfully admitted for permanent residence" individuals who, "in the opinion of the Attorney General," satisfied certain criteria, although either legislative chamber retained

Sentencing Commission "a power as sensitive and central to our Anglo-American legal tradition as shaping a federal court's jurisdiction," a question not remotely analogous to the Secretary's invocation of the HEROES Act to cancel certain student loan debts. *See* 18 F.3d 1355, 1360 n.7 (7th Cir. 1994). And the court in *Tiger Lilly, LLC v. United States Department of Housing and Urban Development*, 5 F.4th 666, 672 (6th Cir. 2021) (citation omitted), merely mused in dicta that, as "'extra icing on a cake already frosted,' the government's interpretation of [the relevant statute] could raise a nondelegation problem." It sheds no light on the question presented here.

veto power over such decisions. *Id.* at 923, 924 (citing INA § 244(a)(1), 66 Stat. 214). The Court struck down the one-House veto procedure because altering the legal rights, duties, and obligations of a deportable alien "was essentially legislative in purpose and effect," and thus could be accomplished only through bicameralism and presentment. *Id.* at 952.

Neither *Clinton* nor *Chadha* casts any doubt on the HEROES Act's delegation of authority to the Secretary to waive or modify statutory provisions when specified criteria are met. Unlike in the case of the line-item veto, the Secretary here is not authorized to amend or repeal a duly enacted statute, nor can the Secretary render particular provisions null and without effect entirely. *See Clinton*, 524 U.S. at 441. Nor does the Secretary's authority remotely resemble an action by one House of Congress unilaterally to overrule an exercise of delegated authority, as in *Chadha*, 462 U.S. at 953-55. On the contrary, the Secretary's discretion to "waive or modify" certain statutory provisions when deemed necessary to accomplish the purposes set forth in the HEROES Act more closely resembles the delegation to the Attorney General to suspend deportation in *Chadha*—a delegation that the Court expressly approved and distinguished from the one-House veto procedure. *Id.* at 953 n.16 ("Executive action under legislatively delegated authority that might resemble 'legislative' action in some respects is not subject to the approval of both Houses of Congress and the President ... That kind of Executive action is always subject to check by the terms of the legislation that authorized it; and if that authority is exceeded it is open to judicial review as well as the power of Congress to modify or revoke the authority entirely."). Likewise here, the Secretary relied on express statutory authorization to provide targeted debt relief to borrowers affected by a national emergency. There is no authority supporting Plaintiffs' insistence that bicameralism and presentment are required to effectuate that decision.

Indeed, similar grants of authority to suspend, modify, or waive operation of statutory provisions are commonplace. For instance, courts have uniformly rejected constitutional challenges to a statutory delegation to the Secretary of Homeland Security of "authority to waive all legal

requirements" that the Secretary, in his "sole discretion, determines necessary to ensure expeditious construction of the barriers and roads" authorized at the U.S. Border. *See, e.g.*, *In re Border Infrastructure Env't Litig.*, 284 F. Supp. 3d 1092, 1130-41 (S.D. Cal. 2018) (rejecting argument that "the DHS Secretaries' waiver of more than thirty environmental laws" "amounts to an amendment or repeal of statutes" and thus is unconstitutional under *Clinton*); *Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 242-50 (D.D.C. 2019) (Brown Jackson, J.); *Cnty. of El Paso v. Chertoff*, 2008 WL 4372693, at *2-*7 (W.D. Tex. Aug. 29, 2008). Analogous delegations abound in the U.S. Code. *See, e.g.*, 20 U.S.C. § 1412(a)(18)(c) (Individuals with Disabilities Education Act granting the Secretary of Education authority to waive statutory requirements upon a determination that "granting a waiver would be equitable due to exceptional or uncontrollable circumstances such as a natural disaster or a precipitous and unforeseen decline in the financial resources of the State"); 7 U.S.C. § 2015(o) (granting Secretary of Agriculture authority to "waive the applicability" of statutory work requirements for nutrition-assistance beneficiaries in areas of high unemployment); 42 U.S.C. § 1315(a) (allowing Secretary of Health and Human Services to "waive compliance with" numerous statutory requirements "to the extent and for the period he finds necessary" to enable Medicaid demonstration projects he believes "likely to assist in promoting the objectives of" the statute); 21 U.S.C. § 360bbb-3 (allowing Food and Drug Administration to suspend provisions of the Public Health Service Act in a national emergency to authorize drugs and medical devices for emergency use); 47 U.S.C. § 160(a) (Federal Communications Commission "shall forbear from applying any regulation or any provision of this chapter" upon determination that enforcement of statutory provisions are not necessary for specified reasons); ARPA § 5003(b)(2)(B)(ii) (granting authority to "make adjustments as necessary" to statutory formula for disbursement of funds).

It is not unusual for Congress to grant the head of an agency discretion to waive or modify the operation of a federal statute in discrete circumstances; if Plaintiffs were correct that a "non-

delegation violation is inherent in the nature of a waiver or modification," PI Br. at 27, a great many statutory schemes would fall.  Plaintiffs' nondelegation challenge is unlikely to succeed on the merits.

## III.   Plaintiffs Have Failed To Establish Any Irreparable Harm.

"A sine qua non for [preliminary] relief is proof of irreparable harm if the injunction is denied." *Univ. of Notre Dame v. Sebelius*, 743 F.3d 547, 553 (7th Cir. 2014).  "It is not enough for a party seeking an injunction to show that injury is possible; instead, the plaintiff must 'demonstrate that irreparable injury is *likely* in the absence of an injunction.'"  *See Mike Avila Trustee v. Bronger Masonry, Inc.*, 123 F. Supp. 3d 1088, 1098 (S.D. Ind. 2015) (quoting *Winter*, 555 U.S. at 22)).

As discussed above, Plaintiffs cannot show that they will be harmed *at all* by the Department's policy.  Indeed, the Court has already rejected the very theory of irreparable injury that Plaintiffs reassert in their renewed motions.  Despite the Court's prior determination that Mr. Garrison "cannot be irreparably harmed as is required for preliminary relief," ECF No. 16, because he is "exempted . . . from receiving debt relief," *id.*, Plaintiffs continue to seek emergency injunctive relief on Mr. Garrison's behalf.  They are foreclosed from doing so, and the Court's prior ruling with respect to Mr. Garrison applies equally to Mr. Johnson.  The Department has similarly "exempted [Mr. Johnson] from receiving debt relief," and so he also "cannot be irreparably harmed" based on the theories asserted in the amended complaint.  *Id.*

The fact that neither named Plaintiff can demonstrate irreparable injury is a sufficient basis on which to deny Plaintiffs' emergency motions.  *See* ECF No. 16; *see also GEFT Outdoors, LLC*, 922 F.3d at 364 (where a plaintiff "fails to meet any of [the] threshold requirements" for preliminary relief," including irreparable harm, "the court 'must deny the injunction'" (citation omitted)); *see also McKenzie v. City of Chicago*, 118 F.3d 552, 555 (7th Cir. 1997) ("Because a class has not been certified, the only interests at stake are those of the named plaintiffs.").  Moreover, as discussed above, every borrower eligible for automatic loan cancellation will be given a meaningful opportunity to opt out of receiving

36

such relief, so Plaintiffs are wrong to contend that "potentially millions of members of the proposed class face irreparable harm from the automatic tax liability that Defendants' loan cancellation will impose." PI Br. at 30. Because any borrower can opt out of receiving debt relief, Plaintiffs' feared state tax liability is not "automatic," and the claimed injury is hypothetical, at best. *See, e.g.*, *Trustees of Teamsters Union No. 142 Pension Fund v. AJ & S Trucking, Inc.*, 992 F. Supp. 2d 870, 879-80 (N.D. Ind. 2014) (a plaintiff seeking preliminary relief must demonstrate that "irreparable injury is likely in the absence of an injunction" and cannot "speculat[e] about hypothetical future injuries").

Plaintiffs' passing claim that the Department's opt-out policy "is no substitute for an injunction," PI Br. at 31, gets things exactly backwards. A "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion" to show, as relevant here, irreparable harm in the absence of injunctive relief. *Mazurek*, 520 U.S. at 972 (citation omitted). As discussed above, the Department has already notified the public about the opt-out policy via its website, and it is personally emailing individuals regarding their eligibility for relief and their ability to opt out by November 14. Plaintiffs' desire for further "assurances that the entire class"—which has not been certified in this case and whose interests are not at issue—will receive the notice that the Department has already determined to provide them, *see* PI Br. at 31, cannot substitute for a showing of irreparable injury. Absent that showing, Plaintiffs are not entitled to extraordinary emergency relief.

## IV.    The Balance Of The Equities And Public Interest Weigh Against Injunctive Relief.

The balance of the equities and the public interest—factors that merge when the government is the opposing party—weigh strongly in the Government's favor. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Congress determined that it is in the public interest for the Secretary to act swiftly and forcefully to protect student loan borrowers in times of national emergencies, and Plaintiffs' non-injuries pale in comparison to these significant countervailing considerations.

37

The Secretary's decision to mitigate the adverse financial consequences to student loan borrowers as their loan payment obligations resume is in the public interest. It also reflects Congress's judgment that the Secretary should be able to react nimbly to protect student loan borrowers in times of national emergency. *See Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008) (concluding that "our consideration of the public interest is constrained in this case, for . . . responsible public officials . . . have already considered that interest"); *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008) ("There is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct that agency develop."). In the HEROES Act, Congress granted the Secretary broad discretion for certain delineated purposes: in times of emergency, he may "waive or modify" any federal student loan provision. 20 U.S.C. § 1098bb(a)(1). Congress also granted the Secretary the ability to move quickly: he may act without notice-and-comment rulemaking and enact broad relief. *Id.* § 1098bb(b), (d). Accordingly, the HEROES Act manifests Congress's determination that the public interest is served when the Secretary has discretion to protect student loan borrowers in times of national emergency.

Plaintiffs' desire to not receive one-time student loan debt relief—which has already been vindicated without the need for any judicial intervention—should not tip the scales against the millions of student loan borrowers who want to receive that relief and who, economic researchers and the Secretary conclude, will be at increased risk of default on their student loans when repayment restarts. Some of the most prominent consequences of such default include wage garnishment, credit report damage, and the withholding of federal benefits. FSA, *Student Loan Delinquency and Default*, https://perma.cc/9T5Y-7Q9L.[11] Accordingly, the Secretary concluded that aiding these borrowers is necessary, and Congress, through the HEROES Act, concluded that the public interest favors moving

---

[11] Plaintiffs do not attempt to argue that their financial interests outweigh those of other borrowers.

swiftly towards that goal. A preliminary injunction enjoining the Secretary from doing so harms the public interests identified by the Secretary and by Congress.

## V. Any Relief Should Be Appropriately Limited.

If the Court were to disagree with Defendants' argument, any relief ordered should be no broader than necessary to remedy any demonstrated irreparable harm by the named Plaintiffs. Contrary to Plaintiffs' suggestion, a nationwide injunction is not necessary here to "preserve the possibility of the APA's presumptive remedy of *vacatur.*" PI Br. at 34. Rather, "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018), and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted); *see also Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1094 (7th Cir. 1988) ("[T]he scope of injunctive relief must not exceed the extent of the plaintiff's protectible rights."). Plaintiffs' requested nationwide relief is inconsistent with this principle. *See, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring) (noting that nationwide injunctions "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch"); *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, J., concurring) ("nationwide injunctions" or "universal remedies" improperly "permit[] district courts to order the government to act or refrain from acting towards nonparties in the case"); *Georgia v. President*, 46 F.4th 1283, 1303 (11th Cir. 2022) (noting "nationwide injunctions push against the boundaries of judicial power, and very often impede the proper functioning of our federal court system").

Indeed, a nationwide injunction against the Department's "entire program" for providing student loan debt relief, PI Br. at 34, would be particularly inappropriate and overbroad here. Plaintiffs can opt out of the injury they claim and, even absent such an opt-out, Plaintiffs' asserted injury could

be completely remedied with a narrowly tailored order that excepts the named Plaintiffs from receiving debt relief.  Moreover, there would be somewhat broader orders—such as extending the period for opting out or enjoining the Department from automatically canceling any student loan debt—that still are not warranted here but at least would hew more closely to Plaintiffs' alleged injury than a nationwide injunction against the Department's entire program for providing student loan debt relief. Plaintiffs' requested injunction—which would prevent millions of federal student loan borrowers who do want student loan debt relief from receiving the relief to which the Secretary has deemed them entitled—is neither "necessary," nor "fair," nor "workable" in these circumstances, *North Carolina v. Covington*, 137 S. Ct. 1624, 1625 (2017) (citation omitted).

## CONCLUSION

For these reasons, the Court should deny both of Plaintiffs' emergency motions and dismiss this case.

Dated:  October 18, 2022                    Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ R. Charlie Merritt*
R. CHARLIE MERRITT
CODY T. KNAPP
KATE TALMOR
SAMUEL REBO
Trial Attorney (VA Bar # 89400)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
(202) 616-8098
robert.c.merritt@usdoj.gov

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 18, 2022 I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system, which will automatically serve a copy to all counsel of record.


*/s/ R. Charlie Merritt*
R. Charlie Merritt