**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| FRANK GARRISON, *et al.*,<br><br>        Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION, *et al.*,<br><br>        Defendants. | CIVIL ACTION NO.: 1:22-cv-1895 |

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION**

Plaintiffs Frank Garrison and Noel Johnson, on behalf all those similarly situated, reply to

Defendants Secretary of Education Miguel Cardona and the Department of Education and their

opposition to Plaintiffs' request for a preliminary injunction.[1] Defendants are poised to enact an

unprecedented and utterly unlawful loan cancellation policy with far-reaching consequences. This

Court must intervene and enjoin the policy so that it can review the merits of the agency's action.

Should the Court deny Plaintiffs' motion, Plaintiffs respectfully requests that the Court do

so prior to October 24, 2022, so that they may seek appellate relief before the loan program is

implemented. *Cf. Wheeler v. Talbot*, 770 F.3d 550, 552 (7th Cir. 2014) (holding that district courts

may deny preliminary injunctions without notice to adverse parties, including before adverse

---

[1] By an agreed scheduling order, ED filed its response to Plaintiffs' motion for a preliminary injunction on October 18, 2022. ED, however, also styled its response as a separate motion to dismiss, in violation of the local rules. *See* Local Rule 7-1(a) ("A motion must not be contained within a brief, response, or reply to a previously filed motion, unless ordered by the court."). Moreover, ED filed its response over the page limit, and simply asked for forgiveness with a contemporaneous motion to exceed the page limit. *See* ECF No. 29. Plaintiffs now have 24 hours to reply to the overlong response. *See* ECF No. 27. This document constitutes Plaintiffs' *reply* concerning the preliminary injunction motion. If appropriate, Plaintiffs will file a response to the putative motion to dismiss in due course in a separate filing.

parties are served, and that an order doing so "may be appealed immediately").

## I. PLAINTIFFS HAVE STANDING TO CHALLENGE THE CANCELLATION POLICY

ED's arguments concerning standing should be rejected. ED claims that both of the named plaintiffs and all members of the plaintiff class lack standing to sue because it has voluntarily ceased its challenged conduct and created an opt-out remedy in response to the original complaint. ECF No. 31 at 10. Simultaneously, ED insists that any discussion of mootness is irrelevant because the plaintiffs hadn't yet been injured when they filed suit because there would later be an opt-out. *See id*. But ED's whole premise is circular. The opt-out policy didn't exist until Mr. Garrison sued, and ED is simply trying to avoid judicial review by changing its policy in response. This Court should not reward these tactics.

### A. Plaintiff Garrison Had Standing When He Filed Suit

ED first attacks Mr. Garrison's standing to file suit in a curious sleight of hand. It says, "At the time Plaintiffs filed their amended complaint, they lacked an injury because the existence of an opt-out provision—whether or not Plaintiffs have exercised it or the Department has exercised it on behalf of Plaintiffs—means Plaintiffs, and anyone else similarly situated, are at no risk of receiving unwanted loan relief or incurring any resulting tax consequences." ECF No. 31 at 11-12. But it ignores the obvious fact that it only created the opt-out *in response* to the suit. *See id.*

ED essentially claims that by trying to moot Mr. Garrison's claim and avoid judicial review, it need not have to answer for its voluntary cessation, because it has defeated standing in the first instance. ED's argument entirely ignores the difference between standing and mootness. Its response is nothing but a circular attempt to avoid the well-established judicial doctrine of voluntary cessation by focusing only on the amended complaint instead of the original complaint.

It is the "longstanding rule that jurisdiction is to be assessed under the facts existing when

the complaint is filed." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 571 n. 4 (1992). "[S]tanding is to be determined as of the commencement of suit," and, indeed, if it did not otherwise exist, standing cannot be created "on the basis of the defendant's litigation conduct" after the initial filing. *Id.* at n.4, 5. In other words, "subject-matter jurisdiction 'depends on the state of things at the time of the action brought[.]'" *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473 (2007) (quoting *Mullan v. Torrance*, 9 Wheat. 537, 539 (1824)). "The state of things and the originally alleged state of things are not synonymous; [for instance] demonstration that the original allegations were false will defeat jurisdiction. So also will the *withdrawal* of those allegations, unless they are replaced by others that establish jurisdiction." *Id*. (emphasis added).

But mootness deals with what happens *after* an action is filed, and, of course, voluntary cessation applies as an exception to mootness where, as here, a defendant changes its conduct in order to defeat standing. *See W. Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2607 (2022). Indeed, in *W. Virginia* the Court decided a series of cases challenging agency action that had already been vacated by the agency and cast aside questions of mootness. *See id.*; Brief for Federal Respondents, *W. Virginia v. Env't Prot. Agency*, 2022 WL 216161 at *21-23 (Jan. 18, 2022). In deciding whether this exception applies, courts still look to the state of things when the complaint was *filed*, even if a plaintiff later amends its complaint to update the allegations concerning voluntary cessation. *See, e.g.*, *KG Urb. Enters., LLC v. Patrick*, 969 F. Supp. 2d 52, 58 (D. Mass. 2013) (voluntary cessation of challenged conduct, as alleged in *amended complaint*, did not render case moot).

Mr. Garrison's standing must be measured when he filed his original complaint, and ED's changed behavior towards *him* is a classic attempt to avoid judicial review through voluntary cessation. No opt-out policy existed "at the time of the action brought," which is the relevant time

3

for purposes of standing. *See Rockwell*, 549 U.S. at 473. And when Mr. Garrison amended his complaint to discuss the newly-added opt-out policy, he did not *withdraw* his original allegations; he simply noted that the policy did not cure the harms facing the new plaintiffs—Mr. Johnson and the remaining members of the class. *See* ECF No. 23 ¶¶ 61-101. Thus, ED's claim that *Mr. Garrison* lacks standing because of "the existence of an opt-out provision" is simply false. *See* ECF No. 31 at 10-12.[2]

**B. Plaintiff Johnson Had Standing When He Filed His Amended Complaint and Sought Class Certification**

ED fares no better with its challenge to Mr. Johnson's standing. Keeping with its theme, ED says it "can now represent" that it has considered "this lawsuit as [his] opt out," and has also mooted his claim. *See* ECF No. 31 at 11-12. But this again raises questions of mootness, not standing. And Mr. Johnson can raise a challenge on behalf of a class concerning the adequacy of the opt-out so long as his claim was live when he *filed* suit. *See, e.g.*, *Fischer v. Instant Checkmate LLC*, No. 19 C 4892, 2022 WL 971479, at *5 (N.D. Ill. Mar. 31, 2022) (named plaintiffs' "claims for injunctive relief [we]re not moot, and they retain[ed] a sufficient interest in the controversy to seek injunctive relief for the putative class members" even though the defendants responded to the suit by ceasing conduct against named plaintiffs). Indeed, the Supreme Court has held that for certain types of transitory issues, when "the claims of the named plaintiffs have since been rendered moot," "the termination of a class representative's claim does not moot the claims of the unnamed members of the class." *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 51–52 (1991) (citations omitted). Moreover, "That the class was not certified until after the named plaintiffs'

---

[2] As noted in his opening brief, ECF No. 25 at 17 n. 7, Mr. Garrison also seeks to serve as a class representative by relating back to his original complaint, which allows him to maintain his claim on behalf of the entire class. *See Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 76 (2013).

claims had become moot does not deprive us of jurisdiction." *Id*. Claims that are "so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires" are still appropriate for class determination. *See id*. (citations omitted). As discussed in Plaintiffs' motion, loan cancellation fits comfortably into this category as a one-time and uniquely transitory government action. *See* ECF No. 25 at 17.

### C. The Class Can Challenge the Inadequacy of the Opt-Out Policy

ED claims that because a class representative must have standing when he sues, because it mooted Mr. Garrison and Mr. Johnson's individual claims, then the class falls out as well. *See* ECF No. 31 at 12-13. But it also insists that mootness is "a red herring" because the opt-out arose in response to the original lawsuit. *See id*. at 12. As discussed, this argument is nonsensical with respect to Mr. Garrison, who had to sue to *create* the opt-out in the first place. *See Fischer,* 2022 WL 971479, at *5.

Mr. Johnson on the other hand is the appropriate class representative to challenge the *inadequacy* of the opt-out policy itself. *See id.* at 14 (rejecting argument "that injunctive relief is not appropriate for the Injunctive Relief Class as a whole because a putative class member's failure to opt out means that they are suffering a self-inflicted injury," since challenge was to adequacy of the opt-out policy). The class as a whole has an interest in protecting all of its members through Mr. Johnson. *See id.*

ED also suggests that the named plaintiffs must have standing until the class certification motion has "been decided," ECF No. 31 at 11, but ED is wrong. A class representative must generally have standing when he *files* suit, and when he *seeks* certification. But a defendant's effort to pick off the class representatives *after* those events is of no moment—"as long as the proposed

5

class representative has not lost on the merits before a class certification motion is filed, it is not barred from seeking class treatment." *Fulton Dental, LLC v. Bisco, Inc.*, 860 F.3d 541, 546 (7th Cir. 2017). That "the class was not certified until after the named plaintiffs' claims had become moot does not deprive [this Court] of jurisdiction." *See Cnty. of Riverside*, 500 U.S. at 52.

ED also unabashedly argues that the class plaintiffs not only filed too late but too soon to have standing—having "rushed to file their renewed emergency motions before the Department had fully implemented the opt out policy." *See* ECF No. 31 at 13. That is, since ED has now altered the opt-out policy after the amended complaint was filed, it insists that the injuries suffered by Mr. Johnson and members of the class at the time the amended complaint was filed, are "self-inflicted." *Id.* ED is trying to have it both ways.

At the time of the amended complaint Mr. Johnson and members of the class faced a certain irreparable injury through ED's "automatic" loan cancellation. *See* ECF No. 23 ¶¶ 126-40. They still do, even if ED has since tried to avoid reviewability by continuing to change the policy on the fly. And while Mr. Johnson can opt out, as a class representative it cannot be said that the *class* has a meaningful choice or that the opt-out is sufficient to remedy the harm. *See Fischer,* 2022 WL 971479, at *14. And it is not a "self-inflicted" injury when a class representative knows he can opt out, when the claims he asserts are based on the inadequacy of that remedy. *Id.* If it were otherwise then *no* plaintiff could ever challenge an opt-out mechanism, since he would always know of his choices. Although a "readily avoidable" harm may in some circumstances be self-inflicted, the pertinent inquiry "depends on the particular circumstances of the case," and a plaintiff must have a "true choice" with respect to a readily avoidable harm for it to qualify as a self-inflicted harm. *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 679 (7th Cir. 2012); *see also Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017)

(explaining that irreparable harm is not "self-inflicted" when available alternative choices fail to mitigate the claimed harm), *abrogation on other grounds recognized in Ill. Repub. Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). Moreover, whatever the opt-out policy looks like *today* is merely a matter of ED's good faith and informal practice.[3] As we've seen, that can change hourly. That is why an injunction was necessary when the amended complaint was filed and is still necessary now to protect the interests of the class members.

### D. Plaintiffs' Harm Is Hardly Speculative

ED also argues that Plaintiffs' state tax liability doesn't confer standing because it is "speculative," and "contingent on hypothetical future events." ECF No. 31 at 14. Tellingly, ED doesn't even mention the Supreme Court's cases on this issue, and unsurprisingly its arguments fail easily.

As Plaintiffs have argued, a potential harm that would only arise from a third party's actions still establishes standing if the "independent third party" "will likely react in predictable ways." *California v. Texas*, 141 S. Ct. 2104, 2113 (2021). This can even happen when a third party's predictable reactions would be "unlawful[]." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019). "Article III requires no more than *de facto* causality." *Id.* (cleaned up). And it is certainly *predictable* that states like Indiana will apply their own laws as written. *See* Ark. Code § 26-51-404(b)(1); Ind. Code § 6-3-1-3.5(a)(30); Minn. Stat. § 290.01(19)(f); Miss. Code § 27-7-15(4)(mm); N.C. Stat. § 105-153.5(c2)(22); Wis. Stat. § 70.01.

ED doesn't even mention these cases or address this argument; it just postulates that maybe the named plaintiffs won't really seek PSLF discharge. *See* ECF No. 31 at 14-15. But that's

---

[3] It is also difficult to take ED's arguments seriously concerning the opt-out provisions and notice to borrowers, as it appears to have been created only in response to this suit, and without any administrative formality.

irrelevant. What matters is that Indiana *will likely* follow the law as written, and tax ED's new cancellation policy. That's a concrete injury. *See Dep't of Com.*, 139 S. Ct. at 2566.[4]

ED also relies on the Seventh Circuit's decision in *Segovia v. United States*, 880 F.3d 384, 389 (7th Cir. 2018), saying that "a state's decision about what to tax is just as discretionary and optional as the state's decision, at issue in *Segovia*, about who should receive ballots." ECF No. 31 at 15. But it omits the key distinction between that case and this one. There the challenged federal law was what gave the state the option of sending ballots or not. *Segovia*, 880 F.3d at 388. The federal law therefore did not result in any discrete action—the challenged action was solely up to the states. Here, however, state law predated ED's policy, and necessarily results in tax liability to Plaintiffs. There was no intervening and independent discretionary decision by the state resulting in the challenged harm.[5]

## II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A. Defendants' Debt Cancellation Is Not Supported by Statute

Defendants expend numerous pages of their oversized brief explaining that "borrowers across the nation" fall within the "affected individuals" definition. *See* ECF No. 31 at 17. Plaintiffs, however, never disputed that designation, arguing instead that debt cancellation is not "necessary to ensure that . . . recipients of student financial assistance . . . who are affected individuals are not placed in a worse place financially in relation to that financial assistance because of their status as affected individuals." 20 U.S.C. § 1098bb(a)(2)(A). As Plaintiffs explained previously, this

---

[4] This Court should also recognize that the harm exists regardless of whether the individual borrower will eventually come out ahead from loan cancellation. A tax liability today is an injury even if some borrowers may eventually recover that loss in the future through reductions in their loans. Of course, for the named plaintiffs, neither will come out ahead as cancellation provides them *no* benefit.

[5] To the extent that *Segovia* might also suggest that the independent acts of third parties *can't* support standing, the Supreme Court has subsequently repudiated any such conclusion. *See Dep't of Com.*, 139 S.Ct. at 2566.

provision allows waivers only for affected individuals who would otherwise be (1) "in a worse position financially" (2) "in relation to their financial assistance" (3) "because of their status as affected individuals." *Id.*; ECF No. 25 at 19. And such waivers must be "necessary" to achieve this aim. 20 U.S.C. § 1098bb(a)(2)(A). Defendants fail to rebut these critical points.

### i. The Secretary Lacks Authority to Categorically Cancel Debt Based on Income Alone

First, Plaintiffs argued that the debt cancellation program would grant waivers to individuals who, rather than being "in a worse position financially," are actually better off since the beginning of the COVID-19 pandemic. ECF No. 25 at 19–20. Defendants respond that the definition of "affected individuals" does not require individuals to be worse off. ECF No. 31 at 22. This is irrelevant. Even when someone is an "affected individual," a waiver is only permitted for affected individuals who would otherwise be "placed in a worse place financially." 20 U.S.C. § 1098bb(a)(2)(A).

In response, Defendants only state that the Secretary is not required to act on a case-by-case basis and so may grant relief to an entire category of borrowers, even if that category includes many who do not qualify for a waiver under § 1098bb(a)(2)(A). ECF No. 31 at 22. That does not follow. "The Secretary is not required to exercise [his] authority under this section on a case-by-case basis." 20 U.S.C. § 1098bb(b)(3). This provision, however, does not expand who is eligible for waiver. *See id.* § 1098bb(a)(2)(A). As Plaintiffs explained, paragraph (b)(3) permits the Secretary to proceed on a categorical basis when every member of the category is clearly eligible for waiver. *See* ECF No. 25 at 21. Defendants have no response to this.

Defendants' position boils down to the idea that, if a single person is eligible for a waiver, the Secretary is authorized to issue waivers to every borrower because he is not required to evaluate borrowers on a case-by-case basis. Nothing in the statute allows such flagrant disregard of the

9

statutory requirements.[6]

Second, Plaintiffs argued that the debt cancellation program would grant waivers to individuals who would not otherwise be worse off "in relation to their financial assistance." ECF No. 25 at 20. Borrowers cannot be worse off in relation to their financial assistance, because repayments and interest accruals have been paused since the beginning of the pandemic. *Id.*[7] When repayments and interest accruals resume, borrowers will simply be in the same place as they were before the pandemic. They thus cannot be worse off in relation to their financial assistance.

Defendants have no response to this in the relevant section of their brief, see ECF No. 31 at 22, though elsewhere they argue that, historically a "long" repayment pause has been followed by a spike in defaults and delinquencies, see *id*. at 18–19. But this does not demonstrate that each of the 40 million borrowers will be in a worse place in relation to their student loans. Rather, it shows only that it is expected that some borrowers will default or enter delinquency.

Third, even ignoring the above, Plaintiffs argued that the debt cancellation program extends to far more individuals than those who would otherwise be worse off in relation to their student loans "because of their status as affected individuals." ECF No. 25 at 20–21. The government's response here is particularly weak.

One's status as an affected individual here turns on whether he resides or works in the United States, 20 U.S.C. § 1098ee(2)(C), or suffered "direct" economic hardship as a "direct" result of a national emergency, *id.* § 1098ee(2)(D). As Plaintiffs explained, there is no indication

---

[6] Defendants suggest that Plaintiffs lack standing to raise these arguments but fall short of actually so arguing. ECF No. 31 at 22 n.7. The APA directs the Court to "set aside" any action that is in excess of authority or contrary to the Constitution. 5 U.S.C. § 706. Setting aside the debt cancellation program would relieve the harm to Plaintiffs and the putative plaintiff class.

[7] Curiously, Defendants persistently describe these policies as ones Plaintiffs "endorse." ECF No. 31 at 24. Plaintiffs have pointed out these policies exist and have made no reference to their legality or wisdom. Regardless, Plaintiffs' endorsement or lack of endorsement has no bearing on the merits.

that anyone is worse off in relation to their student loans "because of their status as" a resident of, or an employee in, the United States. ECF No. 25 at 20–21. Defendants never suggest that a borrower would be better off with respect to their student loans if they lived or worked abroad.

The same problem occurs under the "direct economic hardship" definition of affected individual. Plaintiffs acknowledged that those who actually suffered "*direct* economic hardship as a *direct* result of . . . national emergency" may consequently be worse off with respect to their student loans. ECF No. 25 at 21. But Defendants' extremely general and broad income criteria do not limit eligibility to those who have suffered such direct hardship, rather than those who have suffered indirect hardship or indeed no hardship at all. Defendants' program therefore includes borrowers who would not otherwise be worse off.

Defendants argue elsewhere that the "direct economic hardship" prong of the "affected individuals" definition may include those who have not *actually* suffered direct economic hardship as a result of COVID-19, because the definition states that such hardship is "determined by the Secretary." 20 U.S.C. § 1098ee(2)(D); ECF No. 31 at 17. But that does not avoid the requirement under § 1098bb(a)(2)(A) that the waiver or modification be granted only to those who would be worse off in relation to their student loans "because of their status as affected individuals."

If a borrower is an "affected individual" not because of true direct economic hardship but only because the Secretary has so designated him, he cannot be worse off "because of [his] status as [an] affected individual[]"—that is, he is not worse off simply because the Secretary has designated him a direct-hardship case. And, of course, if the Court construes the direct-hardship definition as a meaningful limit, restricting relief to those who have actually suffered *direct* economic hardship as a *direct* result of COVID-19, then Defendants' income criteria is both wildly over-inclusive and under-inclusive, as discussed above.

### ii. Debt Cancellation Is Not "Necessary"

The statute requires that debt cancellation be "necessary" to ensure that affected individuals are not placed in a worse position in relation to their student loans because of their status as affected individuals. 20 U.S.C. § 1098bb(a)(2). As Plaintiffs pointed out, ECF No. 25 at 21–23, the "necessary" language in paragraph (a)(2) must be a meaningful limit on the Secretary, particularly when contrasted with the broader "as the Secretary deems necessary" language in paragraph (a)(1).

Defendants have no response to this, yet their arguments depend on the Secretary's determination of necessity being sufficient. Specifically, Defendants rely on the Secretary's "reasonably determined" "finding of necessity." ECF No. 31 at 24; *see also id*. at 18 ("the Secretary reasonably determined"), 20 ("the Secretary reasonably concluded"), 21 (same), 23 ("the Secretary acted reasonably"), 25 ("the Secretary acted reasonably").

But paragraph (a)(2) requires more than that the rock-bottom standard that an agency act reasonably or reasonably believe that action is necessary; by its plain terms, the waiver or modification must actually be "necessary" to prevent affected individuals from being worse off relative to their student loans because of their status as affected individuals. "What does it mean to be 'necessary'? The word implies more than something merely helpful or conducive. It suggests instead something indispensable, essential, something that cannot be done without." *Cinn. Hills Youth Crisis Ctr., Inc. v. Saint George*, 685 F.3d 917, 923 (10th Cir. 2012) (citation omitted).

As Plaintiffs explain, in the absence of debt cancellation, no borrower would be worse off relative to their student loans because of their status as affected individuals; so debt cancellation cannot be necessary to prevent that potentiality. Even if some borrowers are expected to default, Defendants might act to assist those borrowers or to prevent defaults, rather than wiping out debt for 40 million people, including those who are financially better off. Defendants' program grossly

12

exceeds the limits of the statute and so cannot be "indispensable" to preventing such harm.

The most damning, glaring example of Defendants' complete disregard for actual necessity is their plan to *refund* loan payments to borrowers who have *finished* paying off their loans, reimpose debt in the refunded amount—and then cancel that debt. Ex. 1, at 4 ("Refunds for Past Payments" heading); Adriana Morga, *How to get a student loan refund if you paid during the pandemic*, PBS (Sept. 20, 2022).[8] No rote repetitions of "the Secretary reasonably determines" can cover for the utter absence of necessity here, nor can there be any suggestion that *reimposing* student debt only to cancel it is required to ensure that once-borrowers will not be placed in a worse position with respect to their federal student loans when repayment restarts—they do not even currently have such loans.

### iii. The Debt Cancellation Program Presents a Major Question Not Answered by Statute

Plaintiffs argued that loan cancellation is an issue of extraordinary economic and social significance that was expected to engender—and has engendered—incredible controversy and political conflict. Moreover, the HEROES Act's waiver authority has never before been applied to such a broad class or to confer hundreds of billions of dollars in debt cancellations. As such, the Court should doubt that the issue of categorical loan cancellation was left to the Secretary of Education. ECF No. 25 at 23–25.

Defendants do not suggest that the waiver authority has been used in these ways before the pandemic. Rather, they suggest that the "history, purpose, or context of the statute" supports the debt cancellation program. ECF No. 31 at 26. Not so. In the HEROES Act's congressional findings provision, Congress's exclusive focus was assisting members of the United States military—the

---

[8]    https://www.pbs.org/newshour/education/how-to-get-a-student-loan-refund-if-you-paid-during-the-pandemic.

eponymous "heroes"—not 40 million individuals, largely civilians, who happened to take out federal loans. HEROES Act of 2003, Pub. L. 108-76, 117 Stat. 904 § 1(b); *see* ECF No. 25 at 24 (noting that the waiver authority has generally been invoked for the benefit of "deployed military service members or victims of certain natura disasters").

Defendants also suggest that the major questions doctrine is limited to regulations but cite no support for the proposition. The major questions doctrine has only ever centered on the presumption "that Congress intends to make major policy decisions itself," regardless of whether such decisions dispense benefits or limit liberty. *See West Virginia*, 142 S. Ct. at 2609 (simplified).

The scope of the COVID-19 pandemic also does not mean that the scope of the Secretary's power expands. Rather, the broader the scope of a problem, the more significant the economic or social problem—and the stronger the presumption that Congress retained the decision for itself.

Next, Defendants unconvincingly argue that the HEROES Act contemplates the Secretary's power to cancel debt, because a provision in the Higher Education Act permits the Secretary "[i]n the performance of, and with respect to, the functions, powers, and duties, vested in him by this part [20 U.S.C. Ch. 28, Subch. IV, Part B]" to "compromise, waive, or release any right, title, claim, lien or demand." 20 U.S.C. § 1082(a)(6). But § 1098bb does not appear in Part B to which § 1082 refers, so § 1082 cannot suggest that the Secretary may cancel debts when using his § 1098bb powers. Further, § 1082 simply lists powers the Secretary has available in performing *other* statutory duties in Part B. It does not permit the Secretary to release claims as he sees fit. For example, to the extent § 1082(a)(6) empowers the Secretary to forgive debts, it would serve the Secretary's obligation under § 1078-11 to create a loan forgiveness program for workers in certain sectors. Finally, if § 1082(a)(6) empowers the Secretary to forgive debts, the absence of a similar provision in Part G-1, which houses the HEROES Act provisions, demonstrates that such powers

14

were not contemplated thereunder.

Defendants ultimately point out that Congress in 2021 exempted student loan discharges from federal taxes from 2021 through 2025. ECF No. 31 at 30; 26 U.S.C. § 108(f)(5). But that does not demonstrate what Congress meant when it passed the HEROES Act in 2003, 18 years earlier and before any discussion of cancelling student debt *en masse* had arisen. Nor does the relevant provision suggest it anticipated debt cancelation under the HEROES Act, rather than by Congressional act. Indeed, the provision extends to loans made or guaranteed by states and schools, 26 U.S.C. § 108(f)(5)(A), and is not limited to higher education loans, *id.* § 108(f)(5)(B).

### iv. The Statute Should Be Read to Avoid Constitutional Questions

Plaintiffs argued that "[t]he HEROES Act contains important limits to Defendants' discretion" but if the HEROES Act's limitations are "construed so elastically as to permit debt cancellation for 40 million debtors solely based on their income," the limits will be so meaningless as to raise a serious question of the statute's validity under the non-delegation doctrine. ECF No. 25 at 25–26. Defendants strangely respond that Plaintiffs' agreement that the HEROES Act "contains important limits" satisfies the intelligible principle requirement, but appear to ignore the second half of the argument. ECF No. 31 at 31–32.

The upshot of Defendants' position on the HEROES Act is that, because the Secretary need not apply waivers on a case-by-case basis, he may apply waivers to those who are not eligible for waivers, so long as they belong to a category that includes *some* eligible persons. If that is so, nothing prevents the Secretary from waiving requirements for every borrower if even one borrower is eligible. It wouldn't matter that the waiver would be grossly overbroad and capture tens of millions of ineligible borrowers. That makes the HEROES Act's eligibility requirements irrelevant and would vest the Secretary with unguided discretion in violation of the non-delegation doctrine.

At minimum, it would "raise serious constitutional problems" under that doctrine. *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 173 (2001) (simplified).

Likewise, if refunding loan repayments, reimposing debt, and then cancelling that debt can be considered "necessary" to prevent borrowers from being worse off relative to their student loans—even though the loans had already been paid off—the limit of 20 U.S.C. § 1098bb(a)(2)(A) is illusory and vests the Secretary with vast power and no intelligible principle.

These are only some of the specific applications of Defendants' position that raise serious non-delegation problems. More broadly, if the statute's limits are so flexible that the Secretary can spend half a trillion dollars by dispensing tens of thousands of dollars to each of 40 million individuals simply because they all reside in the United States, the limits are meaningless and would raise significant non-delegation problems.

**B. The HEROES Act Unconstitutionally Delegates Lawmaking Authority to The Secretary**

Plaintiffs argued that the Secretary's authority to waive or modify statutory provisions under the HEROES Act was substantially the same as the line-item veto disapproved in *Clinton v. City of New York*, 524 U.S. 417 (1998), because the "legal and practical effect" of waiver-and-modification is to amend an Act of Congress, even if it does not formally "effect a repeal." ECF No. 25 at 26–30 (quoting *Clinton*, 524 U.S. at 438, 441).

Without engaging with Plaintiffs' arguments, Defendants simply assert that the Secretary's waivers and modifications do not "amend or repeal" any statute. ECF No. 31 at 34. They then point to the Attorney General's power to suspend deportations as analogous to the Secretary's HEROES Act waiver authority, though Defendants failed to explain how that is so. *See id.* Finally, Defendants point to "commonplace" law-suspension authorities created by Congress. *Id.*

As Plaintiffs have explained, whether an act has a "legislative character" is "confirmed by

the character of the Congressional action it supplants." *INS v. Chadha*, 462 U.S. 919, 953 (1983). Waiving and modifying a statute, then replacing it with "the terms and conditions to be applied in lieu of such statutory . . . provisions," clearly has the character of legislative amendment. 20 U.S.C. § 1098bb(b)(2). Defendants do not rebut this. And as *Clinton* confirms, the fact that waiver and modification does not formally "effect a repeal" is irrelevant; what matters is that relevant statutory provisions become "entirely inoperative as to appellees" or, here, as to the 40 million borrowers that are eligible for Defendants' program. *Clinton*, 524 U.S. at 441. Defendants also do not rebut the fact that the HEROES Act vests such discretion in the Secretary as to violate the requirement that "Congress itself ma[ke] the decision" as to whether, when, and how "to suspend or repeal . . . particular provisions . . . upon the occurrence of particular events." *Id*. at 445.

The Attorney General's power to withhold deportation for an individual in *Chadha* does not waive or modify statute. Rather, withholding some enforcement action in accordance with statute is traditional executive action.  *See Chadha*, 462 U.S. at 924; 8 U.S.C. § 1254 (1983) (providing that "the Attorney General may, in his discretion, suspend deportation and adjust the status" of aliens under certain circumstances). That is even more so in the immigration realm. *See Clinton*, 524 U.S. at 445 (acknowledging that the Executive "has a degree of discretion and freedom" "in the foreign affairs arena" (simplified)).

Finally, the possibility that non-delegation violations "abound in the U.S. Code," ECF No. 31 at 35, makes judicial enforcement of the separation of powers more, not less, urgent. *See Freytag v. Comm'r*, 501 U.S. 868, 878–79 (1991) (emphasizing "the strong interest of the federal judiciary in maintaining the constitutional plan of separation of powers").

## III. PLAINTIFFS FACE IRREPARABLE HARM WITHOUT AN INJUNCTION

ED's arguments concerning irreparable harm are just as circular as its efforts to defeat

standing. ED insists that "Plaintiffs cannot show that they will be harmed *at all* by the Department's policy" because it has successfully mooted the claims of the class representatives, and, because it successfully evaded review in the first instance, none of the ongoing harms for the class can be considered. *See* ECF No. 31 at 36. But this cynical ploy won't work here either.

ED's attempts to avoid judicial review from the precise harms suffered by the named plaintiffs is foreclosed by longstanding equitable practice. Pointing to its initial effort to avoid judicial review by selectively exempting Mr. Garrison from the challenged program, ED claims that Mr. Johnson and all members of the class are somehow "foreclosed from" even asserting that they might face irreparable harm. *See* ECF No. 31 at 36. ED says that it "has similarly 'exempted [Mr. Johnson] from receiving debt relief,' and so he also 'cannot be irreparably harmed' based on the theories asserted in the amended complaint." *Id.* (citing ECF No. 16). But this kind of gamesmanship is *why* the doctrine of voluntary cessation exists. *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 288 (2000). To date, ED's policy has evolved with breathtaking speed, and only in direct response to legal challenges. But without an injunction, there's nothing to stop ED from changing its policy yet again. This Court's equitable powers to preliminary enjoin challenged conduct certainly can take account of ED's behavior.

ED also claims that the harms facing the class can't be considered at all. ECF No. 31 at 37. It misleadingly cites *McKenzie v. City of Chicago*, 118 F.3d 552, 555 (7th Cir. 1997), for the proposition that "[b]ecause a class has not been certified, the only interests at stake are those of the named plaintiffs." *Id.* at 36. But *McKenzie* is no longer good law. The line ED relies on in *McKenzie* was in support of a larger conclusion that a district court "lacks authority to grant" injunctive "relief that benefits third parties," and until a class certification motion is *decided*, the putative class can't be considered. 118 F.3d at 555. Since that decision the Seventh Circuit has

explicitly rejected both notions. *See Finch v. Treto*, No. 22 C 1508, 2022 WL 2073572, at *10-11 (N.D. Ill. June 9, 2022) (granting injunctive relief to non-parties and noting that *McKenzie*'s broad language has been repudiated by the Seventh Circuit). Indeed, the Seventh Circuit has recently reaffirmed that when imposing an injunction or other equitable relief, "both historical and current practice lends support to a determination that the courts possess the authority to impose injunctions that extend beyond the parties before the court." *City of Chicago v. Barr*, 961 F.3d 882, 916 (7th Cir. 2020). Further, the scope of any equitable relief will depend, in part, on the harm faced by the public at large—not just the parties themselves. *See id.* Moreover, as the Seventh Circuit has also recently emphasized, a court looks to the harms facing a putative class when certification is *sought*—not only once it has been decided. *See Fulton Dental, LLC v. Bisco, Inc.*, 860 F.3d 541, 546 (7th Cir. 2017) ("as long as the proposed class representative has not lost on the merits before a class certification motion is filed, it is not barred from seeking class treatment"); *accord Cnty. of Riverside*, 500 U.S. at 52 (that "the class was not certified until after the named plaintiffs' claims had become moot does not deprive [this Court] of jurisdiction"). Thus, this Court *should* consider the harms facing members of the class and craft an appropriate remedy.

When it actually addresses the fact that it will still enact "automatic" cancellation, ED simply dismisses the harm as "hypothetical, at best." ECF No. 31 at 37. While an injunction is not needed for mere possibilities, it is telling that ED is dismissing its *own actions* as merely hypothetical. Indeed, the harm is that ED will enact what *it describes* as "automatic" cancellation for up to 8 million borrowers, hundreds of thousands of whom reside in Indiana, who will then face certain tax liability under well-established state law. *See* ECF No. 23 ¶¶ 126-40. ED has simply *responded* to the suit by also claiming to have an evolving opt-out policy. Since such a policy was not even a consideration prior to this lawsuit, ED's arguments should fail.

## IV. THE EQUITIES WARRANT BROAD RELIEF

ED finally requests it be allowed to enact the rest of its unprecedented, informal, and shockingly rapid policy apart from the two named plaintiffs, even if its actions are unlawful. *See* ECF No. 31 at 38-40. Claiming the need for the Secretary to "be able to react nimbly to protect student loan borrowers in times of national emergency," it argues that the only necessary response to an *unlawful* policy would be to exclude Mr. Garrison and Mr. Johnson. *Id.* But ED can't rely on its asserted need to justify its *unlawful* actions. When a rule exceeds an agency's authority, the court should not "weigh [] tradeoffs" between its intended effect and harms. *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 142 S. Ct. 661, 666 (2022). Since the entire policy is unlawful and cannot be unwound if it takes effect without an injunction, the Administrative Procedure Act's presumptive remedy of *vacatur* would be meaningless absent immediate relief. *See Camp v. Pitts*, 411 U.S. 138, 143 (1973) ("If [the agency's action] is not sustainable on the administrative record made, then the [agency's] decision must be vacated."). This Court should instead preserve the status quo until it can issue a final ruling on the merits of the challenged policy.

DATED: October 19, 2022.

Respectfully submitted,

*/s/ Caleb Kruckenberg*
**CALEB KRUCKENBERG\***

*/s/ Michael Poon*
**MICHAEL POON\***

*\*Pro Hac Vice*
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on this day, October 19, 2022, I served copies of the foregoing on counsel of record for all Defendants using the Court's CM/ECF system.


*/s/ Caleb Kruckenberg*
**CALEB KRUCKENBERG**